UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JIMMIE O. ROBINSON, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. |
| | : | |
| | : | CLASS ACTION |
| Plaintiff, | : | |
| | : | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | : | |
| | : | |
| DIANA CONTAINERSHIPS INC., SYMEON P. PALIOS, ANDREAS MICHALOPOULOS, ANASTASIOS MARGARONIS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD. and MARC BISTRICER, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | x | DEMAND FOR JURY TRIAL |

Plaintiff, individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Diana Containerships Inc. ("Diana" or the "Company"), Company press releases and conference call transcripts, as well as analyst reports and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.       This is a securities class action on behalf of all purchasers of Diana common stock between January 26, 2017 and October 3, 2017 (the "Class Period"), against Diana, certain of the Company's officers and/or directors and Kalani Investments Limited and certain of its affiliates seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.       The claims asserted herein arise under §§9, 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78i, 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.       Venue is proper in this District pursuant to §27 of the Exchange Act.  The acts and transactions giving rise to the violations of law complained of herein occurred in part in this District. Diana common stock is listed on the NASDAQ Global Select Market ("NASDAQ").  The false and misleading statements were disseminated in this District and the manipulative conduct was carried out in part in this District.

## PARTIES

4.      Plaintiff Jimmie O. Robinson purchased Diana common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

5.      Defendant Diana is a global provider of shipping transportation services through its ownership of containerships.  During the Class Period, shares of Diana common stock traded in an efficient market on the NASDAQ under the ticker symbol "DCIX."

6.      Defendant Symeon P. Palios ("Palios") is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Diana.

7.      Defendant Andreas Michalopoulos ("Michalopoulos") is the Chief Financial Officer ("CFO") of Diana.  Michalopoulos is the son-in-law of defendant Palios.

8.      Defendant Anastasios Margaronis ("Margaronis") is the President and a director of Diana.

9.      Defendants Palios, Michalopoulos and Margaronis are referred to herein as the "Diana Officer Defendants."

10.      Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of Diana common stock during the Class Period as described herein.

11.      Defendant Murchinson Ltd. ("Murchinson") is reportedly a Toronto-based hedge fund behind Kalani.

12.      Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and, therefore, controls Kalani.

13.      Defendants Kalani, Murchinson and Bistricer are referred to herein as the "Kalani Defendants."

- 2 -

14.     During the Class Period, the Diana Officer Defendants ran the Company as hands-on managers, overseeing Diana's operations and finances and made the materially false and misleading statements described herein.  The Diana Officer Defendants had intimate knowledge about core aspects of Diana's financial and business operations, including its major contracts and revenue sources.  They were also intimately involved in deciding which disclosures would be made by Diana and in the decision to conduct manipulative securities offerings and reverse stock splits.  Similarly, defendant Bistricer controlled and oversaw Kalani and Murchinson and was directly involved in the decision to conduct the manipulative securities offerings and reverse stock splits as detailed herein.

## BACKGROUND

15.     Defendant Diana is a global provider of shipping transportation services through its ownership of containerships.  It is headquartered in Greece, but its stock trades in New York on the NASDAQ under the ticker symbol "DCIX."  As of December 31, 2016, the Company's fleet consisted of 12 vessels.

16.     The Company is run by defendant Palios, the Company's CEO and Chairman, who also owns a number of private companies, either directly or indirectly, that provide services to Diana and engage in material commercial business dealings with the Company.

17.     Defendant Palios and members of his family derive significant financial benefits from these relationships.  For example, Palios owns and controls Diana Enterprises Inc. (together with its successor entity "DEI"),[1] which provides brokerage services to Diana in exchange for an annual fee. In 2016, Diana paid more than $2 million to DEI for brokerage services.  Palios also owns and controls Altair Travel Agency S.A. ("Altair"), which serves as the Company's travel agent.  The Company has paid Altair approximately $1 million per year from 2014 to 2016.

---

[1]     DEI was recently renamed Steamship Shipbroking Enterprises Inc.

18.     In addition, defendant Palios founded a company, Diana Shipping Services S.A. ("DSS"), that provided commercial, technical, accounting, administrative, financial reporting and other services to Diana in exchange for various fees.  In March 2013, the services provided by DSS to Diana were taken over by Unitized Ocean Transport Limited ("UOT"), a wholly-owned subsidiary of Diana.  UOT is headed by defendant Palios's daughter, Semiramis Paliou.  In exchange for its services, Diana pays UOT commissions equal to 2% of gross revenues, a fixed management fee of $15,000 per month for each vessel in operation, a fixed monthly fee of $7,500 for laid-up vessels, and a $10,000 per month administrative fee.  Because Diana characterizes the fees as "inter-company transactions," it eliminates them from the Company's financial statements.

