## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JIMMIE O. ROBINSON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> DIANA CONTAINERSHIPS INC., SYMEON P. PALIOS, ANDREAS MICHALOPOULOS, ANASTASIOS MARGARONIS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., and MARC BISTRICER, <br> Defendants. | **Case No. 17-cv-06160-SJF-SIL** <br><br><br> **JURY TRIAL DEMANDED** |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Burcin Ekser, Steven Gerber, and Gianfilippo Mogavero (collectively, "Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, and based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Diana Containerships, Inc. ("Diana" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased or otherwise acquired Diana common stock between June 9, 2016 and October 3, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and defendants named herein.

2.      This action arises from a fraudulent scheme by Defendants Diana, Symeon P. Palios ("Palios"), Andreas Michalopoulos, and Anastasios Margaronis (collectively, the "Diana Defendants"), and Kalani Investments Limited ("Kalani"), a hedge fund owned and controlled by Defendants Murchinson Ltd. ("Murchinson") and Marc Bistricer ("Bistricer"), to mislead investors and deliberately manipulate the price of Diana common stock for the benefit of Defendants, Company insiders, and related entities owned and controlled by Diana and Palios. As a result of this scheme, Diana investors' holdings of Diana's common stock have been rendered virtually worthless.

3.      Diana, through its subsidiaries, operates in the seaborne transportation industry in Greece.  It owns and operates containerships, as well as focuses on containership acquisition opportunities.  The Company also engages in chartering of its vessels.  Its common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "DCIX."

4.      On or about June 2016, Defendants devised a fraudulent financing scheme involving a series of manipulative, deceptive reverse stock splits and securities issuances, which were intended drive up Diana's common stock price and allow Defendants to profit when newly-converted common shares were dumped into the secondary market, while simultaneously

2

decimating the value of existing shareholders' shares. The first in a series of fraudulent reverse stock splits took effect on June 9, 2016. The one-for-eight reverse split of Diana's common shares reduced the number of shares outstanding from 74,890,570 to approximately 9,361,321 and temporarily increased Diana's share price.

5.       The June 9, 2016 reverse stock split paved the way for the next step in Defendants' scheme, when on January 26, 2017, Diana filed a Shelf Registration and Preliminary Prospectus on Form F-3 with the Securities and Exchange Commission ("SEC") (the "Registration Statement"), which authorized the Company to issue various securities up to an aggregate offering price of $250 million. The Registration Statement failed to disclose that the securities offerings pursuant to the Registration Statement were part of a manipulative financing scheme to benefit Defendants. The Registration Statement became effective on March 7, 2017.

6.       Approximately two weeks later, on March 21, 2018, Defendants furthered their fraud when Diana entered into an agreement to sell convertible preferred stock and warrants to Kalani, a secretive British Virgin Islands corporation owned by a Canadian hedge fund manager named Marc Bistricer and his firm, Murchinson Ltd. These securities were convertible into approximately 19 million shares of Diana common stock almost immediately at below-market prices and contained no lock-up period or other meaningful restriction on disposal of these shares. Although Kalani represented that it was acquiring Diana's securities *for its own account*, in actuality Defendants intended that Kalani essentially would act as underwriter and sell newly-acquired, below-market-price common shares at a profit in exchange for the influx of capital for the benefit of Palios and other related parties, which is exactly what Kalani proceeded to do.

7.       This type of financing scheme, known as "death spiral" convertible debt, enables an entity, like Kalani, to dump the discounted common shares it obtains upon conversion into the

market and potentially short the company's stock in anticipation of a declining stock price as these new discounted shares enter the market. Thus, while shareholders lose value, the entity dumping the discounted shares earns profits on both the direct sales of its discounted shares at prevailing higher market prices, as well as the short sales. The Kalani Defendants were intimately familiar with "death spiral" financing, as they orchestrated nearly identical arrangements with other Greek shipping companies, including DryShips Inc., at the same time Kalani's scheme with the Diana Defendants was underway. Kalani's conduct with respect to DryShips is now the subject of an investigation by the SEC.

8.     However, in order to perpetuate the fraudulent "death spiral" financing scheme, Defendants needed to periodically remove shares from the market in order to prop up Diana's share price so that Kalani could profitably unload newly-converted, discounted common stock in the market. Through a separate share issuance to Diana Shipping, Inc. ("DSI"), an entity controlled by Defendant Palios, the Diana Defendants allowed Defendant Palios to obtain voting control of Diana and approve a shareholder proposal allowing the Diana Board of Directors to authorize cumulative reverse stock splits up to a maximum of 1-for-1,000 common shares.

9.     The series of carefully-timed, dilutive reverse stock splits that followed reduced the number of shares outstanding and temporarily bumped up Diana's stock price so that Kalani could continue to flood the market with its newly-converted common shares. Specifically, in addition to the reverse stock split implemented on June 9, 2016, between July 5, 2017 and the close of the Class Period, Diana implemented four reverse stock splits: (1) a one-for-seven split on July 5, 2017, which reduced the number of shares outstanding from 14.4 million to 2.1 million; (2) a one-for-six reverse stock split on July 26, 2017, which reduced the number of shares outstanding from 6.1 million to 1 million; (3) a one-for-seven reverse stock split on

August 24, 2017, which reduced the number of shares outstanding from 5.3 million to .8 million; and (4) a one-for-three reverse stock split on September 25, 2017, which reduced the number of shares outstanding from 3.2 million to 1.1 million.

10. In total, on an adjusted basis, these reverse stock splits cumulatively reflect a 1-for-882 reverse split, which decimated more than 99% of shareholder value, rendering all of the shares purchased by investors during the Class Period worthless. In contrast, Diana and its insiders and related entities have collected upwards of $40 million as a result of this fraud, while Kalani has derived untold millions in trading profits.

11. As the result of Defendants' fraudulent scheme, Diana now teeters on the verge of bankruptcy. On March 16, 2018, Diana disclosed in its annual report that its auditors expressed substantial doubt as to the Company's ability to continue as a going concern.

12. In addition to the deliberate manipulation of Diana's stock price, Defendants also made materially false and misleading statements and omissions regarding the Company's business, operational, and compliance policies throughout the Class Period. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants were engaged in a fraudulent stock-manipulation and financing scheme to artificially inflate Diana's share price; (ii) Defendants engineered a securities offering that allowed Kalani to act as underwriter and acquire Diana common stock at discounted prices, which it could re-sell immediately on the secondary market for profit nearly without restriction; (iii) the Diana Defendants utilized reverse stock splits to manipulate the price of Diana stock so that Kalani could continue to profit by dumping its discounted common shares; (iv) the Diana Defendants diverted the proceeds from the Kalani financing to benefit Company insiders, Palios, and entities

he controls; and (v) as a result of the foregoing, Diana's public statements were materially false and misleading at all relevant times.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§9(a), 10(b), 20(a), and 20A of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. §1391(b).  Diana's stock trades on the NASDAQ, located within this Judicial District.

17.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff as previously set forth acquired Diana securities at artificially inflated prices during the Class Period and was damaged thereby.

19.     Defendant Diana is a corporation incorporated under the laws of the Republic of the Marshall Islands, which maintains its principal executive offices at Pendelis 18, Palaio Faliro, Athens, Greece 17564.  Diana's shares trade on the NASDAQ under the ticker symbol "DCIX."

6

20.     Defendant Symeon P. Palios ("Palios") is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Diana.

21.     Defendant Andreas Michalopoulos ("Michalopoulos") is the Chief Financial Officer ("CFO") of Diana.  Michalopoulos is the son-in-law of Defendant Palios.

22.     Defendant Anastasios Margaronis ("Margaronis") is the President and a director of Diana.

23.     Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands and served as the underwriter and distributer of multiple offerings of Diana common stock as described herein.

24.     Defendant Murchinson Ltd. ("Murchinson") is, upon information and belief, a Toronto-based hedge fund that controls Kalani.

25.     Defendant Marc Bistricer ("Bistricer") is reportedly the head of Murchinson and therefore, controls Kalani.  Upon information and belief, Bistricer resides at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219-2514.

26.     The Defendants referenced above in ¶¶20-22 are sometimes referred to herein collectively as the "Individual Defendants."  The Individual Defendants, together with Diana, are referred to collectively as the "Diana Defendants."

27.     Defendants Kalani, Murchinson, and Bistricer are sometimes referred to herein collectively as the "Kalani Defendants."

## SUBSTANTIVE ALLEGATIONS

### Diana Operates Through Interconnected Entities Controlled by Palios

28.     Diana is a holding company that provides shipping transportation services through its ownership of containerships, which are each held by separate wholly-owned subsidiaries.  At

7

the start of the Class Period, the Company's fleet consisted of 12 vessels. As of the filing of the Company's most recent annual report, Diana owned 10 vessels. Currently, Diana owns 5 vessels.

29.     The Company is run by Defendant Palios, the Company's CEO and Chairman, who is also the founder of Diana's predecessors and who owns approximately 4.5% of the Company's common stock. Defendant Palios also owns and/or controls several related companies, which provide various services to Diana and engage in material commercial business dealings with the Company.

30.     Defendant Palios and members of his family derive significant financial benefits from these relationships. For example, Palios owns and controls Diana Enterprises Inc. (together with its successor entity "DEI"),[1] which provides brokerage services to Diana in exchange for an annual fee plus bonuses. From 2014 through 2017, Diana paid approximately $1.5 million, $1.5 million, $2 million, and $2.1 million, respectively, to DEI for brokerage services.

31.     Palios also owns and controls Altair Travel Agency S.A. ("Altair"), which serves as the Company's travel agent. The Company has paid Altair approximately $1 million per year from 2014 to 2016.

32.     In addition, Defendant Palios founded Diana Shipping Services S.A. ("DSS"), which provides commercial, technical, accounting, administrative, financial reporting, and other services to Diana in exchange for various fees. In March 2013, the services provided by DSS to Diana were taken over by Unitized Ocean Transport Limited ("UOT"), a wholly-owned subsidiary of Diana. UOT is headed by Defendant Palios's daughter, Semiramis Paliou. In exchange for its services, Diana pays UOT commissions equal to 2% of gross revenues, a fixed

---

[1] DEI was recently renamed Steamship Shipbroking Enterprises, Inc.

management fee of $15,000 per month for each vessel in operation, a fixed monthly fee of $7,500 for laid-up vessels, and a $10,000 per month administrative fee.  Because Diana characterizes the fees as "intercompany transactions," it eliminates them from the Company's financial statements.

33.     Diana also has a sister Company, Diana Shipping Inc. ("DSI"), which specializes in the transport of dry bulk goods.  In May 2013, Diana and DSI entered into an unsecured loan agreement of up to $50 million, of which more than $40 million remains outstanding.  Defendant Palios serves as the CEO and Chairman of DSI, and other officers and directors, including the President, CFO, and Chief Operating Officer, are the same for both companies.  For most of the Class Period, until DSI sold its shares in the course of Defendants' fraud, DSI was Diana's largest shareholder, owning approximately 25.7% of the Company's common stock, which was mostly beneficially owned by Defendant Palios.  As of May 30, 2017, Diana issued DSI 100 shares of Series C Preferred Stock, with each share entitling the holder of up to 250,000 votes, to be voted alongside the common shareholders, in an amount not to exceed 49% of the total number of shares eligible to vote.