19.     Diana also has a sister Company, Diana Shipping Inc. ("DSI"), that specializes in the transport of dry bulk goods.  Defendant Palios serves as the CEO and Chairman of DSI.  He was also that company's largest shareholder, with beneficial ownership of approximately 22.7% of DSI's common stock as of February 17, 2017.  As a result of his corporate positions, his influence over DSI's board of directors and his share ownership, Palios effectively controlled DSI's actions throughout the Class Period.  DSI, in turn, was the Company's largest shareholder around the start of the Class Period, owning approximately 25.7% of Diana's outstanding common stock as of February 16, 2017.  In addition, DSI also has control and influence over Diana because the CEO, President, CFO and Chief Operating Officer are the same for the two companies.  As a result of the ownership of Diana shares by DSI and defendant Palios, the Company's SEC filings stated that they "will continue to be able to exercise considerable influence over our decisions" "even though the amount held by each such shareholder represents less than 50% of our voting power."

20.     Defendant Palios received fees and payments from DSI similar to those he received from Diana through various businesses that he owns and controls that provide services to DSI.  For

example, DSS provides commercial, technical, administrative and management services to DSI in exchange for various fees and commissions.  In May 2013, Diana also took out a $50 million loan from DSI to fund vessel acquisitions and for general corporate purposes, which has been subsequently amended and for which Diana owes various interest fees and expenses to DSI.

## DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT

21.     As detailed herein, defendant Palios caused Diana to engage in a series of manipulative share issuance/sales transactions with Kalani and related entities.  The manipulative scheme (hereinafter referred to as the "Reverse Split Share Issuance Scheme") worked as follows: Through his control of Diana, Palios caused Diana to sell its common shares and securities convertible into common shares to Kalani at a significant discount to market price and to file registration statements so that Kalani could resell these shares into the market.  When Kalani's sales of Diana stock caused the price of Diana stock to decline, the Company would reverse split the stock, causing a certain number of outstanding shares to be merged into a single share, and thereby raise the price of Diana stock.  Then Diana would again sell securities to Kalani and the same pattern of transactions would ensue.  The following chart details the scope and magnitude of the Reverse Split Share Issuance Scheme:



22.     At the same time that Diana was engaging in these transactions, defendants failed to disclose the true purpose of the transactions and related stock issuances and reverses – to provide Diana with financing that benefited Palios and his related companies and family members and otherwise funnel money to Company insiders.  In other words, unbeknownst to investors, the transactions and related stock issuances and reversals – the Reverse Split Share Issuance Scheme – were nothing more than a manipulative financing scheme designed to further enrich Palios and Kalani and their associates.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
MARKET MANIPULATION DURING THE CLASS PERIOD**

23.     The Class Period begins on January 26, 2017.  On that date, the Company filed a shelf registration statement signed by defendants Palios, Margaronis and Michalopoulos on Form F-3 for the sale of $250 million worth of Company securities (together with its prospectus, the "Registration Statement").

24.     The Registration Statement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.  For example, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303"), requires that the Registration Statement "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at Diana's shareholders' expense.  Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), in the "'Risk factors'" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."  Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of their Diana shares in a matter of months.

25.     In addition, the Registration Statement misleadingly stated that the Company "*may*" issue additional shares, which would have the effect of diluting the interest of existing shareholders, but failed to disclose that the Registration Statement represented a critical step in defendants' scheme to issue more than *100 times* the number of shares outstanding as of the date of the Registration Statement, which, as defendants knew but failed to disclose, or were reckless in not

- 7 -

knowing, was *certain* to dilute the interest of existing shareholders and render their shares essentially worthless.

26.     On February 16, 2017, Diana filed its annual report for the year ended December 31, 2016 on Form 20-F, which was signed by defendant Michalopoulos (the "2016 20-F").  The Company posted a net loss of $8.5 million and time charter revenues of $5.4 million for the fourth quarter.  The 2016 20-F, like the Registration Statement, misleadingly provided a boilerplate risk disclosure that share dilution and share price depreciation "*may*" occur if new securities were issued by the Company, but omitted the specific fact that defendants had already embarked on the Reverse Split Share Issuance Scheme by filing the Registration Statement – a scheme that was certain to effectively wipe out existing shareholders and that was designed to enrich Palios and the Kalani Defendants and their associates.  This fact also needed to be disclosed under Item 303 for the reasons stated in ¶24.