34.     As a result of his corporate positions, his influence over DSI's board of directors, and his beneficial ownership of DSI's shares, Palios effectively controlled DSI throughout the Class Period.  Given their overlapping executive officers, and as Diana's largest shareholder, a significant lender, and holder of up to 49% of the Company's voting rights (including voting rights held by Palios and affiliates), DSI, in turn, has control and influence over Diana.  Indeed, Diana has acknowledged in its SEC filings that DSI (and, consequently, Defendant Palios) "will continue to exercise considerable influence over our decisions."  Importantly, the foregoing

allowed Palios to maintain his control over Diana irrespective of the impact that Defendants' fraudulent scheme had on Diana common stock.

35.     Defendant Palios received fees and payments from DSI similar to those he received from Diana through various businesses that he owns and controls, which provide services to DSI.   For example, DSS provides commercial, technical, administrative, and management services to DSI in exchange for various fees and commissions.

**Defendants' Fraudulent "Death Spiral" Financing Scheme**

36.     Beginning in or about 2016, Diana began to experience financial difficulties that adversely impacted the Company's share price.   As the Company's financial condition deteriorated, the Diana Defendants determined to insulate themselves from the downturn, preserve their positions of control, and otherwise further their own interests at the expense of investors.  With the knowledge and participation of the Kalani Defendants, the Diana Defendants devised a deceptive financing scheme, whereby through a series of stock offerings and dilutive reverse stock splits, Defendants manipulated the market for Diana common stock and enabled Diana to funnel the proceeds from sales of securities to the Kalani Defendants and Defendant Palios and other Diana-related parties.

37.     As illustrated by the chart annexed hereto as Exhibit A, Defendants' fraudulent scheme commenced on June 6, 2016, when Diana announced that its Board of Directors determined to implement a one-for-eight reverse stock, effective June 9, 2016.  The purported rationale for the reverse stock split, as disclosed in the Company's Proxy Statement, filed January 15, 2016, was to improve liquidity and attract institutional investors and investment funds to invest in the Company's common stock.  In fact, by substantially reducing the number of shares outstanding, this reverse stock split set the stage for the sale of "death spiral"

convertible securities to Kalani, the proceeds from which were then funneled through Diana to Palios and entities he owns and controls.

38.     The reduction in shares increased the share price of Diana in several ways.  First, there was a mechanical increase in share price since eight shares were combined into one. Second, the reduction of shares created the potential for investment frenzies among individual investors chasing the spike in the stock.  *See*, *e.g.*, *Dryships: The Incredible Sinking Money Machine*, The Wall Street Journal, April 27, 2017 (discussing market analysts' view that "individual investors" had fueled the massive increase in the price of Dryships and Diana stock"); *How a CEO Made Millions From a Sinking Ship*, The Wall Street Journal, April 27, 2017 (discussing spike in "bullish mentions" of Dryships on investing sites following reverse stock splits).  Third, the reverse stock split triggered a potential "short squeeze," whereby traders who have shorted the stock and want to unwind their positions need to purchase shares of the company, of which fewer are now available, thereby fueling an increase in demand that pushes the stock higher, which in turn compels more short sellers to seek shares to unwind their positions.

39.     Notably, both DryShips and Diana experienced extraordinary price increases during the period of their reverse stock splits.  For example, DryShips stock spiked 1,500% over a few days in November 2016 while Diana stock spiked 300%.  *See Unmoored from Reality: Dryships Halted After 1,500% Post-Election Rally*, The Wall Street Journal, November 16, 2016.

40.     Thus, by fostering a situation where Diana stock could increase sharply in a manner not tied to the "reality" of the Company's actual performance or value, Defendants created the perfect opportunity to reap windfall profits through well-timed sales of massive numbers of new shares illicitly dumped into the market by Kalani.

41.     The Kalani Defendants had already honed their expertise with this type of fraudulent scheme, as they entered into similar financing schemes with other Greek shipping companies, including Dryships Inc. and its CEO, George Economou, and TOP Ships Inc. and its CEO, Evangelos J. Pistiolis, around the same time they conspired with the Diana Defendants. As discussed herein, DryShips is currently under investigation by the SEC.

42.     Part of the scheme included a package of "death spiral" convertibles.  In a "death spiral" situation, a financial backer is issued debt or other securities convertible into the company's common stock.  However, the convertible securities lack protective measures to prevent dilution and volatility of the company's stock price, such as lock-up periods, specific conversion prices, and certain trading and resale restrictions.  Consequently, the purchaser of the convertible security is able to immediately short shares and/or convert securities at a discounted price, and then flood the market with new shares, thereby deriving significant profits while driving down the company's share price.  In addition, as discussed herein, Defendants paired the death spiral securities with deliberate manipulation of Diana's the stock price through reverse stock splits.

43.     On January 26, 2017, the Diana Defendants filed a Shelf Registration and Preliminary Prospectus on Form F-3 with the SEC (the "Registration Statement"), which authorized the Company to issue various securities up to an aggregate offering price of $250 million.  At the time of the Registration Statement, Diana had approximately 9,361,321 shares of common stock outstanding, and its total market capitalization was only about $44 million.

44.     On March 21, 2017, less than two weeks after the Registration Statement became effective, the Diana Defendants announced that the Company entered into a Securities Purchase Agreement with Kalani for the sale of 3,000 newly-designated Series B-1 Convertible Preferred

Shares (the "B-1 Convertible Shares") and warrants to purchase 6,500 Series B-1 Convertible Preferred Shares (the "B-1 Warrants") at an aggregate price of $9.5 million. The B-1 Convertible Shares and B-1 Warrants were issued pursuant to the Registration Statement. The B-1 Convertible Shares and B-1 Warrants could be converted into approximately 19 million Diana common shares.

45. On March 24, 2017, the Company announced warrants to purchase 140,500 newly-designated Series B-2 Convertible Preferred Shares (the "B-2 Warrants"). In the aggregate, the securities issuances were expected to yield up to $150 million in gross proceeds.

46. However, Defendants did not disclose that the Company's deal with Kalani not only failed to protect shareholders from volatility and dilution, but that the transaction was intended to facilitate the manipulation of Diana's stock price and funnel proceeds from sales of securities to Defendants. First, the securities purchased by Kalani were convertible ***at any time***, subject only to minimal trading volume restrictions on the date of conversion. The conversion price, at Kalani's option, was either $7.00 per common share, or a per-share price equal to the higher of (i) 92.25% of the lowest daily volume weighted average price on any trading day during the 5 consecutive trading day period ending on and including the conversion date and (ii) US$0.50. Since Diana's common stock was then trading at approximately $2.49 per share, and the convertible shares and warrants were immediately convertible, Kalani was guaranteed to acquire Diana common stock at a discount. In conjunction with the impending series of reverse stock splits, Defendants were positioned to enrich themselves while destroying shareholder value.

47. Second, unbeknownst to investors, the supposed minimum "floor" price was illusory, as Diana was able to ***reduce the then current Conversion Price to any amount*** and for

13

any period of time deemed appropriate by the Board of Directors.   Thus, the disclosed conversion formula concealed the true effects of the "Death Spiral" Financing Scheme, which, as Defendants knew but failed to disclose, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

48.     Third, Defendants fraudulently concealed the fact that Kalani intended to dump the shares immediately into the market to exploit the price increases in the stock and misrepresented that Kalani was buying the shares for its own account and not for resale. Specifically, the Securities Purchase Agreement filed on March 21, 2017 includes the following representation with respect to Kalani:

> **(b)**        **No Public Sale or Distribution**.   Such Buyer (i) is acquiring its PIPE Warrants, (ii) upon exercise of its PIPE Warrants will acquire the PIPE Preferred Shares issuable upon exercise thereof, and (iii) upon exercise of its PIPE Preferred Shares will acquire the PIPE Conversion Shares issuable upon conversion thereof, *in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof in violation of applicable securities laws*, except pursuant to sales registered or exempted under the 1933 Act; provided, however, by making the representations herein, such Buyer does not agree, or make any representation or warranty, to hold any of the PIPE Securities for any minimum or other specific term and reserves the right to dispose of the PIPE Securities at any time in accordance with or pursuant to a registration statement or an exemption from registration under the 1933 Act.   Such Buyer does not presently have any agreement or understanding, directly or indirectly, with any Person to distribute any of the PIPE Securities in violation of applicable securities laws.

49.     Fourth, Defendants concealed their scheme by failing to disclose Kalani as an underwriter.   An underwriter is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."   15 U.S.C. § 77b (a)(11).   Kalani qualified as an underwriter, because it purchased securities with a view toward selling Diana stock into the secondary market.

50.     Indeed, the Company's Registration statement, as amended on February 23, 2017, acknowledged that "Any broker-dealers or other persons acting on our behalf that participate with us in the distribution of the securities may be deemed to be underwriters," but falsely represented that "we are not a party to any agreement, arrangement or understanding between any broker or dealer and us with respect to the offer or sale of the securities pursuant to this prospectus."  Again, this representation concealed the fact that Defendants had already embarked on a manipulative scheme that included Kalani's sale of millions of shares of Diana stock into the market.

51.     Diana further represented in its registration statement that "The names of any underwriters, agents or dealers will be included in a supplement to this prospectus."  However, despite this representation, the Company's March 21, 2017 prospectus falsely stated that "There is no underwriter or placement agent in connection with the sale of the offered securities."  Further, Kalani's name did not appear in the March 21, 2017 prospectus.

52.     Defendants' conduct also violated SEC regulations.  For example, Reg. S-K §229.508(a) (Item 508), which regulates the content of registration statements, states as follows:

> If the securities are to be offered through underwriters, name the principal underwriters, and state the respective amounts underwritten.  Identify each such underwriter having a material relationship with the registrant and state the nature of the relationship.  State briefly the nature of the obligation of the underwriter(s) to take the securities.

In violation of Item 508, Kalani was not named and its relationship as a co-conspirator in fraudulent stock scheme was not disclosed.

53.     Reg. S-K §229.508(c)(2) states:

> If the securities are to be offered through the selling efforts of brokers or dealers, describe the plan of distribution and the terms of any agreement, arrangement, or understanding entered into with broker(s) or dealer(s) prior to the effective date of the registration statement, including volume limitations on sales, parties to the

> agreement and the conditions under which the agreement may be terminated.  If known, identify the broker(s) or dealer(s) which will participate in the offering and state the amount to be offered through each.

Again, Defendants completely failed to comply with these requirements.

54.     Reg. S-K §229.508(l)(1) states:

> Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities.  Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price.  Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price.  Identify the exchange or other market on which these transactions may occur.  If true, disclose that the underwriter may discontinue these transactions at any time[.]

In violation of this provision, Defendants did not disclose that Kalani would convert its preferred shares into the market shortly after the issuance and severely impact the price of Diana stock.

55.     Further, although the Company's disclosures stated that the proceeds from the Kalani securities issuances would be used for "general corporate purposes and/or to repay indebtedness under one or more of its existing credit facilities," unbeknownst to investors, the true purpose of Defendants' "death spiral" financing, to enrich Kalani and Palios, remained concealed.