27.     The Registration Statement was declared effective on March 7, 2017.  On March 21, 2017, the Company filed a prospectus supplement to the Registration Statement on Form 424B5 for the issuance and sale of 3,000 Series B-1 Convertible Preferred Shares (the "B-1 Shares"), common stock underlying the B-1 Shares, and warrants to purchase 6,500 B-1 Shares (the "B-1 Warrants"), as well as the B-1 Shares and common stock underlying such warrants (together with the Registration Statement, the "March 2017 Prospectus Supplement").  The Company was to receive $3 million for the sale of the B-1 Shares and an additional $6.5 million if the B-1 Warrants were exercised from Kalani.  The March 2017 Prospectus Supplement contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.  For example, Item 303 required the March 2017 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or

uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at Diana's shareholders' expense.  Moreover, the scheme needed to be disclosed under Item 503 in the "'Risk Factors'" section of the March 2017 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."  Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

28.     The March 2017 Prospectus Supplement described a securities purchase agreement between Kalani and Diana by which the Company would sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and which was designed to allow defendants to obscure the true magnitude of the potential dilution and risk of economic loss to the Company's outside shareholders (the "Securities Purchase Agreement").  Over the next several weeks, Kalani, in turn, sold its newly acquired shares to the investing public, thereby acting as an underwriter and distributor of the shares sold, and further diluting the interests of Diana common shareholders and causing a decline in the price of Diana common stock.  The following excerpt from the March 2017 Prospectus Supplement illustrates some aspects of the formula by which the number of shares issued to Kalani would be calculated under the Securities Purchase Agreement:

> The Series B-1 Convertible Preferred Shares are convertible at the option of the holder into common shares at a fixed conversion price of $7.00 per common share, subject to certain adjustments, and provided that on the date of conversion the trading volume of our common shares on The Nasdaq Global Select Market is not less than 15,000,000 shares. Alternatively, at the option of the holder, the Series B-1 Convertible Preferred Shares may be converted at a price equal to the higher of (i) 92.25% of the lowest volume-weighted average price of the common shares on any trading day during the five consecutive trading day period ending and including the

trading day immediately prior to the date of the applicable conversion date, and (ii) $0.50. . . .  The Series B-1 Preferred Warrants will be exercisable immediately at an exercise price of $1,000 per Series B-1 Convertible Preferred Share, and shall expire two years after the date of issuance of such warrants.

29.    The March 2017 Prospectus Supplement represented that the default "fixed" conversion price of the B-1 Shares was **$7 per share** – a more than 200% premium over the shares' then-current unadjusted trading price, which gave the false and misleading impression that the Company's common shares could appreciate to this price or had intrinsic value approximating this price.  While the "alternative" price of 92.25% of the lowest volume-weighted average over the preceding five trading days had a nominal floor of $0.50 per share, a review of the Securities Purchase Agreement and related documents governing the sale of the B-1 Shares to Kalani indicates that even this "floor" price was illusory.  As reflected in the statement of designations, preferences and rights of the B-1 Shares, "The Company **may at any time** any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, **reduce the then current Conversion Price to any amount** and for any period of time deemed appropriate by the Board of Directors."  The ability of the Company and Kalani to agree to sell the shares at an even lower price than the floor price was not discussed in the March 2017 Prospectus Supplement.  Instead, it simply mentioned other documents containing these important terms, which were buried among other convoluted aspects of the Securities Purchase Agreement, while the March 2017 Prospectus Supplement misleadingly touted the token $7 per share conversion price.  This was done in order to conceal the true effects of the Reverse Split Share Issuance Scheme, which, as defendants knew but failed to disclose, or were reckless in not knowing, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

30.    On March 22, 2017, Diana issued a press release regarding the Company's agreement with Kalani.  In addition to the sale of B-1 Shares and B-1 Warrants, the press release stated that

Diana planned to sell up to an additional $140.5 million worth of Series B-2 Preferred Warrants for total proceeds of up to $150 million.  The press release stated that "[t]he Company intends to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay indebtedness under one or more of our existing credit facilities, although the Company has no present agreements to do so."  The press release also stated that, "[a]part from the transaction described in this press release, the Company is not aware of any other news that would result in the increased trading activity of its stock or a fluctuation of its stock price."