56.     Immediately following Kalani's share purchase, as Defendants intended, Kalani began converting its securities to common stock at the deeply discounted prices provided in the Securities Purchase Agreement and then dumping the shares into the secondary market. Between March 22, 2017 and July 3, 2017, the total number of Diana common shares outstanding jumped from approximately 9.4 million to 14.4 million.  Meanwhile, during the same period, the price of Diana's common stock declined precipitously from roughly $10,125.00 per share to $1,729.00 per share

**Defendant Palios Wrests Voting Control Of The Company To Perpetuate The Fraud**

57.     To prevent the "death spiral" financing scheme from running its course before Defendants could maximize their own returns, the Diana Defendants needed to artificially prop up the Company's stock price.  Because the market was saturated with Kalani's converted common shares, the most expedient way to manipulate Diana's stock price was to implement additional stock splits.

58.     On March 29, 2017, Diana filed its Notice of Annual Meeting of Shareholders, to be held on May 10, 2017.  The Proxy Statement for the Annual Meeting informed shareholders that the Board was soliciting shareholder approval of an amendment to the Company's Amended and Restated Articles of Incorporation, which would allow the Board to effect one or more reverse stock splits of the Company's common shares at a ratio of not less than one-for-two and not more than one-for-100 individually and of not more than one-for-1,000 in the aggregate without further shareholder action (the "Reverse Stock Split Proposal").  The Reverse Stock Split Proposal, which required the affirmative vote of the holders of a majority of all outstanding shares of common stock, would be valid for two years if approved.

59.     The Diana Defendants assured investors that "shareholder approval of an exchange ratio range (rather than an exact exchange ratio) provide[d] the Board with maximum flexibility to achieve the purposes of one or more reverse stock splits."  The Diana Defendants further assured investors that "[t]he Board intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders."  These statements were materially false and misleading because, in fact,

Defendants were utilizing the "death spiral" financing scheme to manipulate Diana's stock price and benefit themselves at the expense of investors.

60.     At the Annual Shareholder Meeting on May 10, 2017, it became apparent that Defendants lacked sufficient votes to obtain shareholder approval for the Reverse Stock Split Proposal.  To prevent interruption of their fraudulent scheme, the Diana Defendants announced on May 24, 2017 that they had adjourned the meeting to June 29, 2017 "to allow additional time for the solicitation of proxies."

61.     But the true purpose of the adjournment was to wrest voting control from shareholders in order to get the Reverse Stock Split Proposal approved.  On June 6, 2017, the Diana Defendants announced that on May 30, 2017, only one week after claiming to need time to solicit proxies, the Company instead had issued 100 shares of newly-designated Series C Preferred Stock to DSI, the Company's largest shareholder, in exchange for a reduction of $3 million in the principal amount of the Company's outstanding $45 million loan.  Shockingly, each share of the Series C Preferred Stock entitled the holder to up to 250,000 votes, to be cast alongside holders of common shares.  The fact that aggregate voting power of DSI and any affiliates was capped at 49% was meaningless; the only purpose for issuing the "super-voting" rights, Series C Preferred Stock, to DSI at this time was to give the Diana Defendants nearly all the votes needed to push through the Reverse Stock Split Proposal.  Moreover, since these preferred shares were not publicly traded, Defendants insulated themselves from the impending stock price volatility and dilution that would result from the planned, consecutive, reverse stock splits underpinning Defendants' fraudulent scheme.

62.     Belying any assertion that they were acting in shareholders' best interests, on June 30, 2017, the Diana Defendants announced that the Reverse Stock Split Proposal was approved

by a majority of shareholders at the adjourned Annual Shareholders Meeting, which was held on June 29, 2017.

**The "Death Spiral" Financing Scheme Eviscerates Shareholder Value**

63.     With shareholders' voting rights out of the way, Defendants were free to execute the remaining phases of their fraudulent scheme.  On June 30, 2017, the same day the Company announced approval of the Reverse Stock Split Proposal, the Diana Defendants issued a second press release, announcing Board approval of a one-for-seven reverse stock split.

64.     By market close on June 30, 2017, the price of Diana common stock had declined to $0.38 per share on an unadjusted basis as a direct result of Defendants' dilutive securities offerings and share issuances.  This price was 86% below the closing price of the Company's shares on January 26, 2017, when the Registration Statement was first filed.  During this same time frame, the number of Company shares outstanding had grown from approximately 9.4 million shares to 14.4 million shares, an increase of more than 53%.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.28 per share on July 3, 2017 to a close of $1.42 per share on July 5, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on an adjusted basis.

65.     The one-for-seven reverse split took effect on July 5, 2017.  According to the Company's public filings, the reverse stock split reduced the number of common shares outstanding from 14.4 million to 2.1 million.

66.     In the wake of the reverse stock split, Diana's common stock price increased from $.28 on July 3, 2017 to $1.42 on July 5, 2017.  As intended, Kalani could now convert its preferred shares at a strike price of $.50 and continue to dump its shares of common stock. Between July 5, 2017 and July 26, 2017, *a period of only three weeks*, the number of

19

outstanding shares of common stock rose from 2.1 million to 6.1 million, respectively.  During the same period, the price of Diana's common stock cratered again.

67.     By market close on July 26, 2017, the price of Diana common stock had declined from $1.42 on July 5, 2017 to $0.19 per share on an unadjusted basis as a direct result of the Defendants' dilutive securities offerings and share issuances.  This price was 87% below the closing price of the Company's shares on July 5, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect.  During this same time frame, the number of Company shares outstanding had ballooned from approximately 2.1 million shares to 6.1 million shares, an increase of more than 190%.

68.     With Diana's share price once again below $0.50, Defendants immediately determined to ignite another cycle of manipulative, fraudulent trading activity to fuel their fraud.  On July 26, 2017, the Diana Defendants announced another reverse stock split, which took effect on July 27, 2017.  The one-for-six reverse stock split reduced the number of shares outstanding from 6.1 million to 1 million.  The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.19 per share on July 26, 2017 to a close of $0.83 per share on July 27, 2017 – above the $0.50 per share strike price to enable Kalani to profit from converting and selling its shares.

69.     On July 31, 2017, DSI filed a report on Form SC 13D/A disclosing that it had sold over 90% of its Diana common shares in open market transactions between July 7 and July 14, 2017, and, as a result of these sales and the Company's share issuances under the Securities Purchase Agreement, had retained only 0.8% of the Company's common shares as of the reporting date.  The following table reflects Diana Shipping's sales in July 2017 of Diana common stock, par value $0.01 per share, in open-market transactions:

| Trade Date | Shares Sold | Average Price per Share | Total Shares Sale Amount | Commissions & Stamp Duties | Total Transaction Amount |
|---|---|---|---|---|---|
| 7/7/17 | 47,549 | $0.86300 | $41,034.79 | -$328.25 | $40,706.54 |
| 7/10/17 | 50,530 | $0.75891 | $38,347.64 | -$250.18 | $38,097.46 |
| 7/11/17 | 25,762 | $0.65324 | $16,828.71 | -$109.79 | $16,718.92 |
| 7/12/17 | 44,454 | $0.59636 | $26,510.42 | -$172.90 | $26,337.52 |
| 7/13/17 | 18,203 | $0.51397 | $9,355.75 | -$61.02 | $9,294.73 |
| 7/14/17 | 20,850 | $0.50605 | $10,551.09 | -$68.82 | $10,482.27 |
| **TOTALS** | **207,348** | **$0.6879** | **$142,628.39** | **-$990.96** | **$141,637.43** |

70. In effect, Defendant Palios used his control and influence over DSI to exit DSI's equity stake in Diana, even as he was overseeing the issuance of millions of new shares that were being sold into the market through Kalani. Significantly, because of the issuance of the "super-voting" rights, C-Series Preferred Shares, DSI – and consequently, Palios, still maintained *de facto* voting control over the Company.

71. The "death spiral" now at full throttle, Kalani converted and dumped over 4 million shares of common stock between July 27, 2017 and August 23, 2017, increasing the total number of shares outstanding for approximately 1 million to 5.3 million, respectively, an increase of approximately 430%. By market close on August 23, 2017, the price of Diana common stock had declined to $0.26 per share on an unadjusted basis from $0.83 on July 27, 2017 as a direct result of Defendants' dilutive securities offerings and share issuances. This price was 69% below the closing price of the Company's shares on July 27, 2017, after the Company's previously announced 1-for-6 reverse stock split took effect.

21

72.     The next reverse stock split was announced on August 23, 2017 and took effect on August 24, 2017.   The one-for-seven reverse stock split reduced the number of shares outstanding from 5.3 million to .8 million.   The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.26 per share on August 23, 2017 to a close of $1.15 per share on August 24, 2017.

73.     Kalani continued to illicitly dump into the market, increasing the total number of shares outstanding from .8 to 3.2 million, or roughly 300%, between August 24, 2017 and September 22, 2017.   During the same period, Diana's common share price declined from $1.15 per share to $0.42 per share.

74.     By market close on September 22, 2017, the price of Diana common stock had declined to $0.42 per share on an unadjusted basis as a direct result of defendants' dilutive securities offerings and share issuances.   This price was 63% below the closing price of the Company's shares on August 24, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect.

75.     On September 22, 2017, the Company announced that the Diana Defendants approved a one-for-three reverse stock split, effective September 25, 2017, which reduced the number of shares outstanding from 3.2 million to 1.1 million.   The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.42 per share on September 22, 2017 to a close of $0.74 per share on September 25, 2017, the next trading day.

76.     By the end of the Class Period, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of Diana common stock had declined to approximately $0.003264 on an unadjusted basis.   At this share price, Diana had a market capitalization of

$22,900.00, despite having raised millions of dollars from investors since January 2017. The decimation of shareholder value was entirely attributable to the fraudulent "death spiral" financing scheme, through which Defendants manipulated the price of Diana's common stock and induced purchases through the manipulative and deceptive stock offerings and reverse stock splits described herein.

77.    While shareholders lost millions of dollars, Defendants reaped the benefits of their fraudulent scheme. Palios has earned millions of dollars through self-dealing, as monies have been funneled to companies he owns and controls. For example, DEI was paid $2.1 million for providing broker services to Diana in 2017, and Altair Travel Agency was paid nearly $1 million that same year. Additionally, administrative expenses, paid in part to UOT, increased from $7.2 million in 2016 to $8.4 million in 2017. Similarly, Kalani made hundreds of thousands of dollars in commissions, fees, and profits from its resale of the discounted Diana common stock to unsuspecting investors in the secondary market.

78.    Defendants' fraudulent scheme remains ongoing. Repeating the now all-too-familiar cycle, Kalani continued to drive up the number of shares outstanding after the close of the Class Period. On October 26, 2017, DSI, exercising its "super-voting" rights, pushed through a shareholder proposal allowing the Company to implement one or more reverse stock splits, up to an aggregate of one-for-10,000. Within days, the Board approved yet another reverse stock split, effective on November 2, 2017, which reduced the number of shares outstanding from 5.3 million to approximately 757,194 shares.