31.     On March 24, 2017, the Company filed a registration statement on Form F-3, signed by defendants Palios, Margaronis and Michalopoulos, for the issuance and sale of $140.5 million worth of outstanding warrants (the "B-2 Warrants") to purchase Series B-2 Convertible Preferred Shares (the "B-2 Shares") (together with its prospectus, the "B-2 Registration Statement"), which warrants had been sold earlier to Kalani in a private placement.  The B-2 Registration Statement, like the Registration Statement, misleadingly provided a boilerplate risk disclosure that share dilution and share price depreciation "*may*" occur if new securities were issued by the Company, but omitted the specific fact that defendants had already embarked on the Reverse Split Share Issuance Scheme by filing the Registration Statement – a scheme that was certain to effectively wipe out existing shareholders and that was designed to enrich Palios and the Kalani Defendants and their associates. This fact also needed to be disclosed under Items 503 and 303 for the reasons stated in ¶24.

32.     In addition, as with the B-1 Shares and B-1 Warrants, pursuant to the Securities Purchase Agreement, the Company would use the B-2 Shares and B-2 Warrants to sell to Kalani its common shares at a substantial discount to market price pursuant to a convoluted, variable formula, the details of which left much to the undisclosed discretion of Kalani and Company insiders and which was designed to allow defendants to obscure the true magnitude of the potential dilution and

risk of economic loss to the Company's outside shareholders.  As with the March 2017 Prospectus Supplement, the B-2 Registration Statement misleadingly touted the $7 per share "fixed" conversion price and illusory floor price of $0.50 per share. As reflected in the statement of designations, preferences and rights of the B-2 Shares, however, "The Company *may at any time* any Preferred Shares remain outstanding, with the prior written consent of the Required Holders, *reduce the then current Conversion Price to any amount* and for any period of time deemed appropriate by the Board of Directors."  The ability of the Company and Kalani to agree to sell the shares at an even lower price than the floor price was not discussed in the B-2 Registration Statement.  Instead, it simply mentioned other documents containing these important terms, which were buried among other convoluted aspects of the Securities Purchase Agreement, while misleadingly touting the token $7 per share conversion price.  This was done in order to conceal the true effects of the Reverse Split Share Issuance Scheme, which, as defendants knew but failed to disclose, or were reckless in not knowing, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

33.    On March 29, 2017, the Company filed a notice of annual meeting of shareholders on Form 6-K, which was signed by defendant Margaronis.  The notice stated that the meeting would be held on May 10, 2017.  Among the proposals up for a shareholder vote was a proposal to approve an amendment to Diana's Articles of Incorporation to allow up to 1-for-1000 share reverse splits.  The Form 6-K stated that the "purpose of a reverse stock split is *to increase the per share trading value* of the Company's Common Shares," and further assured investors that Diana's "Board intends to effect one or more reverse stock splits *only if it* believes that a decrease in the number of Common Shares outstanding *is likely to improve the trading price for the Company's Common Shares*, and only if the implementation of a reverse stock split *is determined by the Board to be in the best*

- 12 -

*interests of the Company and its shareholders*."  These statements were materially false and misleading when made because, as defendants knew but failed to disclose, or were reckless in not knowing, the true purpose of the proposal was to further defendants' Reverse Spilt Share Issuance Scheme and enable Diana to funnel the proceeds of securities sales to Kalani to Company insiders. In addition, defendants knew, but failed to disclose, that they intended to repeatedly engage in stock issuances and related reverse splits, thereby manipulating the market for Diana stock.

34.     The B-2 Registration Statement was declared effective on May 11, 2017.  The next day, the Company filed a report on Form 6-K stating that its annual shareholder meeting originally scheduled for May 10, 2017 had been adjourned until May 19, 2017 "to allow additional time for the solicitation of proxies," including the reverse split proxy proposal described in ¶33.

35.     On May 22, 2017, Diana issued a press release announcing its financial results for the first quarter ended March 31, 2017.  The Company reported a net loss of $7.4 million and time charter revenues of $3.8 million for the quarter.