79.    According to published reports, Kalani still holds more than enough convertible preferred shares and warrants to continue fueling Defendants' stock manipulation and toxic financing scheme.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

80.     The Class Period begins on June 9, 2016, when Diana filed with the SEC a Form 6-K, which Defendant Margaronis signed, regarding a 1-for-8 reverse stock split of the common shares, par value of $0.01 per share, which took effect.  Diana stated the following in the Articles of Amendment to the Amended and Restated Articles of Incorporation, in relevant part:

> Effective with the commencement of business on June 9, 2016, the Corporation shall effect a one-for-eight reverse stock split as to its issued shares of common stock, par value $0.01 per share.  No fractional shares shall be issued and, in lieu thereof, holders of the Corporation's common stock shall receive a cash payment.  As a result of the reverse stock split, the number of issued shares of the Corporation's common stock shall decrease from 74,890,570 to approximately 9,361,321, which may be further adjusted for the cancellation of fractional shares.  The reverse stock split shall not change the number of registered shares of common stock the Corporation is authorized to issue or the par value of the common stock.  The stated capital of the Corporation shall be reduced from $748,905.70 to $93,613.21, which may be further adjusted for the cancellation of fractional shares, and the amount of $655,292.49, which may be further adjusted for the cancellation of fractional shares, is allocated to surplus.

81.     The statements in ¶80 were materially false and misleading and/or failed to disclose that, *inter alia*: (i) Defendants were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits were being utilized to manipulate the price of Diana's common stock; (ii) the reduction in the number of outstanding shares enabled Diana to artificially prop up the Company's share price and issue additional securities; (iii) the true purpose of the reverse stock splits and related securities issuances and sales was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Defendants and Company insiders; and (iv) the reverse stock splits would enable Kalani to profit by converting securities at discounted prices, which it could immediately re-sell while Diana's share price was artificially inflated.

24

82.     On January 26, 2017, the Company filed with the SEC a Form F-3 shelf registration statement (together with its prospectus, the "Registration Statement"), which was signed by Defendants Palios, Margaronis, and Michalopoulos, amongst others, for the sale of $250 million worth of the Company's securities, including common shares (par value of $0.01 per share), preferred shares (par value $0.01 per share), preferred stock purchase rights, debt, warrants, purchase contracts, rights, and units.   In the Registration Statement, Diana disclosed: "We **_may_** issue additional common shares or other equity securities of equal or senior rank in the future in connection with, among other things, future vessel acquisitions or repayment of outstanding indebtedness, without shareholder approval, in a number of circumstances." (Emphasis added.)   The Registration Statement also included certain boilerplate disclosures about the potential impact of purportedly-hypothetical future share issuances, including that, *inter alia*, "our existing shareholders' proportionate ownership interest in us will decrease; … the relative voting strength of each previously outstanding common share **_may_** be diminished; and the market price of our common shares **_may_** decline." (Emphasis added.)

83.     The statements in ¶82 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the Registration Statement and anticipated securities sales and issuances to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible

securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

84.     The Registration Statement also contained other materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.  Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303"), requires that the Registration Statement "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at the Company's shareholders' expense.

85.     Moreover, the scheme needed to be disclosed under Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503") in the "'Risk factors'" section of the Registration Statement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."  Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of their Diana shares in a matter of months.

86.     The Registration Statement also violated Item 508, Reg. S-K §229.508(a), which regulates the content of registration statements, and states as follows:

> If the securities are to be offered through underwriters, name the principal underwriters, and state the respective amounts underwritten. Identify each such underwriter having a material relationship with the registrant and state the nature of the relationship.  State briefly the nature of the obligation of the underwriter(s) to take the securities.

In violation of Item 508, Kalani was not named, and its relationship as a co-conspirator in the fraudulent stock manipulation scheme was not disclosed.

87.     The Registration Statement also violated Item 508, Reg. S-K §229.508(c)(2), which states:

> If the securities are to be offered through the selling efforts of brokers or dealers, describe the plan of distribution and the terms of any agreement, arrangement, or understanding entered into with broker(s) or dealer(s) prior to the effective date of the registration statement, including volume limitations on sales, parties to the agreement and the conditions under which the agreement may be terminated. If known, identify the broker(s) or dealer(s) which will participate in the offering and state the amount to be offered through each.

Again, Defendants completely failed to comply with these requirements.

88.     The Registration Statement also violated Item 508, Reg. S-K §229.508(l), which states:

> Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities. Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price.  Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price. Identify the exchange or other market on which these transactions may occur.  If true, disclose that the underwriter may discontinue these transactions at any time.

In violation of this provision, Defendants did not disclose that Kalani would convert its preferred shares into the market shortly after the issuance and severely impact the price of Diana stock.

89.     On February 16, 2017, Diana filed with the SEC a Form 20-F for the fiscal year ended December 31, 2016, which Defendants Michalopoulos and Palios signed (the "2016 Annual Report").  Diana disclosed the following concerning common-stock prices and offerings:

> Because our decision to borrow additional amounts under credit facilities or issue securities in any future offering will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future indebtedness or offering of securities.

\*\*\*

We *may* offer and sell such securities from time to time and through one or more methods of distribution, subject to market conditions and our capital needs.  The market price of our common stock *could* decline from its current levels due to sales of a large number of shares in the market, ***including sales of shares by our large shareholders, our issuance of additional shares, or securities convertible into our common stock*** or the perception that these sales could occur.  These sales could also make it more difficult or impossible for us to sell equity securities in the future at a time and price that we deem appropriate to raise funds through future offerings of shares of our common stock.  The issuance of such additional shares of common stock would also result in the dilution of the ownership interests of our existing shareholders. (All emphasis added.)

90.     The statements in ¶89 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of anticipated securities issuances to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; and (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

91.     The 2016 Annual Report contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed therein under the rules and regulations regarding its preparation.   Specifically, Item 303 requires that the 2016 Annual Report

"[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at Diana's shareholders' expense.

92. Moreover, the scheme needed to be disclosed under Item 503, in the "'Risk factors'" section of the 2016 Annual Report, since the manipulative scheme was one of "the most significant factors that make the offering speculative or risky." Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of their Diana shares in a matter of months.

93. In his opening letter to the 2016 Annual Report, which was posted on the Company's website, Defendant Palios stated:

> *We have always believed that it is important to be good stewards of our shareholders' investment and of our financial resources.* In this regard, the Board of Directors determined, based on conditions in the container vessel market, to suspend the quarterly cash dividend on our common shares effective as of the quarter ended June 30, 2016. This decision reflected the Board's determination that it was in the best long-term interest of the Company and its shareholders to aggressively preserve liquidity to manage current market conditions and be in a position to benefit from an eventual sector recovery. In addition, the Company completed a reverse stock split of its common shares at a ratio of 1-for-8, effective as of the opening of trading on June 9, 2016. This action enabled the Company to regain compliance with the minimum bid price requirement for The Nasdaq Global Select Market.
>
> ***
>
> We … are committed to continuing our efforts to deliver shareholder value over the long-term. (All emphasis added.)

94. The statements in ¶93 were materially false and misleading and and/or failed to disclose material adverse information, which was required to be disclosed, because contrary to

the Diana Defendants' statements that, *inter alia*, "We have always believed that it is important to be good stewards of our shareholders' investment and of our financial resources," and "We … are committed to continuing our efforts to deliver shareholder value over the long-term," (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the reverse stock splits and anticipated securities sales and issuances to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.  Similarly, Defendants' statements concerning the reasons for suspending the quarterly dividend and for implementing a reverse stock split were false and misleading for the reasons stated above.

95.     On March 21, 2017, Diana filed with the SEC a Form 6-K ("3/21/17 6-K"), which Defendant Margaronis signed, announcing a securities purchase agreement executed on March 21, 2017 with an institutional investor for the sale of (i) 3,000 newly-designated Series B-1 Convertible Preferred Shares, par value $0.01 per share (the "B-1 Convertible Shares"); (ii) warrants to purchase 6,500 B-1 Convertible Shares (the "B-1 Warrants," and collectively, with the B-1 Convertible Shares, the "B-1 Securities");  and (iii) warrants to purchase 140,500 newly designated Series B-2 Convertible Preferred Shares, par value $0.01 per share (the "B-2 Securities").  The 3/21/17 6-K indicated that the B-1 Securities were being issued and sold

pursuant to the Registration Statement and that the B-2 Securities were being issued and sold in a private placement in reliance on Regulation S under the Securities Act of 1933.

96.     The Securities Purchase Agreement, dated March 21, 2017, between Diana and Kalani, was annexed as an exhibit to the 3/21/17 6-K.  The Securities Purchase Agreement was executed by Defendant Palios on behalf of Diana and by John Gordon, a Kalani director, on behalf of Kalani.

97.     The Securities Purchase Agreement stated the following regarding manipulation of the price of Diana's securities, without limitation:

> Neither the Company nor any of its Subsidiaries has, and, to the knowledge of the Company, no Person acting on their behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company or any of its Subsidiaries to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities (other than the Financial Advisor), (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company or any of its Subsidiaries or (iv) paid or agreed to pay any Person for research services with respect to any securities of the Company or any of its Subsidiaries.

98.     The statements in ¶97 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the Registration Statement and the Securities Purchase Agreement was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling

to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

99.     In the Securities Purchase Agreement, Diana represented:  "The Company is not aware of any Person (other than the Financial Advisor) that has been or will be paid (directly or indirectly) remuneration for solicitation of Buyers or potential purchasers in connection with the sale of the Securities."

100.     Diana further stated: "The Company does not have any agreement or understanding with any Buyer with respect to the transactions contemplated by the Transaction Documents other than as specified in the Transaction Documents."

101.     The statements in ¶¶99-100 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because, *inter alia*, (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; and (ii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, with a view toward converting those securities into Diana common stock at below-market prices and then selling that stock to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

102.     In the Securities Purchase Agreement, Diana disclosed the following regarding disclosure of material, non-public information, without limitation:

> The Company confirms that neither it nor any other Person acting on its behalf has provided any of the Buyers or their agents or counsel with any information that constitutes or could reasonably be expected to constitute material, nonpublic information concerning the Company or any of its Subsidiaries, other than the

existence of the transactions contemplated by this Agreement and the other Transaction Documents.  The Company understands and confirms that each of the Buyers will rely on the foregoing representations in effecting transactions in securities of the Company.  All disclosure provided to the Buyers regarding the Company and its Subsidiaries, their businesses and the transactions contemplated hereby, including the schedules to this Agreement, furnished by or on behalf of the Company or any of its Subsidiaries is true and correct and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.  All of the written information furnished after the date hereof by or on behalf of the Company or any of its Subsidiaries to each Buyer pursuant to or in connection with this Agreement and the other Transaction Documents, taken as a whole, will be true and correct in all material respects as of the date on which such information is so provided and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. Each press release issued by the Company or any of its Subsidiaries during the twelve (12) months preceding the date of this Agreement did not at the time of release contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading. No event or circumstance has occurred or information exists with respect to the Company or any of its Subsidiaries or its or their business, properties, liabilities, prospects, operations (including results thereof) or conditions (financial or otherwise), which, under applicable law, rule or regulation, requires public disclosure at or before the date hereof or announcement by the Company but which has not been so publicly disclosed.  All financial projections and forecasts that have been prepared by or on behalf of the Company or any of its Subsidiaries and made available to you have been prepared in good faith based upon reasonable assumptions and represented, at the time each such financial projection or forecast was delivered to each Buyer, the Company's best estimate of future financial performance (it being recognized that such financial projections or forecasts are not to be viewed as facts and that the actual results during the period or periods covered by any such financial projections or forecasts may differ from the projected or forecasted results). The Company acknowledges and agrees that no Buyer makes or has made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in Section 2.