36.     That same day, the Company held an earnings conference call to discuss the results, which was attended by the Diana Officer Defendants.  During the call, these defendants made numerous representations that the container shipping business was in recovery and that Diana would be able to take advantage of emerging opportunities as a result of its Securities Purchase Agreement with Kalani.  For example, in reference to the Securities Purchase Agreement, defendant Palios stated: "Diana Containerships has taken action *to reinforce our financial strength* and to operate our business to navigate the current phase of the industry cycle."  Similarly, defendant Margaronis stated that "[t]he containership sector *finally showed signs of recovery* across the whole 5 ranges during the first quarter of this year."  He continued in pertinent part:

> *With the actions put in place by the senior management of Diana Containerships*, we are hopeful that the market upturn, *when it comes in earnest,*

*will find a company with a very robust balance sheet. This will make it possible to take advantage of opportunities which will undoubtedly present themselves* as they always do at the end of a prolonged downturn, similar to what this industry has gone through over the last few years.

37.     Defendants knew, or were reckless in not knowing, that the statements in ¶36 misrepresented and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading.  Specifically, defendants failed to disclose that the Reverse Split Share Issuance Scheme would effectively wipe out the Company's existing shareholders and critically impair the Company's ability to raise additional capital, operate as a going concern, or otherwise participate in any broader recovery in the containership market.

38.     On May 24, 2017, the Company filed a report on Form 6-K stating that the Company's proxy proposal to allow for additional reverse splits describe in ¶33 was again adjourned until June 29, 2017 to allow time to solicit proxy proposals.  Notably, this proposal required the affirmative vote of the holders of a majority of all outstanding shares eligible to attend and vote at the meeting.

39.     On June 6, 2017, the Company filed a report on Form 6-K stating that it had issued 100 shares of newly designated Series C Preferred Stock (the "Series C Shares") to Diana's sister company DSI, which was effectively controlled by defendant Palios and his affiliates, in exchange for a $3 million reduction of the principal amount of the Company's loan outstanding from DSI. Each Series C Share entitled the holder thereof to up to 250,000 votes.  Although DSI's voting power was capped at 49%, because of defendant Palios's independent ownership of Diana common stock, this financial maneuver effectively gave him voting control of the Company with minimal exposure to the downside risks facing the Company's outside common shareholders.  In sum, while Diana represented that it had adjourned the regularly scheduled shareholder meeting to provide time

- 14 -

to solicit additional proxies for the reverse split proposal, in truth it had simply done so in order to allow defendant Palios and his associates time to obtain voting control of the Company so as to ensure the outcome of the vote to approve the reverse split proxy proposal and further the Reverse Split Share Issuance Scheme.

40.     On June 29, 2017, defendant Palios and his affiliates used their newly obtained voting control of the Company to approve the reverse split shareholder proposal.  The next day, Diana announced that it would be conducting a 1-for-7 reverse split.

41.     By market close on June 30, 2017, the price of Diana common stock had declined to $0.38 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances.  This price was *86%* below the closing price of the Company's shares on January 26, 2017, when the Registration Statement was first filed.  During this same time frame, the number of Company shares outstanding had grown from approximately 9.4 million shares to 14.4 million shares, an increase of more than 53%.  As result of the 1-for-7 reverse split, the number of Diana's outstanding common shares declined from approximately 14.4 million shares to approximately 2.1 million shares, which began trading on a split-adjusted basis on July 5, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.28 per share on July 3, 2017 to a close of $1.42 per share on July 5, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares *actually declined over 27%* on an adjusted basis.

42.     On July 25, 2017, Diana issued a press release announcing its financial results for the second quarter ended June 30, 2017.  The Company reported net income of $36.5 million and time

charter revenues of $5.5 million for the quarter. The net income results included a one-time net gain of $42.2 million from a debt write-off related to the refinancing of a Diana loan.

43.     That same day, the Company held an earnings conference call to discuss the results, which was attended by the Diana Officer Defendants. During the call, these defendants again made numerous representations that the container shipping business was in recovery, which Diana would be able to take advantage of as a result of its recent financing activities. For example, defendant Palios stated: "Second quarter was highlighted by ***financing transactions that have significantly strengthened the company's balance sheet*** and has [sic] also provided additional flexibility ***to take advantage of an eventual improvement in market conditions*** in the containership segment." Similarly, defendant Margaronis stated in pertinent part:

> Putting the general tendency for recalibration alongside improving fundamentals and market conditions, ***the foundations for lasting improvement to the market environment are at last starting to appear***. As our Chairman and CEO mentioned earlier on, there has been a ***dramatic improvement in the company's balance sheet*** this quarter coming from the recent buyout of Royal Bank of Scotland loan facility. Senior management realizes that more capital will be needed over the next few quarters to repay short and medium-term debt and enable the company to take advantage of opportunities, which may from time to time arise in our sector.