103.    The statements in ¶102 were materially false and misleading and/or failed to

disclose material adverse information, which was required to be disclosed, because (i) at the time

of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated,

deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the Registration Statement and the Securities Purchase Agreement was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

104.    In the Securities Purchase Agreement, Kalani represented and warranted that, *inter alia*:

> No Public Sale or Distribution. Such Buyer (i) is acquiring its [B-2] Warrants, (ii) upon exercise of its [B-2] Warrants will acquire the [B-2] Preferred Shares issuable upon exercise thereof, and (iii) upon exercise of its [B-2] Preferred Shares will acquire the [B-2] Conversion Shares issuable upon conversion thereof, in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof in violation of applicable securities laws, except pursuant to sales registered or exempted under the 1933 Act[.]

105.    The statements in ¶104 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; and (ii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a

view toward immediately selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

106.    On March 21, 2017, Diana filed with the SEC a Form 424B5 prospectus supplement to the Registration Statement (the "B-1 Prospectus Supplement") for the issuance and sale of 3,000 Series B-1 Convertible Preferred Shares (the "B-1 Convertible Shares"), common stock underlying the B-1 Convertible Shares, and warrants to purchase 6,500 B-1 Shares (the "B-1 Warrants"), as well as the B-1 Shares and common stock underlying such warrants (collectively, the "B-1 Securities").  Diana was to receive $3 million for the sale of the B-1 Convertible Shares and an additional $6.5 million when the B-1 Warrants were exercised.

107.    The B-1 Prospectus Supplement disclosed that the B-1 Convertible Shares were convertible into Diana common shares as follows:

> The Series B-1 Convertible Preferred Shares are convertible at the option of the holder into common shares at a fixed conversion price of $7.00 per common share, subject to certain adjustments, and provided that on the date of conversion the trading volume of our common shares on The Nasdaq Global Select Market is not less than 15,000,000 shares. Alternatively, at the option of the holder, the Series B-1 Convertible Preferred Shares may be converted at a price equal to the higher of (i) 92.25% of the lowest volume-weighted average price of the common shares on any trading day during the five consecutive trading day period ending and including the trading day immediately prior to the date of the applicable conversion date, and (ii) $0.50.

108.    The statements in ¶107 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because the default "fixed" conversion price of ***$7.00 per share*** – a more than 200% premium over Diana's common shares' then-current unadjusted trading price – gave the false and misleading impression that Diana's common stock shares could appreciate to this price or had intrinsic value approximating this price.  Defendants' statements were also false and misleading, because even though the

"alternative" price of 92.25% of the lowest volume-weighted average over the preceding five trading days had a nominal floor of $0.50 per share, this "floor" price was illusory, because Diana could **reduce the then current Conversion Price to any amount at any time.**  Defendants' ability to agree to sell the shares at an even lower price than the floor price was not discussed in the B-1 Prospectus Supplement.  Defendants deliberately intended that the conversion formula would conceal the true effects of the "Death Spiral" Financing Scheme, which, as Defendants knew but failed to disclose, or were reckless in not knowing, was certain to effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

109.    Furthermore, the statements in ¶107 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the Registration Statement, the Securities Purchase Agreement, and the related prospectuses was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward immediately selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

110.    In the B-1 Prospectus Supplement, Diana stated:  "We intend to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay

indebtedness under one or more of its existing credit facilities, although we have no present agreements to do so."

111.    The statements in ¶110 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

112.    The B-1 Prospectus Supplement incorporated the Registration Statement and reiterated:

> We may sell or distribute the securities included in this prospectus through underwriters, through agents, to dealers, in private transactions, at market prices prevailing at the time of sale, at prices related to the prevailing market prices, or at negotiated prices.

> In addition, we may sell some or all of our securities included in this prospectus through:

> · a block trade in which a broker-dealer may resell a portion of the block, as principal, in order to facilitate the transaction;

> · purchases by a broker-dealer, as principal, and resale by the broker-dealer for its account;

37

· ordinary brokerage transactions and transactions in which a broker solicits purchasers; or

· trading plans entered into by us pursuant to Rule 10b5-1 under the Securities Exchange Act of 1934, as amended, or the Exchange Act, that are in place at the time of an offering pursuant to this prospectus and any applicable prospectus supplement hereto that provide for periodic sales of our securities on the basis of parameters described in such trading plans.

In addition, we may enter into options or other types of transactions that require us to deliver our securities to a broker-dealer, who will then resell or transfer the securities under this prospectus.  We may enter into hedging transactions with respect to our securities.  For example, we may:

· enter into transactions involving short sales of our common shares by broker-dealers;

· sell common shares short and deliver the shares to close out short positions;

· enter into option or other types of transactions that require us to deliver common shares to a broker-dealer, who will then resell or transfer the common shares under this prospectus; or

· loan or pledge our common shares to a broker-dealer, who may sell the loaned shares or, in the event of default, sell the pledged shares.

113.    The statements in ¶112 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because, as set forth in ¶¶41-56, without limitation, Defendants were required to disclose that Kalani was acting as underwriter and/or a broker or dealer in connection with its acquisition of Diana securities, which it intended to convert to discounted common shares with a view toward immediately selling to investors.  Moreover, these statements were false and misleading, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; and (ii) the true purpose of the Registration Statement, the Securities Purchase Agreement, and the

related prospectuses was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders.

114.    The B-1 Prospectus Supplement also contained materially false and misleading statements of fact and failed to disclose facts required to be disclosed thereunder with respect to the rules and regulations regarding its preparation.  Specifically, Item 303 required the B-1 Prospectus Supplement to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way."  Defendants failed to disclose their fraudulent scheme to manipulate the price of Diana common stock through a series of securities offerings and reverse stock splits in order to enrich themselves at the Company's shareholders' expense.  Moreover, the scheme needed to be disclosed under Item 503 in the "'Risk Factors'" section of the B-1 Prospectus Supplement because the manipulative scheme was one of "the most significant factors that make the offering speculative or risky."  Indeed, the scheme would ultimately result in shareholders losing more than 99% of the value of the shares purchased in the offering in a matter of months.

115.    Thereafter, Kalani, in turn, sold its newly-converted shares to the investing public, thereby acting as an underwriter and distributor of the shares sold, and further diluting the interests of Diana common shareholders and causing a decline in the price of the Company's common stock.

116.    On March 22, 2017, Diana Containerships filed with the SEC a Form 6-K in connection with the Securities Purchase Agreement.  In addition to the sale of B-1 Convertible Shares and B-1 Warrants, the press release annexed to the Form 6-K stated that Diana planned to

sell up to an additional $140.5 million worth of Series B-2 Preferred Warrants for total proceeds of up to $150 million.  The press release stated that "[t]he Company intends to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay indebtedness under one or more of our existing credit facilities, although the Company has no present agreements to do so."  The press release also stated that, "[a]part from the transaction described in this press release, the Company is not aware of any other news that would result in the increased trading activity of its stock or a fluctuation of its stock price."

117.    The statements in ¶116 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

118.    On March 24, 2017, Diana filed with the SEC a Form F-3 registration statement, which was signed by Defendants Palios, Margaronis, and Michalopoulos (the "B-2 Registration Statement"), for up to 140,500 Series B-2 Convertible Preferred Shares (the "B-2 Shares") issuable upon exercise of the outstanding Series B-2 Preferred Warrants (the "B-2 Warrants"),

which were sold to Kalani in a private placement pursuant to the Securities Purchase Agreement. The B-2 Registration Statement, like the B-1 Prospectus Supplement and the Registration Statement, provided boilerplate risk disclosures that share dilution and share-price depreciation "may" occur if new securities were issued by Diana, but omitted the specific fact that the "Death Spiral" Financing Scheme was already underway. This fact also needed to be disclosed under Items 503 and 303 for the reasons stated in ¶¶84-85, 114.

119.    Specifically, the B-2 Registration Statement stated: "We intend to use the proceeds from the exercise of the Series B-2 Preferred Warrants for general corporate purposes and/or to repay indebtedness under one or more of its existing credit facilities, although we have no present agreements to do so. It is possible that some or all of the Series B-2 Preferred Warrants may never be exercised prior to their expiration date."

120.    The statements in ¶¶119-20 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

121.    In addition, as with the B-1 Convertible Shares and B-1 Warrants, pursuant to the Securities Purchase Agreement, Kalani could immediately convert the B-2 Warrants into B-2 Convertible Shares, which were then convertible into Diana common shares.   The B-2 Registration Statement explained:

> The Series B-2 Convertible Preferred Shares are convertible at the option of the holder into common shares at a fixed conversion price of $7.00 per common share, subject to certain adjustments, and provided that on the date of conversion the trading volume of our common shares on The Nasdaq Global Select Market is not less than 15,000,000 shares. Alternatively, the Series B-2 Convertible Preferred Shares may be converted at a price equal to the higher of (i) 92.25% of the lowest volume-weighted average price of the common shares on any trading day during the five consecutive trading day period ending and including the trading day immediately prior to the date of the applicable conversion date, and (ii) $0.50.

122.    The statements in ¶121 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because the default "fixed" conversion price of **$7.00 per share** – a more than 200% premium over Diana's common shares' then-current unadjusted trading price – gave the false and misleading impression that Diana's common stock shares could appreciate to this price or had intrinsic value approximating this price.   Defendants' statements were also false and misleading, because even though the "alternative" price of 92.25% of the lowest volume-weighted average over the preceding five trading days had a nominal floor of $0.50 per share, this "floor" price was illusory, as Diana actually could **reduce the then current Conversion Price to any amount at any time.** Defendants' ability to agree to sell the shares at an even lower price than the floor price was not discussed in the B-2 Registration Statement.   Defendants deliberately intended that the conversion formula would conceal the true effects of the "Death Spiral" Financing Scheme, which, as Defendants knew but failed to disclose, or were reckless in not knowing, was certain to

42

effectively dilute the interest of existing shareholders and destroy more than 99% of shareholder value.

123.     Furthermore, the statements in ¶121 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the Registration Statement and the Securities Purchase Agreement was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

124.     The B-2 Registration Statement also violated Reg. S-K §229.508(a) (Item 508), which regulates the content of registration statements, states as follows:

> If the securities are to be offered through underwriters, name the principal underwriters, and state the respective amounts underwritten. Identify each such underwriter having a material relationship with the registrant and state the nature of the relationship. State briefly the nature of the obligation of the underwriter(s) to take the securities.

In violation of Item 508, Kalani was not named and its relationship as a co-conspirator in fraudulent stock scheme was not disclosed.

125.     The B-2 Registration Statement also violated Reg. S-K §229.508(c), which states:

> If the securities are to be offered through the selling efforts of brokers or dealers, describe the plan of distribution and the terms of any agreement, arrangement, or

understanding entered into with broker(s) or dealer(s) prior to the effective date of the registration statement, including volume limitations on sales, parties to the agreement and the conditions under which the agreement may be terminated. If known, identify the broker(s) or dealer(s) which will participate in the offering and state the amount to be offered through each.