44.     Defendants knew, or were reckless in not knowing, that the statements in ¶43 misrepresented and/or omitted material facts necessary to make the statements made, at the time made and in light of the circumstances under which they were made, not misleading. Specifically, defendants failed to disclose that the Reverse Split Share Issuance Scheme would effectively wipe out the Company's existing shareholders and critically impair the Company's ability to raise additional capital, operate as a going concern, or otherwise participate in any broader recovery of the containership market.

45.     By market close on July 26, 2017, the price of Diana common stock had declined to $0.19 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings

and share issuances.  This price was *87%* below the closing price of the Company's shares on July 5, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect.  During this same time frame, the number of Company shares outstanding had ballooned from approximately 2.1 million shares to 6.1 million shares, *an increase of more than 190%*.

46.     Also on July 26, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-6 reverse stock split of the Company's common shares.  This reduced the number of Diana's outstanding common shares from approximately 6.1 million shares to approximately 1 million shares, which began trading on a split-adjusted basis on July 27, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.19 per share on July 26, 2017 to a close of $0.83 per share on July 27, 2017.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares *actually declined over 27%* on an adjusted basis.

47.     On July 31, 2017, DSI filed a report on Form SC 13D/A disclosing that it had sold over 90% of its Diana common shares in open market transactions between July 7 and July 14, 2017, and, as a result of these sales and the Company's share issuances under the Securities Purchase Agreement, had retained only 0.8% of the Company's common shares as of the reporting date.  In effect, defendant Palios had used his control and influence over DSI to exit that Company's equity stake in Diana, even as he was overseeing the issuance of millions of new shares that were being sold into the market through Kalani.

48.     By market close on August 23, 2017, the price of Diana common stock had declined to $0.26 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances.  This price was *69%* below the closing price of the Company's shares on July 27, 2017, after the Company's previously announced 1-for-6 reverse stock split took effect.  During

this same time frame, the number of Company shares outstanding had ballooned from approximately 1 million shares to 5.3 million shares, ***an increase of approximately 430%***.

49.     Also on August 23, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-7 reverse stock split of the Company's common shares.  This reduced the number of Diana's outstanding common shares from approximately 5.3 million shares to approximately 0.8 million shares, which began trading on a split-adjusted basis on August 24, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.26 per share on August 23, 2017 to a close of $1.15 per share on August 24, 2017.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares ***actually declined 37%*** on an adjusted basis.

50.     On September 8, 2017, Diana filed a report on its financial condition and its results of operations for the six months ended June 30, 2017 on Form 6-K (the "1H17 6-K").  The 1H17 6-K revealed that, even as the Company's time charter revenues had plummeted from approximately $22.5 million in the first six months of fiscal 2016 to approximately $9.3 million in the first six months of fiscal 2017 (a decline of over 58%), defendant Palios had continued to reap considerable financial benefits from his ownership of related companies.  For example, Altair and DEI collectively received over $1 million in fees, expenses and bonuses paid by Diana during this time period.

51.     By market close on September 22, 2017, the price of Diana common stock had declined to $0.42 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances.  This price was ***63%*** below the closing price of the Company's shares on August 24, 2017, after the Company's previously announced 1-for-7 reverse stock split took

effect.  During this same time frame, the number of Company shares outstanding had ballooned from approximately 0.8 million shares to 3.2 million shares, ***an increase of approximately 300%***.

52.     Also on September 22, 2017, Diana filed a report on Form 6-K stating that it would effect a 1-for-3 reverse stock split of the Company's common shares.  This reduced the number of Diana's outstanding common shares from approximately 3.2 million shares to approximately 1.1 million shares, which began trading on a split-adjusted basis on September 25, 2017.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.42 per share on September 22, 2017 to a close of $0.74 per share on September 25, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares ***actually declined 41%*** on an adjusted basis.

53.     By October 3, 2017, as a result of defendants' ongoing dilutive and manipulative conduct, the price of Diana common stock had declined to close at $0.47 per share on an unadjusted basis.  At this share price, Diana had a market capitalization of ***less than one million dollars***, despite having raised millions of dollars from investors since January 2017.  This shocking erosion in shareholder value was the direct result of defendants' fraudulent scheme to manipulate the price of Diana common stock and to induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

54.     The following example illustrates the extent to which defendants' conduct has manipulated the market for Diana common shares:  If a shareholder held ***the entirety*** of the 9.4 million shares of Diana common stock outstanding as of January 26, 2017 – the date of the Registration Statement – this same shareholder, if he or she engaged in no other transactions, would own less than 10,700 shares following the September 25, 2017 1-for-3 reverse stock split, ***a decline***

*of more than 99%*.  Similarly, on an adjusted basis, Diana common stock traded at a price of more

than $2,500 per share during the early part of the Class Period – stock which was worth *only $0.47*

*per share* on an adjusted basis as of October 3, 2017 – meaning shareholders have been effectively

wiped out.