Again, Defendants completely failed to comply with these requirements.

126.    The B-2 Registration Statement also violated Reg. S-K §229.508(l), which states:

Briefly describe any transaction that the underwriter intends to conduct during the offering that stabilizes, maintains, or otherwise affects the market price of the offered securities.  Include information on stabilizing transactions, syndicate short covering transactions, penalty bids, or any other transaction that affects the offered security's price.  Describe the nature of the transactions clearly and explain how the transactions affect the offered security's price.  Identify the exchange or other market on which these transactions may occur.  If true, disclose that the underwriter may discontinue these transactions at any time[.]

In violation of this provision, Defendants did not disclose that Kalani would convert its preferred shares into the market shortly after the issuance and severely impact the price of Diana stock.

127.    Thereafter, Kalani, in turn, sold its newly-acquired common shares to the investing public, thereby acting as an underwriter and distributor of the shares sold, and further diluting the interests of Diana common shareholders and causing a decline in the price of the Company's common stock.

128.    On March 29, 2017, Diana Containerships filed with the SEC a Form 6-K regarding the Notice of the Annual Meeting of Shareholders, which was signed by Defendant Margaronis.  The notice stated that the meeting would be held on May 10, 2017.  Among other things, the Notice advised that shareholders would be asked to vote on a proposal to approve an amendment to Diana's Articles of Incorporation to allow up to 1-for-1000 share reverse splits in the aggregate.  The Form 6-K stated that the "purpose of a reverse stock split is to increase the per share trading value of the Company's Common Shares" and further assured investors that Diana's "Board intends to effect one or more reverse stock splits only if it believes that a

44

decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders."

129.    These statements were materially false and misleading when made because, as Defendants knew but failed to disclose, or were reckless in not knowing, the true purpose of the proposal was to further Defendants' "Death Spiral" Financing Scheme and enable Diana to funnel the proceeds of securities sales and issuances to Kalani and to Company insiders.  In addition, Defendants knew, but failed to disclose, that they intended to utilize repeated, deliberately-timed, dilutive reverse stock splits to prop up the price of Diana's common stock to facilitate Defendants' dumping of additional shares, thereby destroying shareholder value for the benefit of Defendants.

130.    On May 12, 2017, Diana Containerships filed with the SEC a Form 6-K, which Defendant Margaronis signed, stating that its annual shareholder meeting originally scheduled for May 10, 2017 had been adjourned until May 19, 2017 "to allow additional time for the solicitation of proxies[.]"  Diana disclosed the following concerning reverse stock splits, without limitation:

> 3. To approve one or more amendments to the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued common stock, each at a ratio of not less than one-for-two and not more than one-for-100 and in the aggregate at a ratio of not more than one-for-1,000, ***with the exact ratio to be set at a whole number within this range to be determined by the Company's board of directors in its discretion***, and to authorize the Company's board of directors to implement any such reverse stock split at any time prior to the date of the Company's 2019 Annual Meeting of Shareholders by filing an amendment to the Company's Amended and Restated Articles of Incorporation ("Proposal Three")[.]  (Emphasis added.)

131.    The statements in ¶130 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time

of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; and (ii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.  Furthermore, Defendants knew but failed to disclose that the shareholder meeting was being adjourned, because approval of this "reverse stock split" shareholder proposal was critical to perpetuating their fraudulent "death spiral" financing scheme, and the Diana Defendants planned to wrest voting control from shareholders to prevent the "reverse stock split" shareholder proposal from being rejected.

132.    On May 22, 2017, Diana held its first quarter 2017 earnings call ("Q1 2017 Call"), in which Defendants Margaronis, Michalopoulos, and Palios participated.  During the call, the Diana Defendants made numerous representations that the container shipping business was in recovery and that Diana would be able to take advantage of emerging opportunities as a result of its Securities Purchase Agreement with Kalani.  For example, Defendant Palios stated the following, in relevant part:  "As the container shipping industry continues to face challenging market conditions, we took action during the recent quarter to strengthen the company's financial position while operating our business in a prudent and a responsible manner."

133.    The statements in ¶132 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common

shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

134.    During the Q1 2017 Call, in reference to the Securities Purchase Agreement, Defendant Palios stated the following, in relevant part: "Diana Containerships has taken action to reinforce our financial strength and to operate our business to navigate the current phase of the industry cycle."

135.    The statements in ¶134 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following

carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

136.    On May 24, 2017, the Company filed a report on Form 6-K, which Defendant Margaronis signed, stating that the Company's proxy proposal to allow for additional reverse splits was again adjourned until May 30, 2017 "to allow additional time for the solicitation of proxies."  Notably, this proposal required the affirmative vote of the holders of a majority of all outstanding shares eligible to attend and vote at the meeting.  Diana disclosed the following, without limitation:

> Shareholders of the Company will consider and vote upon the following at the Adjourned Annual Meeting:
>
> 1. To approve one or more amendments to the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued common stock, each at a ratio of not less than one-for-two and not more than one-for-100 and in the aggregate at a ratio of not more than one-for-1,000, *with the exact ratio to be set at a whole number within this range to be determined by the Company's board of directors in its discretion*, and to authorize the Company's board of directors to implement any such reverse stock split at any time prior to the date of the Company's 2019 Annual Meeting of Shareholders by filing an amendment to the Company's Amended and Restated Articles of Incorporation ("Proposal Three")[.]  (Emphasis added.)

137.    The statements in ¶136 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; and (ii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which could be converted to Diana common stock at below-market prices and then sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder

value for the benefit of Defendants.  Furthermore, Defendants knew but failed to disclose that the shareholder meeting was being adjourned again, because approval of this "reverse stock split" shareholder proposal was critical to perpetuating their fraudulent "death spiral" financing scheme, and the Diana Defendants planned to wrest voting control from shareholders to prevent the "reverse stock split" shareholder proposal from being rejected.

138.    On June 6, 2017, Diana filed with the SEC a Form 6-K, which Defendant Margaronis signed, stating that the Company issued all 100 shares of newly designated Series C Preferred Stock (the "Series C Preferred Shares") to Diana's sister company DSI, which was effectively controlled by Defendant Palios and his affiliates, in exchange for a $3 million reduction of the principal amount of the Diana's loan outstanding from DSI.  Each Series C Share entitled the holder thereof to up to 250,000 votes, which would be voted alongside the common shares.  Although DSI's voting power was capped at 49%, because of Defendant Palios' independent ownership of Diana common stock, this financial maneuver effectively gave him voting control of the Company with minimal exposure to the downside risks facing the Company's outside common shareholders.  In sum, while Diana represented that it had adjourned the regularly scheduled shareholder meeting to provide time to solicit additional proxies for the reverse split proposal, in truth it had simply done so in order to allow Defendant Palios and his associates time to obtain voting control of the Company, so as to ensure the outcome of the vote to approve the reverse-split proxy proposal and further the Death Spiral Financing Scheme.

139.    Indeed, on June 6, 2017, Diana filed with the SEC a Form 6-K ("6/6/17 6-K"), which Defendant Margaronis signed.  Attached to this was Exhibit ("Ex.") 99.1, the Notice of Annual Meeting of Shareholders and Proxy Statement of the Company, which was mailed to

shareholders of the Company on or around June 5, 2017, which Defendant Palios signed.  In the

6/6/17 6-K, Ex. 99.1, Diana disclosed that at the Annual Meeting of Shareholder to be held on

June 29, 2017, holders of share of the Company's common stock and Series C Preferred Shares

would consider and vote on the following proposal, amongst others:

> To approve one or more amendments to the Company's Amended and Restated
> Articles of Incorporation to effect one or more reverse stock splits of the
> Company's issued common stock, each at a ratio of not less than one-for-two and
> not more than one-for-100 and in the aggregate at a ratio of not more than one-
> for-1,000, ***with the exact ratio to be set at a whole number within this range to
> be determined by the Company's board of directors in its discretion***, and to
> authorize the Company's board of directors to implement any such reverse stock
> split at any time prior to the date of the Company's 2019 Annual Meeting of
> Shareholders by filing an amendment to the Company's Amended and Restated
> Articles of Incorporation ("Proposal Three")[.] (Emphasis added.).

140.    The statements in ¶139 were materially false and misleading and/or failed to

disclose material adverse information, which was required to be disclosed, because (i) at the time

of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated,

deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common

shares were being utilized to manipulate the price of Diana's common stock; and (ii) Defendants

already knew and intended that the Kalani Defendants would be issued warrants and convertible

securities, which could be converted to Diana common stock at below-market prices and then

sold to investors following carefully-timed reverse stock splits, thereby destroying shareholder

value for the benefit of Defendants.  Furthermore, Defendants knew but failed to disclose that the

shareholder meeting had been adjourned until after the "super-voting" Series C Preferred Shares

were issued to DSI so that approval of the "reverse stock split" shareholder proposal – and

consequently, perpetuation of Defendants' fraudulent scheme – was virtually guaranteed.

141.    In the 6/6/17 6-K, Ex. 99.1, Diana disclosed the following about the proposal

concerning the reverse stock splits, without limitation:

The Board has approved and is hereby soliciting shareholder approval of one or more amendments to Section D of the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued Common Shares at a ratio of not less than one-for-two and not more than one-for-100 individually and of not more than one-for-1,000 in the aggregate (each, an "Amendment").  A vote FOR Proposal Three will constitute approval of one or more Amendments providing for the combination of any number of the Company's issued Common Shares between and including two and 100 into one Common Share and will grant the Board the authority to select which of the approved exchange ratios within that range will be implemented.  *If the shareholders approve this proposal, the Board will have the authority, but not the obligation, in its sole discretion, and without further action on the part of the shareholders, to select, for each reverse stock split, one of the approved reverse stock split ratios* and to effect one or more approved reverse stock splits by filing an Amendment with the Registrar of Corporations of the Republic of the Marshall Islands for each reverse stock split at any time after the approval of such Amendment.

***

*The Board believes that shareholder approval of an exchange ratio range (rather than an exact exchange ratio) provides the Board with maximum flexibility to achieve the purposes of one or more reverse stock splits.  If shareholders approve Proposal Three, a reverse stock split will be effected, if at all, only upon a determination by the Board that the reverse stock split is in the Company's and the shareholders' best interests at that time.*  In connection with any determination to effect a reverse stock split, the Board will set the time for such a split and select a specific exchange ratio within the range.  *These determinations will be made by the Board with the intention to create the greatest marketability of the Company's Common Shares based upon prevailing market conditions at that time.*

*The Board reserves its right to elect not to proceed, and abandon, a reverse stock split if it determines, in its sole discretion, that implementing this proposal is not in the best interests of the Company and its shareholders.*

***

### Purpose and Background of One or More Reverse Stock Splits

The purpose of a reverse stock split is to increase the per share trading value of the Company's Common Shares.  *The Board intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is*

***determined by the Board to be in the best interests of the Company and its shareholders.***

The NASDAQ Global Select Market has several listing criteria that companies must satisfy in order to maintain their listing, including that the Company's Common Shares maintain a minimum bid price that is greater than or equal to $1.00 per share.  The Company believes that effecting one or more reverse stock splits will help it maintain (or, as applicable, regain) compliance with the minimum bid price per share listing requirement for listing its Common Shares on the NASDAQ Global Select Market.