55.    While shareholders have lost millions of dollars, Palios and the Kalani Defendants

and their affiliates have been enriched.  Palios has earned hundreds of thousands of dollars through

self-dealing, as offering proceeds have been used by the Company to pay companies that he owns

and controls.  Similarly, Kalani has made hundreds of thousands of dollars in commissions, fees and

profits from its resale to the investing public of the discounted Diana common stock it purchased in

the securities offerings.

## NO SAFE HARBOR

56.    Diana's "Safe Harbor" warnings accompanying its reportedly forward-looking

statements ("FLS") issued during the Class Period were ineffective to shield those statements from

liability.  Because most of the false and misleading statements related to existing facts or conditions,

the Safe Harbor has no applicability.  To the extent that known trends should have been included in

the Company's financial reports prepared in accordance with Generally Accepted Accounting

Principles ("GAAP"), they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C.

§78u-5(b)(2)(A).

57.    The defendants are also liable for any false or misleading FLS pleaded because, at the

time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

authorized and/or approved by an executive officer and/or director of Diana who knew that the FLS

was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were

required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported

"Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

58.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and the actions intended to manipulate the market price of Diana common stock as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Diana, their control over, and/or receipt or modification of Diana's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Diana, participated in the fraudulent scheme alleged herein.

59.     Moreover, defendants' course of conduct and fraudulent scheme to manipulate the market price of Diana common stock enriched defendants and their associates.  Defendant Palios, through entities he owned and controlled, received hundreds of thousands of dollars from the provision of brokerage and travel services, financing, administration and other aspects of the Company's operations during the Class Period from the proceeds raised from investors in the securities offerings.  Similarly, Kalani earned hundreds of thousands dollars in commissions, underwriting fees and profits from the resale of Diana common stock to the investing public in connection with the securities offerings.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

60.     At all relevant times, the market for Diana common stock was an efficient market for the following reasons, among others:

(a)     Diana stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's Form 6-K filed on September 26, 2017, the Company had approximately 1.1 million shares outstanding as of September 25, 2017, demonstrating a very active and broad market for Diana common stock;

(c)     Diana was qualified to file a less comprehensive Form F-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized foreign issuers for whom less scrutiny is required;

(d)     as a regulated issuer, Diana filed periodic public reports with the SEC;

(e)     Diana regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(f)     unexpected material news about Diana was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

61.     As a result of the foregoing, the market for Diana common stock promptly digested current information regarding Diana from publicly available sources and reflected such information in Diana's stock price.  Under these circumstances, all purchasers of Diana common stock during the Class Period suffered similar injury through their purchase of Diana common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

62.     During the Class Period, as detailed herein, defendants made false and misleading statements and/or omitted material information concerning Diana's business and prospects and engaged in a scheme to deceive the market and manipulate the market price of Diana common stock. By artificially inflating and manipulating the price of Diana stock, defendants deceived plaintiff and the Class and caused them losses when the truth was revealed. When defendants' prior misrepresentations and fraudulent conduct became apparent to the market, this caused Diana's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of Diana stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

63.     This is a class action on behalf of all purchasers of Diana common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

64.     Common questions of law and fact predominate and include: (a) whether defendants violated the Exchange Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether defendants knew or recklessly disregarded that their statements were false; (d) whether defendants manipulated the market price of Diana common stock; (e) whether the price of Diana common stock was artificially inflated during the Class Period; and (f) the extent of and appropriate measure of damages.

65.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the

Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

66.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

67.     During the Class Period, defendants carried out a plan which was intended to, and did: (a) deceive the investing public, including plaintiff and the Class; and (b) artificially manipulate the price of Diana common stock.

68.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct that operated as a fraud and deceit upon the purchasers of Diana common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

69.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

70.     Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Diana common stock, were privy to and participated in the creation of the offering documents for the securities offerings, including the registration statements and prospectuses for the securities offerings and related purchase agreements, and were aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.  Further, Kalani's conduct itself as an underwriter was deceptive.