In addition, the Company believes that a number of institutional investors and investment funds are reluctant to invest, and in some cases may be prohibited from investing, in lower-priced stocks and that brokerage firms are reluctant to recommend lower-priced stocks to their clients.  ***By effecting one or more reverse stock splits, the Company believes it may be able to raise its Common Share price to a level where its Common Shares could be viewed more favorably by potential investors.***

Other investors may also be dissuaded from purchasing lower-priced stocks because the brokerage commissions, as a percentage of the total transaction, tend to be higher for lower-priced stocks.  A higher stock price after a reverse stock split could alleviate this concern.

The combination of continuing to be listed on the NASDAQ Global Select Market and the lower transaction costs and increased interest from institutional investors and investment funds could have the effect of improving the trading liquidity of the Company's Common Shares.  (Emphasis added.)

142.    The statements in ¶141 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the Diana Defendants issued the "super-voting" Series C Preferred Shares to guarantee approval of the "reverse stock split" shareholder proposal so that they could perpetuate their fraud; (iii) the true purpose of the carefully-timed, reverse stock splits was to prop up Diana's share price so that Kalani could profitably convert its securities with a view toward immediately selling to

investors; and (iv) the securities sales and issuances to Kalani provided the Company with financing that benefited Defendant Palios and his related companies and family members, which simultaneously destroying shareholder value.

143.   On June 29, 2017, Defendant Palios and his affiliates used their newly-obtained voting control of the Company to approve the "reverse stock split" shareholder proposal.

144.   On June 30, 2017, Diana filed with the SEC a Form 6-K, which Defendant Margaronis signed, disclosing the results of the continued annual shareholders meeting on June 29, 2017.  Diana disclosed the following about the approved and adopted proposal about the reverse stock splits, without limitation:

> The approval of one or more amendments to the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued common stock, each at a ratio of not less than one-for-two and not more than one-for-100 and in the aggregate at a ratio of not more than one-for-1,000, *with the exact ratio to be set at a whole number within this range to be determined by the Company's board of directors in its discretion*, and to authorize the Company's board of directors to implement any such reverse stock split at any time prior to the date of the Company's 2019 Annual Meeting of Shareholders by filing an amendment to the Company's Amended and Restated Articles of Incorporation. (Emphasis added.)

145.   The statements in ¶144 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the Diana Defendants issued the "super-voting" Series C Preferred Shares to guarantee approval of the "reverse stock split" shareholder proposal so that they could perpetuate their fraud; (iii) the true purpose of the carefully-timed, reverse stock splits was to prop up Diana's share price so that Kalani could profitably convert its securities with a view toward immediately selling to

investors; and (iv) the securities sales and issuances to Kalani provided the Company with financing that benefited Defendant Palios and his related companies and family members, which simultaneously destroying shareholder value.

146.    On July 25, 2017, Diana held its second quarter 2017 earnings call ("Q2 2017 Call"), in which Defendants Margaronis, Michalopoulos, and Palios participated.  During the Q2 2017 Call, the Diana Defendants again made numerous representations that the container shipping business was in recovery, which Diana would be able to take advantage of as a result of its recent financing activities.  For example, Defendant Palios stated the following, in relevant part:

> "Second quarter was highlighted by financing transactions that have significantly strengthened the company's balance sheet and has [sic] also provided additional flexibility to take advantage of an eventual improvement in market conditions in the containership segment."
>
> ***
>
> Diana Containerships Inc. completed a reverse stock split on its common shares at a ratio of 1-for-7, effective as of the opening of trading on July 5, 2017.
>
> ***
>
> In summary, despite continued challenges in the container shipping market, Diana Containerships Inc. has taken action to reinforce our financial strength and to operate our business to navigate the current phase of the industry cycle.

147.    The statements in ¶146 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because (i) at the time of these statements, Defendants already were engaged in a fraudulent scheme whereby repeated, deliberately-timed, dilutive reverse stock splits followed by dumping of newly-issued common shares were being utilized to manipulate the price of Diana's common stock; (ii) the true purpose of the issuance of securities to Kalani was to provide the Company with financing that benefited Defendant Palios and his related companies and family members and to otherwise funnel money

to Company insiders; (iii) Defendants already knew and intended that the Kalani Defendants would be issued warrants and convertible securities, which Kalani would convert to Diana common stock at below-market prices with a view toward selling to investors following carefully-timed reverse stock splits, thereby destroying shareholder value for the benefit of Defendants.

## LOSS CAUSATION/MATERIALIZATION OF THE RISK

148.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

149.   Throughout the Class Period, the price of Diana's common stock was artificially inflated and/or maintained at an artificially high level as a result of Defendants' fraudulent scheme to manipulate Diana's stock price for the purpose of diverting Company assets and/or profits from sales of Diana securities to Defendants at the expense of investors and as a result of Defendants' materially false and misleading statements and omissions identified herein.

150.   As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Diana common stock declined as the artificial inflation was removed from the market price of the stock, causing damage to Plaintiff and members of the Class.

151.   The risks of Defendants' fraudulent "death spiral" financing scheme began to materialize following Diana's March 21, 2017 announcements that the Company entered into the Securities Purchase Agreement with Kalani for the issuance of the B-1 Convertible Shares, the B-1 Warrants, and the B-2 Warrants.   Subsequently, as Defendants planned, the Kalani Defendants began converting these securities into common shares and dumping them on the

secondary market, driving the price of Diana's common stock down and extracting value from shareholders.

152.    On June 30, 2017, once Diana's share price declined below $0.50 and Kalani could no longer profitably convert its securities, Diana announced a 1-for-7 reverse stock split of the Company's common shares, which would take effect at the opening of trading on or around July 5, 2017.  The announcement prompted a further decline in Diana's stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize.   By market close on June 30, 2017, the price of Diana common stock had declined to $0.38 per share on an unadjusted basis.   This price was 86% below the closing price of the Company's shares on January 26, 2017, when the Registration Statement was first filed.  Between March 21 and June 30, 2017, due to the Kalani Defendants' dumping, the number of Diana common shares outstanding had grown from approximately 9.4 million shares to 14.4 million shares, an increase of more than 53%.

153.    The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.28 per share on July 3, 2017 to a close of $1.42 per share on July 5, 2017, the next trading day.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on an adjusted basis.

154.    The value of Diana's common stock continued to dissipate everyday thereafter as Defendants began to flood the market with excess shares, driving the price down and further damaging Plaintiff and other Class members. As a direct result of Defendants' fraudulent scheme, the number of Company shares outstanding ballooned from approximately 2.1 million

shares to 6.1 million shares between July 5, 2017 and July 26, 2017, an increase of more than 190%.

155.   To continue fueling Defendants' fraud, on July 26, 2017, Diana announced a 1-for-6 reverse stock split of the Company's common shares, par value $0.01 per share, which reduced the number of Diana's outstanding common shares from approximately 6.1 million shares to approximately 1 million shares.  The announcement prompted a further decline in Diana's stock price, as the risks of Defendants' fraudulent scheme and false statements continued to materialize.  By market close on July 26, 2017, the price of Diana common stock had declined to $0.19 per share on an unadjusted basis.  The reverse stock split temporarily propped up the price Diana common stock, which closed at $0.83 per share on July 27, 2017 – above the threshold to allow Kalani to continue dumping its shares at a profit.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on an adjusted basis.  This price was 87% below the closing price of the Company's shares on July 5, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect.

156.   The value of Diana's common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani flooded the market with newly-converted shares of discounted common stock, again driving the price down.  Between July 26, 2017 and August 23, 2017, the number of Company shares outstanding expanded from approximately 1 million shares to 5.3 million shares, an increase of approximately 430%

157.   By market close on August 23, 2017, the price of Diana common stock had declined to $0.26 per share on an unadjusted basis as a direct result of Defendants' still-concealed, fraudulent "death spiral" financing scheme.  This price was 69% below the closing

price of the Company's shares on July 27, 2017, after the Company's previously announced 1-for-6 reverse stock split took effect.

158.    The full effect of Defendants' fraud had yet to materialize.  On August 23, 2017, with the price of its common stock again below a profitable threshold for Kalani to convert and dump, Diana announced a 1-for-7 reverse stock split of the Company's common shares.  This reduced the number of Diana's outstanding common shares from approximately 5.3 million shares to approximately 0.8 million shares, which began trading on a split-adjusted basis on August 24, 2017.  The reverse stock split temporarily boosted the unadjusted share price of Diana common stock from a close of $0.26 per share on August 23, 2017 to a close of $1.15 per share on August 24, 2017.  However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined 37% on an adjusted basis.

159.    The value of Diana's common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani continued to flood the market with newly-converted shares, driving the price down.  Between August 23, 2017 and September 22, 2017, as a result of Kalani's dumping, the number of Company shares outstanding catapulted from approximately 0.8 million shares to 3.2 million shares, an increase of approximately 300%.

160.    Defendants' fraud remained ongoing.  On September 22, 2017, Diana announced a 1-for-3 reverse stock split of the Company's common shares, which reduced the number of Diana's outstanding common shares from approximately 3.2 million shares to approximately 1.1 million shares, which began trading on a split-adjusted basis on September 25, 2017.  As the risk of Defendants' scheme materialized, the price of Diana common stock declined to $0.42 per share on an unadjusted basis by market close on September 22, 2017.  This price was 63% below

the closing price of the Company's shares on August 24, 2017, after the Company's previously announced 1-for-7 reverse stock split took effect.

161.   The reverse stock split resulted in a temporary increase in the unadjusted share price of Diana common stock from a close of $0.42 per share on September 22, 2017 to a close of $0.74 per share on September 25, 2017, the next trading day.   However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined 41% on an adjusted basis.

162.   The value of Diana's common stock continued to dissipate and shareholders continued to suffer damages everyday thereafter as Kalani continued to flood the market with newly-converted shares, driving Diana's share price down.

163.   By October 3, 2017, as a result of Defendants' ongoing fraudulent and manipulative conduct, the price of Diana's common stock had declined to close at $0.47 per share on an unadjusted basis.   At this share price, Diana had a market capitalization of less than one million dollars, despite having raised millions of dollars from investors since January 2017. This shocking erosion in shareholder value was the direct result of Defendants' fraudulent scheme to manipulate the price of Diana common stock and to induce purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

164.   As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Diana's securities, which are now virtually worthless, Plaintiff and other Class members have suffered significant losses and damages.

## <u>NO SAFE HARBOR</u>

165.   Diana's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements

from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles (GAAP), they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

166.    The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Diana who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported plaintiff's "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

167.    At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded that, *inter alia*, Defendants were engaged in an ongoing "death spiral" financing scheme involving a series of reverse stock splits and share issuances, which were intended to, and did in fact, manipulate the price of Diana common stock in order to benefit Defendants at the expense of shareholders.  In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter:

**Coordination Of Transactions By Defendants**

168.    At all relevant times, Defendants had direct access to information concerning Diana's business, operations, and finances.  Through his ownership and/or control of Diana and

numerous related parties, Defendant Palios also exerted his influence over the Company's Board to perpetuate the fraudulent financing scheme as described herein.