- 24 -

71.     Defendants had actual knowledge of the misrepresentations, omissions and deceptive conduct alleged herein, or acted with reckless disregard for the truth.  Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially manipulate the market price of Diana common stock.

72.     By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

73.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Diana common stock during the Class Period.

## COUNT II

### For Violation of §9 of the Exchange Act
### Against All Defendants

74.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

75.     Defendants violated §9 of the Exchange Act in that they conspired to engage and did engage in a scheme to manipulate the price of Diana common stock and induce the purchase of Diana common stock by others.

76.     Further, through their dissemination of false and misleading statements during the Class Period, defendants misled investors concerning the nature of their actions and its effect on Diana common stock.

77.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Diana common stock during the Class Period.

**COUNT III**

**For Violation of §20(a) of the Exchange Act**
**Against the Diana Officer Defendants and Defendants Bistricer and Murchinson**

78.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

79.     The Diana Officer Defendants had control over Diana and made the materially false and misleading statements and omissions on behalf of Diana within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their share ownership, executive and board positions and stock ownership, and their culpable participation, as alleged above, the Diana Officer Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including with regard to the content and dissemination of the various statements that plaintiff contends were false and misleading and the decision to effect the dilutive and manipulative stock offerings and reverse stock splits detailed herein.  The Diana Officer Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

80.     In particular, the Diana Officer Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.  Defendant Palios also held voting control of the Company through his ownership of Diana common stock and control over DSI, and thus had control over the Company and its actions.

81.     Bistricer and Murchinson had control over Kalani and therefore directly participated in the Reverse Split Share Issuance Scheme and in the manipulative and deceptive conduct within

the meaning of §20(a) of the Exchange Act as alleged herein.  Bistricer oversaw the day-to-day operations of Murchinson, an investment partnership reportedly behind Kalani, and through Murchinson, the day-to-day operations and investment decisions of Kalani.  Bistricer and Murchinson are therefore presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.  Bistricer and Murchinson conspired with the Diana Officer Defendants to perpetrate the Reverse Split Share Issuance Scheme, and through their culpable participation, as alleged above, had the power to influence and control and did, directly or indirectly, influence and control the decision making of Kalani, including the decision to effectuate the dilutive and manipulative stock offerings and reverse stock splits as detailed herein and had the ability to prevent the Reverse Split Share Issuance Scheme from occurring.

82.     By reason of such wrongful conduct, the Diana Officer Defendants and defendants Bistricer and Murchinson are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 23, 2017                     ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             SAMUEL H. RUDMAN


                                             /s/ Samuel H. Rudman
                                             SAMUEL H. RUDMAN

                                             58 South Service Road, Suite 200
                                             Melville, NY  11747
                                             Telephone:  631/367-7100
                                             631/367-1173 (fax)

                                             ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                             BRIAN E. COCHRAN
                                             655 West Broadway, Suite 1900
                                             San Diego, CA  92101
                                             Telephone:  619/231-1058
                                             619/231-7423 (fax)

                                             Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

JIMMIE O. ROBINSON ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6. The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of October, 2017.

JIMMIE O. ROBINSON

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Acquisitions**

| Date<br>Acquired | Type/Amount of<br>Securities Acquired | Price |
|---|---|---|
| 03/27/2017 | 12 | $1.40 |
| 03/31/2017 | 38 | $1.31 |
| 04/03/2017 | 10 | $1.27 |
| 04/05/2017 | 25 | $1.09 |
| 04/05/2017 | 40 | $1.10 |
| 04/11/2017 | 25 | $0.72 |
| 04/24/2017 | 35 | $0.58 |
| 04/26/2017 | 20 | $0.55 |
| 05/01/2017 | 15 | $0.44 |
| 05/03/2017 | 5 | $0.43 |
| 05/04/2017 | 50 | $0.47 |
| 05/09/2017 | 10 | $0.47 |
| 05/12/2017 | 140 | $0.47 |
| 05/25/2017 | 100 | $0.40 |
| 06/16/2017 | 200 | $0.38 |
| 06/16/2017 | 200 | $0.42 |
| 06/16/2017 | 100 | $0.43 |
| 06/21/2017 | 100 | $0.38 |
| 07/07/2017 | 255 | $0.98 |
| 07/07/2017 | 3 | $0.99 |
| 07/14/2017 | 100 | $0.52 |

**Sales**

| Date<br>Sold | Type/Amount of<br>Securities Sold | Price |
|---|---|---|
| 04/10/2017 | 125 | $0.77 |
| 07/26/2017 | 500 | $0.26 |