169.    The timing and sequence of the share issuances, common stock conversions and sales, and reverse stock splits are highly suspicious and indicative of a coordinated and ongoing effort among Defendants to manipulate Diana's stock price and deceive investors.

170.    First, the June 9, 2016 reverse stock split reduced the number of shares outstanding from approximately 75 million to 9.4 million, laying the groundwork for the January 26, 2017 Registration Statement only seven months later.  That Registration Statement, which provided for an aggregate offering of securities up to $250 million, became effective on March 7, 2017.

171.    Merely two weeks later, on March 21, 2018, Diana announced that the Company entered into a Securities Purchase Agreement with Kalani for the purchase of up to $150 million in convertible securities.  A prospectus in connection with the Kalani securities purchase was filed with the SEC on March 24, 2018 (the "Kalani Prospectus").

172.    Approximately one week later, on March 29, 2018, Diana announced that shareholders would vote on the Reverse Stock Split Proposal on May 10, 2017.

173.    The Kalani Prospectus became effective on May 11, 2017.

174.    Lacking approval of a majority of the shareholders, Diana announced on May 24, 2017 that the vote on the Reverse Stock Split Proposal had been adjourned to June 29, 2017.

175.    One week later, on May 30, 2017, Diana announced that it issued C-Series Preferred Shares with "super-voting" rights to DSI, essentially giving Palios-controlled entities voting control of the Company.

176.    The Reverse Stock Split Proposal was approved on June 29, 2017.

177.   Not coincidentally, the Company announced shareholder approval of the Reverse Stock Split Proposal and Board approval of a one-for-seven reverse stock split the very next day.

178.   Also not coincidentally, the three subsequent dilutive reverse stock splits, on July 26, 2017, August 24, 2017, and September 25, 2017, respectively, were all perfectly timed to coincide with intervening increases in the number of shares outstanding and subsequent stock price declines as Kalani converted its securities and sold common shares into an artificially-inflated market.  In the aggregate, the Diana Defendants effected reverse stock splits equal to one-for-882, almost exactly what was authorized by the Reverse Stock Split Proposal approved by DSI's "super-voting" shares.  This toxic cycle could not have occurred except with Defendants' knowledge of and participation in a deliberate fraudulent scheme.

**Defendants Personally Benefited From The "Death Spiral" Financing Scheme**

179.   Defendant Palios, entities he owns and/or controls, and other related parties derived substantial profits from the "death spiral" financing scheme while preserving Palios' position of power and control over Diana both during and continuing after the Class Period. Specifically, DEI, a firm owned and controlled by Defendant Palios, was paid fees plus bonuses for providing brokerage services to Diana.  From 2014 to 2017, Diana paid approximately $1.5 million, $1.5 million, $2 million, and $2.1 million, respectively, to DEI, at least a portion of which was attributable to Defendants' ongoing fraudulent "death spiral" financing scheme.

180.   Similarly, UOT, a wholly-owned subsidiary of Diana founded by Palios and now run by Palios' daughter, was paid various alleged commissions and increasing management and administrative fees throughout the Class Period.  In particular, Diana paid $6.2 million, $7.2 million, and $8.4 million in administrative expenses, in part to UOT, for 2015 through 2017, respectively.  These purported intercompany transfers, which did not appear on Diana's financial

statements, were a conduit to funnel monies from the Kalani securities purchases to another Palios-controlled entity and then onward to Palios and his family members.

181.    Palios also profited as a result of his control over DSI, which was Diana's largest shareholder, as well as a substantial creditor.  Utilizing his power and influence, Palios caused Diana to issue DSI preferred stock with "super-voting" rights, which enabled him to secure voting control over Diana and approve the Reverse Stock Split Proposal authorizing the reverse stock splits that were critical to the Defendants' scheme.  At the same time, Palios engineered a profitable exit of DSI's holdings of Diana common stock, waiting to liquidate over 90% of DSI's interest in open-market transactions between July 7 and July 14, 2017 – immediately after Diana's reverse stock split took effect on July 5, 2017 and while the Company's stock price remained inflated.  With direct knowledge of the impending volatility and dilution of Diana's common stock, Palios insulated DSI (and himself) from common stock price declines while retaining voting control of Diana through ownership of the "super-voting" rights preferred shares.

182.    Finally, Palios-controlled Altair, which serves as the Company's travel agent, was paid approximately $1 million per year from 2014 to 2017.  These payments from Diana would not have been possible but for Defendants' ongoing fraudulent scheme.

183.    Kalani has also profited as a direct result of its knowledge and participation in Defendants' fraud, earning millions of dollars by perfectly timing conversions and sales of discounted securities to align with the Diana Defendants' planned reverse stock splits.

**Kalani Profited From "Death Spiral" Financing Schemes Executed At The Same Time With Other Companies**

184.    This is not the first time that Kalani has been involved in a manipulative and deceptive financing scheme.  In fact, Kalani executed nearly identical schemes with two other

Greek shipping companies, DryShips Inc. ("DryShips") and TOP Ships Inc. ("Top Ships"), at the same time that the scheme with the Diana Defendants was underway.

185.    Just as with Diana, DryShips and Top Ships entered into deals to sell securities convertible to common stock at a discount to Kalani, which common stock Kalani then re-sold into the market.  When Kalani's sales of common stock caused each respective company's stock price to decline, the company would reverse split the stock, causing a certain number of shares to be merged into a single share, and thereby raise the stock price.  Then, this pattern would be repeated, allowing Kalani to profit while selling discounted shares into an artificially-propped up market.

186.    Upon information and belief, Kalani funneled approximately $700 million in "financing" to DryShips in exchange for various convertible securities, which it then resold at a profit.  Likewise, Kalani engaged in similar "financing" arrangements with Top Ships, totaling approximately $40 million.  With respect to Diana, Kalani has acquired $150 million in various convertible securities, which it has been re-selling at a profit throughout the Class Period.

187.    On August 31, 2017, DryShips disclosed that the company received a subpoena from the SEC seeking information related to its offerings to Kalani.  The investigation remains ongoing.

188.    Kalani's repeated use of the same "death spiral" financing scheme to target three companies in the Greek shipping industry at the same time is indicative of Defendants' knowledge and intent to mislead investors and fraudulently manipulate Diana's stock price.

## CLASS ACTION ALLEGATIONS

189.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Diana securities during the Class Period or who owned shares negatively impacted by Defendants' manipulative scheme (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

190.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Diana securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Diana or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

191.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

192.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

193.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Diana;

- whether the Individual Defendants caused Diana to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Diana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and

- Whether Defendants' manipulative conduct negatively impacted the price of Diana stock.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

195.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Diana securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Diana securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

196.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

197.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## (VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

198.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

199.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), (b), and (c), promulgated thereunder by the SEC.

200.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period did, (a) deceive the investing

public, including Plaintiff and the Class, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase and/or sell Diana's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the false statements alleged herein.

201.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements or participated in the making of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of Diana common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

202.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

203.    Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Diana common stock, and were privy to, participated in, and were otherwise aware of the dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

204.    Defendants had actual knowledge of the misrepresentations, omissions and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and to artificially drive down the value of Diana's common stock.

205.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

206.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Diana common stock during the Class Period.

## COUNT II

## (VIOLATION OF SECTION 9 OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS)

207.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

208.    Defendants violated §9 of the Exchange Act in that they conspired to engage and did engage in a deceptive financing scheme to manipulate the price of Diana common stock and induce the purchase of Diana common stock by others, in violation of Section 9(a)(2) of the Exchange Act.

209.    Further, to induce the purchase of Diana common stock, through their dissemination of false statements during the Class Period, Defendants misled investors concerning the nature of their actions and its effect on Diana common stock in violation of Section 9(a)(4) of the Exchange Act.

210.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of Diana common stock during the Class Period

## COUNT III

## (VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)

211.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

212.     During the Class Period, Defendants Palios, Andreas Michalopoulos, and Anastasios Margaronis (collectively, the "Individual Defendants") participated in the operation and management of Diana, and conducted and participated, directly and indirectly, in the conduct of Diana's business affairs.  Because of their senior positions, they knew the adverse non-public information about Diana's misstatement of income and expenses and false financial statements.

213.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Diana's financial condition and results of operations, and to correct promptly any public statements issued by Diana which had become materially false or misleading.

214.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Diana disseminated in the marketplace during the Class Period concerning Diana's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Diana to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Diana within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Diana securities.

215.     Each of the Individual Defendants, therefore, acted as a controlling person of Diana.  By reason of their senior management positions and/or being directors of Diana, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Diana to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Diana and possessed the power to

control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

216.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Diana.

## COUNT IV

## VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT AGAINST PALIOS AND THE KALANI DEFENDANTS

217.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

218.    As discussed herein, Defendants Kalani, Bistricer, and Murchinson each committed underlying violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder by selling Diana common stock while in possession of material nonpublic information concerning the manipulative scheme, and, consequently, are liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.  *See* 15 U.S.C. § 78t-1(a).

219.    Throughout the Class Period, Defendants Kalani, Bistricer, and Murchinson sold Diana common stock they had received from the company at prices above that which those shares would trade shortly after the sale.  They are therefore liable under Section 20A of the Exchange Act to all Class Members who purchased Diana common stock at inflated prices contemporaneously with sales by Defendants Kalani, Bistricer, and Murchison, accounting for millions of dollars in losses.

220.    Similarly, Defendant Palios, who owns and controls DSI, committed underlying violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder by liquidating DSI's holdings of Diana common stock while in possession of material nonpublic information

concerning the manipulative scheme, and, consequently, is liable to contemporaneous purchasers of that stock under Section 20A of the Exchange Act.  *See* 15 U.S.C. § 78t-1(a).

221.    Section 20A of the Exchange Act provides that "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material nonpublic information shall be liable in an action . . . to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class."

222.    As set forth above, Defendants Kalani, Bistricer, and Murchinson and Defendant Palios each committed underlying violations of Section 10(b) and Rule 10b-5 thereunder, by their acts and omissions as alleged in this Complaint.  Specifically, Defendants Kalani, Bistricer, and Murchinson and Defendant Palios sold Diana common stock while in possession of material nonpublic information about the manipulative scheme alleged herein.  Consequently, they are liable pursuant to Section 20A of the Exchange Act to Plaintiff and all other Class members who purchased common stock contemporaneously with Defendants Kalani, Bistricer, and Murchinson's sales and DSI's sales of Diana common stock throughout the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 13, 2018                                Respectfully submitted,

**POMERANTZ LLP**
*/s/Jeremy A. Lieberman*
Jeremy A. Lieberman
Michele S. Carino
Justin S. Nematzadeh
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        mcarino@pomlaw.com
        jnematzadeh@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**SCOTT+SCOTT, Attorneys at Law, LLP**
Deborah-Clark Weintraub
Thomas L. Laughlin IV
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Tel:  (212) 223-6444
Fax:   (212) 223-6334
Email: dweintraub@scott-scott.com
tlaughlin@scott-scott.com

***Attorneys for Plaintiff***
