**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIMMIE O. ROBINSON, Individually, and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DIANA CONTAINERSHIPS, INC, SYMEON P. PALIOS, KALANI INVESTMENTS LIMITED, MURCHINSON LTD., and MARC BISTRICER,<br><br>Defendants. | Case No. 2:17-cv-06160-BMC<br><br>**JURY TRIAL DEMANDED** |

**THIRD AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1
JURISDICTION AND VENUE ........ 9
PARTIES ........ 9
SUBSTANTIVE ALLEGATIONS ........ 13
Diana Operates Through Interconnected Entities Controlled by Palios ........ 13
Defendants' Reach Their Agreement ........ 14
The SPA Was the Perfect Vehicle to Implement the Defendants' Manipulative Agreement ........ 17
Diana Defendants Go to Great Lengths to Procure Further Reverse Stock Splits for Kalani to Trade, Destroying the Value of Its Common Stock ........ 20
Defendants Execute Their Fraudulent Agreement ........ 22
Diana's and Kalani's Undisclosed Agreement Can Be Inferred from Their Conduct ........ 30
Palios Siphoned Off the Funds Received from Kalani Before Using Diana's Depressed Share Price to Establish a Direct Controlling Stake ........ 38
MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ........ 41
Failure to Disclose the Undisclosed Agreement in the Registration Statement or upon the Announcement of the SPA ........ 41
Failure to Disclose Purpose of Reverse Stock Splits ........ 46
Misstatement as to Intent to Adhere to the Volume Restriction ........ 52
LOSS CAUSATION/MATERIALIZATION OF THE RISK ........ 53
NO SAFE HARBOR ........ 55
ADDITIONAL SCIENTER ALLEGATIONS ........ 56
Coordination of Transactions by Defendants ........ 56
Defendants Personally Benefited from Their Fraud ........ 57
Kalani Profited from Similar Schemes Executed at the Same Time with Other Companies ........ 57
CLASS ACTION ALLEGATIONS ........ 58
COUNT I ........ 61
COUNT II ........ 62
COUNT III ........ 63
VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST PALIOS ........ 63
PRAYER FOR RELIEF ........ 64

Lead Plaintiffs Burcin Ekser, Steven Gerber, and Gianfilippo Mogavero (collectively, "Plaintiffs"), individually, and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, and based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things a review of: (a) the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Diana Containerships, Inc., renamed Performance Shipping Inc. after the class period ("Diana" or the "Company"); (b) analysts' and media reports and advisories about the Company; (c) an Order Instituting Cease-And-Desist Proceedings Pursuant To Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions And A Cease-And-Desist Order against Murchinson Ltd. ("Murchinson"), Marc Bistricer ("Bistricer"), and Paul Zogala issued on August 17, 2021 (the "Cease-and-Desist Order") (attached hereto as Exhibit A); and (d) other publicly available information concerning Defendants. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants who purchased, or otherwise acquired, Diana common stock between June 9, 2016 and October 3, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), and Rule 10b-5 promulgated thereunder, against the Company and Defendants named herein.

2. This action arises from an undisclosed fraudulent agreement reached by Defendants Diana and Kalani Investments Limited ("Kalani"), a hedge fund owned and controlled by Defendants Murchinson Ltd. ("Murchinson") and Marc Bistricer ("Bistricer"), pursuant to which Defendants agreed to manipulate the price of Diana common stock for the benefit of themselves, Company insiders, and related entities owned and controlled by Diana and Symeon P. Palios ("Palios" and with Diana, the "Diana Defendants"). That agreement, which was negotiated and implemented at the direction of Palios, Murchinson, and Bistricer, rendered Diana investors' holdings of Diana common stock virtually worthless.

3. At all times relevant to the Complaint, Diana owned and operated containerships.[1] The Company also chartered its vessels. During the Class Period, its common stock traded on the NASDAQ Global Select Market ("Nasdaq") under the ticker symbol "DCIX." Since March 6, 2020, Diana common stock has traded on the NASDAQ Capital Market.

4. Palios founded Diana's predecessor entities and owned a substantial amount of the Company's common stock and voting power (both under his name and that of entities that he controls) throughout the Class Period. He was Diana's chief executive officer ("CEO") during the Class Period and until his retirement on October 19, 2020, and remains chairman of its board of directors ("Board"), a position he also held throughout the Class Period. Through Palios' control of Diana, he procured the Company to execute several related-party agreements with entities that

---

[1] Diana has more recently shifted towards becoming a pure tanker owning company. Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Mar. 27, 2020) (Press Release), noting that change of name to Performance Shipping, Inc. from Diana Containerships, Inc. and accompanying change of ticker from DCIX to PSHG "reflect the Company's ongoing focus on becoming a pure tanker owning company."

he or his family controlled. These agreements enabled him to siphon money from Diana to benefit himself and his family.

5. Upon meeting with the Kalani Defendants in early 2016, and at their urging, Diana and Palios embraced a new means to continue enriching themselves at the expense of unsuspecting investors. Specifically, and undisclosed to investors, the Diana and Kalani Defendants agreed that: a) Diana would grant Kalani favorable warrants over convertible preferred stock for virtually no consideration that could subsequently be converted into Diana common stock at a discount, allowing Diana to obtain millions of dollars in capital that could be diverted to insiders and/or companies they controlled;[2] and in return b) Diana, would manipulate its stock price to enable Kalani to profitably convert those warrants and sell the common stock it received by conducting reverse stock splits every time the value of its common stock dropped below the convertible securities' floor price thereby allowing Kalani to immediately recoup its "investment" and generate trading profits by unloading its newly acquired shares into the market and/or using them to cover naked short sales of Diana. common stock it had conducted before it was deemed to own the shares under SEC rules[3] (the "Undisclosed Agreement"). Without Diana's agreement to conduct multiple reverse stock splits, Kalani could not continually convert its preferred shares into common shares that could be sold at a profit, as Diana's stock price would remain stuck below the applicable floor price.

6. The scheme was well-rehearsed; Kalani approached Diana and two other Greek shipping companies – DryShips Inc. (hereinafter "DryShips") and TOP Ships Inc. (hereinafter

---

[2] Defendants used a form of public investment in private equity (or "PIPEs" transaction) to issue the securities to Kalani.

[3] Because Kalani deliberately deceived its brokers into marking its sales as "long," its naked short sales of Diana common stock were not recorded as short sales, and thus do not form part of the public record of short interest in Diana's common shares. Thus, absent discovery, Plaintiffs cannot particularize the timing or extent of these short sales.

"Top Ships") – at the same time in early 2016, each time reaching strikingly similar agreements.[4] First, to set the table for what was to come, the Diana Defendants used a reverse stock split in June 2016 to artificially drive up the price of its stock. Diana and Kalani then announced a securities purchase agreement on March 21, 2017 (the "SPA"), which facilitated, but did not record, the parties' wider Undisclosed Agreement. *See* SPA annexed hereto as Exhibit C. Under the SPA, Kalani agreed to purchase convertible preferred stock for $3 million and receive further warrants over additional convertible preferred stock, consideration for which was only payable upon exercise. The SPA permitted Kalani to convert the preferred stock it had acquired into Diana common stock at substantial discounts to its market price, subject only to minimal trading volume restrictions and a floor price of $0.50. This allowed Kalani to quickly profit from its "investment," at little to no risk by immediately reselling any common stock it received from the conversion of its preferred stock to unsuspecting investors at the higher prevailing market price. Alternatively, Kalani could ensure risk free profits by using the converted common shares to cover its "naked" short selling activity, as highlighted in the Cease-and-Desist Order directed to Defendants Murchinson and Bistricer. Exhibit A, ¶¶2-4, 14-28.

7. The terms of the SPA also deliberately incentivized Diana to raise the price of its stock above the convertible securities' floor price, a necessary pre-requisite to Kalani's ability to profitably convert and sell them. To raise its stock price above the $0.50 price floor, Diana merely had to stick to its end of the bargain and arrange repeated reverse stock splits each time Kalani's sales drove down the price of Diana common stock below $0.50.

---

[4] *See* Spencer Jakab, *A Shipping Company's Bizarre Stock Maneuvers Create High Seas Intrigue*, WALL ST. J. (July 13, 2017), https://www.wsj.com/articles/a-shipping-companys-bizarre-stock-maneuvers-create-high-seas-intrigue-1499960367 (last visited May 27, 2020) (annexed hereto as Exhibit H) (hereinafter Jakab, *A Shipping Company's Bizarre Stock Maneuvers*).

8. Kalani was in safe hands. Diana, acting at Palios' behest, dutifully executed four additional reverse stock splits between July 5, 2017, and September 25, 2017, each time its stock price dropped below the $0.50 price floor, raising the cumulative value of Diana's reverse stock splits across the Class Period to 7,056 for 1. Each of these splits pushed the price of Diana common stock above the $0.50 price floor, and Kalani, on cue and with advance notice, converted significant volumes of their outstanding warrants – thereby pumping further funds into Diana. Kalani immediately sold its newly converted common stock into the market or used them to cover its naked short selling activity. The immediacy of Kalani's sales and its use of the converted share to cover pre-existing short sales is evident from its failure to file a Schedule 13D beneficial ownership report with the SEC at any point during 2017, despite the large volumes of Diana common stock it received upon the conversion of its preferred shares.

**Figure 1: Diana's Post-SPA Reverse Stock Splits Coincide with Diana's Stock Trading Below $0.50 Floor Price**




9. Through this fraud, Diana stood to raise upwards of $150 million[5] from its sale of discounted convertible securities to Kalani, some of which was to be passed to the Diana Defendants and Palios-related entities. Kalani, for its part, generated lucrative trading profits. Investors, however, were left with nothing.

10. Defendants' actions artificially inflated the price of Diana's stock to levels that would not have prevailed had Defendants' Agreement been fully disclosed to the market. Had Defendants, prior to the reverse stock splits, disclosed their intent to embark upon a course of conduct that would render Diana common stock completely worthless, the market would have

[5] Diana reported that it received $32.5 million in proceeds from the SPA in 2017. Diana Containerships, Annual Report (Form 20-F), at 32 (Mar. 18, 2019).

valued the shares as such and no amount of reverse stock splits would have altered that (as any multiple of zero is zero). Indeed, Diana shares purchased during the Class Period have been rendered virtually worthless by Defendants' fraud. In total, Defendants wiped out 99% of shareholder value in a matter of months.

11. As explained more fully herein, this unprecedented conduct gives rise to a more than plausible inference that Defendants agreed and intended from the outset that they would undertake the number and scope of transactions they ultimately did to the detriment of investors.

12. In furtherance of their scheme, Defendants made numerous materially false and misleading statements and omissions, including the following: (i) that the SPA contained all of Diana's and Kalani's commitments to each other in relation to their transaction, hiding the terms of their Undisclosed Agreement; (ii) that Diana intended to use the proceeds from its sales of securities to Kalani "for general corporate purposes and/or to repay indebtedness" when, in fact, Diana intended to siphon the vast majority of the proceeds from the Company for the benefit of the other Diana and Palios-related companies, family members, and other Diana insiders; (iii) that the reverse stock splits were in the "best interests" of Diana and its shareholders and intended to "increase the per share trading value of [Diana common stock]" and maintain its Nasdaq listing when, in fact, the stock splits formed part of Defendants' Undisclosed Agreement to manipulate the price of Diana common stock in a manner that would destroy shareholder value; and (iv) that Diana and Kalani intended to adhere to the SPA's restriction to Kalani's right to convert its preferred stock into common stock to days on which trading volume in Diana exceeded 15 million when, in fact, they had no such intention.

13. Defendants' material misstatements and omissions were recently confirmed in an August 17, 2021, SEC Order instituting Cease-and-Desist Proceedings against Murchinson,

Bistricer and another individual.[6] Findings of fact contained in the Cease-and-Desist Order made pursuant to Murchinson and Bistricer's Offers of Settlement include that: (i) Murchinson served as a sub-advisor to an unnamed Hedge Fund, which upon information and belief was Kalani,[7] and it, and Mr. Bistricer, "made" all of that Hedge Fund's trading strategies and investment decisions during the period January 2016 through October 2017 (Exhibit A, ¶¶9, 10); (ii) in 2016 and 2017, Murchinson and Bistricer caused Kalani to enter into agreements with multiple issuers "traded on the Nasdaq Stock Market," which upon information and belief included Diana,[8] pursuant to which Kalani purchased hundreds of millions of dollars of the issuers' securities that were convertible or exchangeable into common stock, as well as equity line agreements pursuant to which Dryships and other issuers could sell a specified dollar amount of stock (or "draw down" amount) to be purchased by Kalani in a specified period (*id.*, ¶¶11-13); and (iii) Kalani, at the behest of Murchinson and Bistricer, placed multiple "long" sales[9] orders of Diana, DryShips, and Top Ships common stock with Kalani's brokers which were, in fact, naked short sales because the sales were

---

6 Murchinson and Bistricer agreed to pay the SEC, jointly and severally, disgorgement of $7,000,000, with prejudgment interest of $1,078,183, and penalties of $800,000 and $75,000, respectively, for causing Kalani's "executing brokers to violate the order-marking and locate requirements of Regulation SHO" and causing Kalani "to violate the dealer registration requirements of the Securities Exchange Act of 1934". *See* Press Release, SEC, SEC Charges Investment Adviser and Associated Individuals with Causing Violations of Regulation SHO (Aug. 17, 2021), https://www.sec.gov/news/press-release/2021-156 ("SEC Press Release").

7 *See* Spencer Jakab, "Financier Behind Dryships Stock's Wild Ride Has Settled With SEC," THE WALL STREET JOURNAL (Sept. 20, 2021) (attached hereto as Exhibit B) (hereinafter Jakab, *Financier Behind Dryships*). Note, the Cease-and-Desist Order appears to mistakenly refers to Kalani as being organized under the laws of Bermuda rather than the British Virgin Islands. Cease-and-Desist Order, ¶9. The accompanying SEC press release appears to acknowledge this, as the SEC explicitly thanks the "***British Virgin Islands Financial Services Commission***, the Hellenic Republic Capital Markets Commission, the Central Bank of Ireland, the Jersey Financial Services Commission, the Nova Scotia Securities Commission, and the Ontario Securities Commission" but not the Bermuda authorities. [Emphasis added.] *See* SEC Press Release.

8 There is no record of Kalani having conducted any private placements with an issuer listed on a U.S. exchange outside of Diana, DryShips, and Top Ships. *See* Jakab, *Financier Behind Dryships*, *supra*, n.7.

9 The transactions were conducted by Murchinson employee, trader Paul Zogala, who was responsible for trading securities for Kalani under the control of Muchinson and Bistricer. Exhibit A, ¶8.

executed prior to the time Kalani was deemed to own them under SEC rules and did not otherwise have a net long position in these issuer's stock (*id.*, ¶¶14-17).

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## **JURISDICTION AND VENUE**

15. The claims asserted herein arise under, and pursuant to, §§9, 10(b), and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

17. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).

18. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## **PARTIES**

19. Plaintiffs, as previously set forth, acquired Diana securities at artificially inflated prices during the Class Period and were consequently damaged thereby.

20. Defendant Diana is a corporation incorporated under the laws of the Republic of the Marshall Islands, which maintains its principal executive offices at Pendelis 18, 175 64 Palaio Faliro, Athens, Greece 17564. Diana's shares trade on the Nasdaq. Diana changed its ticker symbol to "PSHG" from "DCIX," effective on March 30, 2020, following its change of name from

"Diana Containerships, Inc." to "Performance Shipping Inc." on February 19, 2019. Diana provided shipping transportation services during the Class Period through its ownership of containerships, which are each held by separate wholly-owned subsidiaries. At the start of the Class Period, the Company's fleet consisted of 13 vessels. This was reduced to 11 vessels by the end of the Class Period.

21. Defendant Symeon P. Palios ("Palios") was the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of Diana at all relevant times.

22. Defendant Kalani Investments Limited ("Kalani") is an entity organized under the laws of the British Virgin Islands,[10] with several associated funds. It was the recipient of the securities issued pursuant to the SPA described herein and operated as a hedge fund.

23. Defendant Murchinson Ltd. ("Murchinson") isa Toronto-based hedge fund that controls Kalani. Murchinson is registered as a domestic for profit business entity in New Jersey with the following address: 35 Laurel Ave, Clifton, NJ 07012. References in this complaint to Murchinson encompass Murchinson LP, its predecessor entity that served as sub-advisor to Kalani until January 24, 2017. Cease-and-Desist Order, ¶6.

24. According to the Cease-and-Desist Order, Murchinson served as a sub-advisor to Kalani (or its affiliate), and it, and Bistricer, "made" all of Kalani's trading strategies and investment decisions during the period January 2016 through October 2017. *See* Exhibit A, ¶¶9, 10. The Cease-and-Desist Order found, amongst other matters, that Murchinson and Bistricer (i) placed with Kalani's brokers multiple "long" sale orders of multiple issuers' common stock, including Diana, before Kalani was "deemed to own," because Murchinson and Bistricer had not

---

[10] Note, as explained in footnote 7 above, the SEC Order mistakenly refers to Kalani as being organized under the laws of Bermuda. SEC Order, 9.

yet tendered the issuers' convertible or exchangeable securities for conversion or exchange and did not have a net long position in the stock; (ii) erroneously identified to Kalani's brokers that these sales orders were "long" sales, which contributed to the brokers incorrectly marking these sales orders as "long" sales; (iii) placed with Kalani's brokers certain "long" sales orders of two issuers, including Dryships, under "equity line agreements,", but before Murchinson and Bistricer had, on Kalani's behalf, purchased or entered into an unconditional contract to purchase the shares being sold and, therefore, Kalani was not "deemed to own" the stock under Regulation SHO and did not have a new long position in the stock. In view of the foregoing, the Cease-and-Desist Order found that Murchinson and Bistricer had caused Kalani's executing brokers to violate (i) Rule 200(g) of Regulation SHO, 17 C.F.R. §242.200(g), which requires executing broker-dealers to mark all sell orders of any equity security as "long," "short," or "short exempt;" and (ii) Rule 203(b)(1) of Regulation SHO, which prohibits a broker-dealer from accepting a short sale order in an equity security from another person or effecting a short sale in an equity security for its own account, unless the broker-dealer has borrowed, or entered into a bona fide arrangement to borrow, the security, or has reasonable grounds to believe that it can be borrowed so that it can be delivered when due. Because the executing brokers did not apply the correct requirements and restrictions to the mismarked short sales, Kalani succeeded in avoiding any cost that might have been incurred in borrowing the stock and received two extra trading days to close out any failures to deliver before its brokers executed a "buy in."

25. In connection with the "equity line" agreements with Dryships and a second issuer, understood to be Top Ships, the Cease-and-Desist Order also found that Murchinson and Bistricer had caused Kalani to engage in dealer activity without registering with the SEC or being exempt from registration in violation of Section 15(a)(1) of the Exchange Act, by agreeing in certain

instances to purchase the number of shares Kalani sold during specified periods, then purchasing the stock from issuers, including Dryships, at a fixed percentage of Kalani's sales proceeds during each specified period. Kalani profited by keeping a percentage of its sales proceeds and remitting the remainder of the proceeds to the issuers. In this manner, Murchinson and Bistricer caused Kalani to engage in the regular business of buying and selling securities for its own account in violation of Section 15(a)(1) of the Exchange Act.

26. Defendant Marc Bistricer ("Bistricer") is the head of Murchinson and controlled its activities. Cease-and-Desist Order, ¶7. As noted above, Murchinson, Bistricer "directed [Kalani's] trading strategies and investment decision", including the PIPEs transactions with Diana, DryShips, and Top Ships. *Id.*, ¶¶10-13. Upon information and belief, Bistricer resides at 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219-2514, and additionally maintains properties at the following New Jersey addresses: (i) 119 3rd St, Lakewood, NJ 08701-3218; and (ii) 419 3rd St, Lakewood, NJ 08701-2529. Upon information and belief, Bistricer met with representatives of Diana, DryShips, and Top Ships in New York in early 2016 to negotiate Kalani's fraudulent agreement with each. *See Id.*, ¶2 (noting infringement period of between "January 2016 through October 2017").

27. Palios, together with Diana, are referred to collectively herein as the "Diana Defendants."

28. Defendants Kalani, Murchinson, and Bistricer are sometimes referred to herein collectively as the "Kalani Defendants."

## SUBSTANTIVE ALLEGATIONS

### Diana Operates Through Interconnected Entities Controlled by Palios

29. Diana is run by Defendant Palios the Company's Class Period CEO and current Chairman, at all relevant times. Defendant Palios was the founder of Diana's predecessors and owned approximately 4.5% of the Company's common stock at the end of 2016, before selling all of his shares during 2017 to avoid the impact of Defendants' fraud.[11] As described in more detail in ¶¶30 and 85-92 below, Defendant Palios also owns and/or controls several related companies, which have derived significant financial benefit from the fraud alleged herein.

30. Of particular note is Diana Shipping Inc. ("DSI"), Diana's sister company. DSI specializes in the transport of dry bulk goods. In May 2013, Diana and DSI entered into an unsecured loan agreement of up to $50 million, which was repaid in July 2018. Palios served as the CEO and Chairman of DSI, and other officers and directors, including the President, CFO, and Chief Operating Officer, were the same for both companies at all relevant times.[12] For most of the Class Period, until DSI sold its shares in the course of Defendants' fraud, DSI was Diana's largest shareholder, owning approximately 25.7% of the Company's common stock, which was mostly beneficially owned by Palios. As of May 30, 2017, Diana issued DSI 100 shares of Series C Preferred Stock, with each share entitling the holder of up to 250,000 votes, to be voted alongside the common shareholders, in an amount not to exceed 49% of the total number of shares eligible to vote.

---

[11] Diana Containerships, Annual Report (Form 20-F), at 80 (Mar. 16, 2018). Having helped destroy the value of the Company's common stock, Palios was able to drastically increase his holdings after the Class Period, ultimately establishing a 47.81% stake in the Company by December 2019.

[12] Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (June 6, 2017). Aside from Palios, the three other members of Diana and DSI's respective management teams were also identical. Anastasios Margaronis served as a director and President of both companies. Ioannis Zafirakis served as a director, Chief Operating Officer and Secretary of both companies. Andreas Michalopoulos served as Chief Financial Officer and Treasurer of both companies.

31. As a result of his corporate positions, his influence over DSI's board of directors, and his beneficial ownership of DSI's shares, Palios effectively controlled DSI throughout the Class Period. Given their overlapping executive officers, and as Diana's largest shareholder, a significant lender and holder of up to 49% of the Company's voting rights (including voting rights held by Palios and affiliates), DSI, in turn, had control and influence over Diana. Indeed, Diana acknowledged in its SEC filings that DSI (and, consequently, Palios) "will continue to exercise considerable influence over our decisions."[13] Importantly, the foregoing allowed Palios to maintain his control over Diana, irrespective of the impact that Defendants' fraudulent scheme had on Diana common stock.

**Defendants' Reach Their Agreement**

32. Sensing that the downturn in the global shipping market presented an opportune moment to strike, in early 2016, the Kalani Defendants approached three U.S.-listed Greek shipping companies – Diana, DryShips, and Top Ships – to discuss a fraudulent scheme that would profit all concerned.[14] The scheme was devastatingly effective, both in terms of enriching the Diana and Kalani Defendants, and eviscerating shareholder value. In each case, Kalani would receive significant quantities of the company's (here, Diana's) common stock or convertible securities at a discount, thereby injecting the company with further capital (that could then be siphoned out to company insiders). In return, the company and its insiders (here, the Diana Defendants) promised that they would artificially and repeatedly raise the price of its stock above the convertible securities' floor price to allow Kalani to immediately recoup its "investment" and

---

[13] Diana Shipping Inc., Annual Report (Form 20-F), at 25 (Feb. 16, 2017); Diana Shipping Inc., Annual Report (Form 20-F), at 25 (Mar. 25, 2018).

[14] Jakab, *A Shipping Company's Bizarre Stock Maneuvers*, *supra*, n.4.. See also Cease-and-Desist Order at 2 (noting infringement period of between "January 2016 through October 2017").

generate large trading profits by unloading its newly purchased shares into the market and/or to cover naked short sales of the issuer's common stock it had conducted in violation of Regulation SHO. In each case, the parties' favorite method of achieving the necessary price spikes was the repeated use of dilutive reverse stock splits.[15] The scheme proposed by Kalani was also to be facilitated in each case by the Greek shipping companies' private investment in public equity agreements (or "PIPEs" transactions) with Kalani.

33. DryShips consummated its agreement to Kalani's scheme in June 2016, signing the first of five PIPE transactions with Kalani, having conducted its first reverse stock splits on March 11, 2016. It would subsequently conduct seven further reverse stock splits between August 2016 and July 2017, decimating the value of its shares.[16] Top Ships likewise disclosed in February 2017 that it had also consummated a PIPEs agreement with Kalani, that was subsequently amended on a number of occasions to increase the issuance amount. Top Ships would ultimately conduct five reverse splits between May 2017 and March 2018, similarly, destroying the value of its shares.[17]

34. The Diana Defendants arranged and executed the first step in their Agreement with Kalani on June 6, 2016, when Diana announced that its Board of Directors determined to implement an eight-for-one[18] reverse stock split, effective June 9, 2016. This raised the price of

---

[15] And while reverse stock splits are not inherently manipulative in and of themselves, they were rendered manipulative through the companies' failure to disclose that the splits were being conducted pursuant to their Undisclosed Agreement with Kalani, which required Diana, DryShips, and Top Ships to execute reverse stock splits each time the price of its common stock fell below the applicable price floor.

[16] Further details of Kalani's and DryShips' actions are found in the Third Amended Complaint filed on today's date in *Silverberg v. DryShips Inc., et al.*, Civil Action No.: 2:17-cv-04547-BMC (E.D.N.Y.).

[17] Further details of Kalani's and Top Ships' actions are found in the Consolidated Amended Class Action Complaint filed Sept. 18, 2018, in *Brady v. Top Ships, Inc., et al.*, Civil Action No.: 2:17-cv-04987-JFB-SIL (E.D.N.Y.).

[18] In this complaint we describe reverse stock splits as ratios whereby the input is the number of pre-split shares, and the output is the number of shares received in return for the pre-split shares.

Diana common stock from $0.52 at the close of June 8, to $4.25 at the close of June 9, 2016, roughly in-line with the mechanical increase expected from an eight-for-one split.

35. The Diana Defendants then took the necessary steps to get the Company's shares into the hands of Kalani. On January 26, 2017, the Diana Defendants filed a Shelf Registration and Preliminary Prospectus on Form F-3 with the SEC (the "Shelf Registration Statement"), authorizing the Company to issue securities up to an aggregate offering price of $250 million. At that time, Diana reportedly had approximately 9,361,274 shares of common stock outstanding, and its total market capitalization was only about $26.2 million.

36. Two weeks after the Shelf Registration Statement became effective, on March 21, 2017, Diana's SEC filings announced that the Company had entered into the SPA. Pursuant to the SPA, Diana granted Kalani the option to purchase up to an aggregate of $150 million in Diana securities, as follows: (a) 3,000 Series B-1 Convertible Preferred Shares for $3,000,000 (the "B-1 Convertible Shares"); (b) warrants to purchase an additional 6,500 Series B-1 Convertible Shares (the "B-1 Warrants") for up to $6,500,000, if fully exercised; and (c) warrants to purchase 140,500 newly-designated Series B-2 Convertible Preferred Shares (the "B-2 Warrants and B-2 Convertible Shares") for up to $140,500,000, if fully exercised. The B-1 Convertible Shares and Warrants were issued pursuant to the Shelf Registration Statement while the B-2 Warrants and B-2 Convertible Shares were issued pursuant to Regulation S.

37. Additionally, on March 21, 2017, Diana disclosed that it had also entered a Registration of Rights Agreement with Kalani, pursuant to which it undertook to file an additional Registration Statement with the SEC "as soon as practicable" in relation to the B-2 Convertible Preferred Shares. Diana duly did so on March 24, 2017 (the "B-2 Registration Statement").

**<u>The SPA Was the Perfect Vehicle to Implement the Defendants' Manipulative Agreement</u>**

38. At its option, Kalani could convert each B-1 and B-2 Warrant into the B-1 and B-2 Convertible Shares, respectively, at an exercise price of $1000 per preferred share.[19] The SPA agreement contained provisions that adjusted the exercise price to protect Kalani against reverse stock splits impacting the B-1 and B-2 convertible shares.[20]

39. The B-1 and B-2 Convertible Shares were convertible into Diana common stock at ***any*** time at the option of Kalani, subject only to minimal trading-volume restrictions on the date of conversion,[21] and with no lock-up period or other meaningful restriction on Kalani's ability to dispose of the shares immediately upon conversion. More importantly, Kalani was able to convert their preferred stock into common stock at discounted prices. The securities were convertible at a fixed price of $7 per share, or at a price per-share equal to the higher of: a) 92.25% of the lowest volume-weighted average price of the common shares during the five-day trading period ending on, and including, the conversion date; or b) $0.50.[22] This effectively created a price floor on Kalani's conversion right of $0.50. If the price of Diana's stock fell below $0.50, Kalani had no incentive to exercise its conversion right at the floor price, as it had no means of profiting from the

---

19 Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Mar. 21, 2017), Exhibit 3.3, Form of Series B-1 and B-2 Warrant (attached hereto as Exhibit D) and B-2 Registration Statement.

20 Diana Containerships, Report of Foreign Private Issuer, (Form 6-K) (Mar. 21, 2017), Exhibit 3.3, Form of Series B-1 and B-2 Warrant, cl. 2.

21 Diana disclosed that Kalani was only permitted to convert its preferred shares to common stock if "on the date of conversion the trading volume of our common shares on [Nasdaq] is not less than 15,000,000." *See, e.g.*, B-2 Registration Statement at 4; cl. 4(b)(ii) of Statement of Designations, Preferences and Rights of the Series B-1 Convertible Preferred Stock of Diana Containerships Inc. ("B-1 Statement of Designations"); and cl. 4(b)(ii) of Statement of Designations, Preferences and Rights of the Series B-2 Convertible Preferred Stock of Diana Containerships Inc. ("B-2 Statement of Designations"), which were enclosed as Exhibits 3.1 and 3.2 to the Form 6-K filed by Diana on March 21, 2017 (annexed hereto as Exhibits E and F, respectively). As discussed below, this was a misstatement, as neither Kalani nor Diana intended to honor this contractual restriction upon Kalani's right of conversion.

22 *See* clauses 4 and 29 ("Alternative Conversion Price" and "Floor Price") of B-1 and B-2 Statement of Designations.

common shares it would subsequently receive at an above market price and which it had no intention of holding.

40. The terms of the SPA were unusual in the context of PIPEs transactions, as Kalani was effectively insulated from any risk, and was not restricted from trading the common shares it would ultimately obtain in a dilutive manner. In particular, Kalani was only required to establish a very limited upfront long position of $3,000,000 for the initial batch of 3,000 preferred B-1 Convertible Shares it acquired under the SPA. This position was totally dwarfed by the B-1 and B-2 Warrants it received, and the preferred shares they represented, for which Kalani paid no upfront consideration. While warrants are often granted to the investor in PIPEs transactions, they typically are provided for consideration and a more significant upfront financing commitment, even in a distressed situation.[23] Moreover, the floor price established for the conversion of the preferred stock was not market standard and encouraged the dilution of common stock. Typically, issuers completing a private placement of convertible securities will establish a floor price of 50%-75% of their prevailing share price at the time of closing.[24] Bucking this, the SPA's price floor was set well below 25% of the price at which Diana common stock was then trading ($2.28).

41. While the terms of the SPA do not make sense in the context of a typical arm's length commercial transaction, they do when viewed in the context of the Defendants' wider,

---

[23] Analysis of all the PIPEs transactions conducted by U.S. issuers across 2016 and 2017 suggests that the average and median warrant coverage granted to investors in these transactions, expressed as a percentage of the issuer's outstanding shares, was 85% and 75%, respectively. The average and median warrant exercise price during this period, expressed as a percentage of the issuers stock price, was 119.7% and 113.6%, respectively. The SPA's terms were considerably more favorable to Kalani. Warrant coverage, expressed as a percentage of Diana's outstanding shares, was approximately 4,900%. And as noted above, the SPA allowed Kalani to ultimately convert these warrants into common stock at a 92.25% discount to market price, well below the prevailing median and average prices.

[24] Steven Dresner et al., *PIPEs: A Guide to Private Investments in Public Equity*, (2d. ed. 2005) ("To negate the potentially unlimited dilution of a [floating or variable conversion price], recent transactions have included minimum conversion prices, or 'floors.' Floors are typically set between 50 percent and 75 percent of the market price at closing of the transaction. Floors serve to control the ultimate dilution of an issuance yet still provide some risk mitigation for the investor.").

Undisclosed Agreement. In fact, in the SPA, Defendants created the perfect vehicle to implement their Agreement and bind the participants to its execution. Kalani could – but was not obliged to – convert their securities to common stock. They would, therefore, only do so when they could take advantage of a price spike, thereby shielding them from any risk of loss. If no such price spike was forthcoming, they were not obliged to outlay any further funds than the initial $3 million, the recoupment of which had already been ensured through the June 9, 2016, reverse stock split. The Diana Defendants, for their part, seeking to funnel to insiders the injection of funds that each conversion would bring, were deliberately incentivized to induce the agreed-upon price rises via reverse stock splits and thereby facilitate Kalani's trading profits, despite the injury necessarily caused to Diana's shareholders. Thus, the SPA solved any would-be conspiracy's number one problem – how to self-police the parties' obligations and reduce both the possibility and harm of "cheating."

42. Neither Diana nor Kalani disclosed that Diana would necessarily have to conduct multiple reverse stock splits for Kalani to exercise any of the B-1 and B-2 Warrants and inject capital into the company, nor that Diana had previously agreed to do so. They also did not disclose that Kalani intended, with the Diana Defendants' knowledge and consent, to immediately sell any securities that it converted at a discounted price into the secondary market, or use the shares to cover naked short sales of Diana common stock it had made in violation of Regulation SHO. Indeed, these omissions left investors with the misleading impression that Kalani was a sophisticated independent investor willing to invest in Diana's future when, in fact, it was reaping a guaranteed profit at unsuspecting investors' expense.

43. Immediately following the execution of the SPA, Kalani began exercising its warrants and converting and selling its securities into the market and/or to cover its naked short

sales. As a result, between March 22, 2017, and July 3, 2017, Diana's total outstanding common stock rose from approximately 9.4 million shares to 14.4 million, with the price of Diana common stock falling precipitously from roughly $1.64 to $0.28 under the weight of Kalani's selling spree.

**Diana Defendants Go to Great Lengths to Procure Further Reverse Stock Splits for Kalani to Trade, Destroying the Value of Its Common Stock**

44. With the necessary structure in place to enrich Palios, his family, and other insiders at the expense of Diana's shareholders, on March 29, 2017, just one week after the announcement of the SPA, Diana filed its Notice of Annual Meeting of Shareholders, to be held on May 10, 2017.[25] The accompanying Proxy Statement requested approval for an amendment to the Company's Amended and Restated Articles of Incorporation to enable the directors, at their discretion, to effect one or more reverse splits, with an aggregate cap of 1,000-for-one (the "Reverse Stock Split Proposal"). The Reverse Stock Split Proposal, which required the affirmative vote of the holders of a majority of all outstanding shares of common stock, would be valid for two years if approved.

45. Shareholders were misleadingly assured that Diana's Board would only effect such stock splits "if it believes that a decrease in the number of Common Shares outstanding is ***likely to improve the trading price*** for the Company's Common Shares, and only if [the stock split] is determined by the Board to be ***in the best interests of the Company*** and its shareholders." [Emphasis added].[26] Investors were again not apprised of the Undisclosed Agreement, or even Diana's intent to conduct a reverse stock split every time Kalani's share sales pushed Diana's share price below the $0.50 price floor.

---

25 Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Mar. 29, 2017) (Ex. 99.1).

26 *Id*. (Proposal Three).

46. At the Annual Shareholder Meeting on May 10, 2017, it became apparent that Defendants lacked sufficient votes to obtain shareholder approval for the Reverse Stock Split Proposal. To prevent interruption of their fraudulent scheme, the Diana Defendants announced on May 12, 2017, that the meeting had been adjourned until May 19, 2017 "to allow additional time for the solicitation of proxies."[27] Voting on the Reverse Stock Split Proposal was then adjourned a second time, as Diana announced on May 24, 2017, that the meeting would be further adjourned to June 29, 2017, to allow further "additional time for the solicitation of proxies."[28]

47. But the true purpose of the multiple adjournments, and a shift of location from Zurich, Switzerland to Limassol, Cyprus, was to wrest voting control from shareholders in order to get the Reverse Stock Split Proposal approved. On June 6, 2017, the Diana Defendants announced that on May 30, 2017, less than one week after claiming to need time to solicit proxies, the Company instead had issued 100 shares of newly-designated Series C Preferred Stock to DSI, the Company's largest shareholder, in exchange for a reduction of $3 million in the principal amount of the Company's outstanding $45 million loan.[29] Each share of the Series C Preferred Stock entitled the holder to up to 250,000 votes, to be cast alongside holders of common shares. The fact that aggregate voting power of DSI and any affiliates was capped at 49% was meaningless; the only purpose for issuing the "super-voting" rights, Series C Preferred Stock, to DSI at this time was to give the Diana Defendants nearly all the votes needed to push through the Reverse Stock Split Proposal. Moreover, since these preferred shares were not publicly traded, Palios, who beneficially owned DSI, insulated himself from the impending stock price volatility

---

[27] Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (May 12, 2017).

[28] Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (May 24, 2017).

[29] The same trick was employed by DryShips in September 2016, when it granted super voting right shares to Economou-controlled Sifnos, ahead of seeking shareholder approval of a similar proposal authorizing further reverse stock splits.

and dilution that would result from the planned, consecutive, reverse stock splits underpinning Defendants' Agreement.

48. Belying any assertion that they were acting in the shareholders' best interests, on June 30, 2017, the Diana Defendants announced that the Reverse Stock Split Proposal was approved by a majority of shareholders at the adjourned Annual Shareholders Meeting, which was held on June 29, 2017.

**Defendants Execute Their Fraudulent Agreement**

49. Having forced the Reverse Stock Split Proposal through, Diana and Palios immediately set to work on upholding their end of the Undisclosed Agreement in order to prompt Kalani to convert and sell more of its securities. Diana common stock had been trading below the $0.50 floor price ever since May 1, effectively forestalling Kalani's injection of further capital into Diana. The decline of Diana common stock from its closing price of $2.28 on March 21, 2017, was the inevitable result of Kalani's receipt and sale of five million shares of common stock in the immediate aftermath of the SPA's announcement. The issuance of these five million shares during this period constituted a 55% increase in the number of Diana's shares outstanding at the time of the SPA.

50. Consequently, on June 30, 2017, the same day the Company announced approval of the Reverse Stock Split Proposal, the Diana Defendants issued a second press release, announcing Board approval of a seven-for-one reverse stock split, effective upon the opening of trading on July 5, 2017. According to the Company's public filings, the reverse stock split reduced the number of common shares outstanding from 14.4 million to 2.1 million.

51. The reverse stock split resulted in a temporary increase in the share price of Diana common stock from a close of $0.28 per share on July 3, 2017, to a close of $1.42 per share on

July 5, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 28% on a split adjusted basis.

52. As intended, with Diana common stock trading above the floor price of $0.50, Kalani could continue to convert its preferred shares into common stock and then immediately sell these into the market and/or used it to cover naked short sales of Diana common stock it had conducted in violation of Regulation SHO. Between July 5, 2017, and July 26, 2017, ***a period of only three weeks***, Diana reported that the number of outstanding shares of its common stock rose from 2.1 million to 6.1 million, suggesting that Kalani received 3.5 million shares during this period.[30] This constituted an increase of more than 190%. During the same period, the price of Diana common stock cratered again under the weight of Kalani's selling activity.[31] It dropped below the $0.50 floor price on July 18, 2017, closing above it only once on June 24, 2019.[32]

53. That decline of Diana common share price was aided by DSI's decision to sell over 90% of its Diana common shares between July 7 and July 14, 2017.[33] Having used its common stock to help secure Diana's passage of the Reverse Stock Split Proposal, DSI evidently wished to liquidate its holding as quickly as possible and, in any event, to do so before Diana's subsequent

---

[30] Approximately 3.5 million of the cumulative 4 million increase in Diana's outstanding shares in this period appear attributable to Kalani's conversion of its preferred stock, with the remaining 0.5 million apparently issued to company insiders (and thus excluded from Bloomberg's record of the Company's float). Diana's public reports suggest that Kalani received approximately 1.77 million of those 3.5 million shares prior to July 18, 2017. Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (July 19, 2017).

[31] Kalani never once filed a Form 13D recording its ownership of more than 5% of Diana common stock. Given the volume of common stock it received across 2017, and the limited size of Diana's float as a result of the stock splits, Kalani could only have avoided holding a 5% stake in Diana if it immediately sold down all the common stock it received upon each conversion of its preferred stock, and/or used it to cover pre-existing short sales.

[32] It previously closed below the floor price on July 14, 2017, but bounced back to close at $0.52 on July 17, 2017, the following trading day.

[33] Diana Containerships, (Form SC 13D/A) (July 31, 2017) (Item 5. Interest in Securities of the Issuer.). The filing noted that DSI held only 0.8% of Diana common stock after the recorded share sales.

splits completely destroyed their remaining value. The following table reflects DSI's sales in July 2017 of Diana common stock, par value $0.01 per share, in open-market transactions:

**Table 1. DSI's Disclosed Sales of Diana Common Stock**

| Trade Date | Shares Sold (adjusted for July 5 split) | Average Price per Share | Total Shares Sale Amount | Commissions Stamp Duties | Total Transaction Amount |
|---|---|---|---|---|---|
| 7/7/17 | 47,549 | $0.86300 | $41,034.79 | -$328.25 | $40,706.54 |
| 7/10/17 | 50,530 | $0.75891 | $38,347.64 | -$250.18 | $38,097.46 |
| 7/11/17 | 25,762 | $0.65324 | $16,828.71 | -$109.79 | $16,718.92 |
| 7/12/17 | 44,454 | $0.59636 | $26,510.42 | -$172.90 | $26,337.52 |
| 7/13/17 | 18,203 | $0.51397 | $9,355.75 | -$61.02 | $9,294.73 |

54. As a result of these sales and the Company's share issuances under the SPA, DSI retained only 0.8% of the Company's common shares as of July 31, 2017.[34] Significantly, because of the issuance of the "super-voting" rights, C-Series Preferred Shares, DSI – and consequently, Palios – still maintained *de facto* voting control over the Company. Thus, Palios was able to protect against the decline of his shareholding's value from the Company's fraud, without losing control over its operations.

55. By market close on July 26, 2017, the price of Diana common stock had declined from $1.42 on July 5, 2017, to $0.19 per share as a direct result of Kalani's sales of common stock. This price was 87% below the closing price of the Company's shares on July 5, 2017, after the Company's previously announced seven-for-one reverse stock split took effect.

---

[34] Palios is also believed to have sold his direct holding of Diana common stock at this stage. Diana's 2017 Annual Report reported that his 4.5% stake in the Company had been reduced to 0% by years' end. Diana Containerships, Annual Report (Form 20-F), at 80 (Mar. 16, 2018).

56. With Diana's share price once again languishing below the $0.50 floor, the Diana Defendants announced another reverse stock split on July 26, 2017, which took effect on July 27, 2017. The six-for-one reverse stock split reduced the number of shares outstanding from 6.1 million to 1 million. The reverse stock split resulted in a temporary increase in the share price of Diana common stock from a close of $0.19 per share on July 26, 2017, to a close of $0.83 per share on July 27, 2017. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined over 27% on a split adjusted basis.

57. Nevertheless, the split had the desired effect of raising Diana's share price above the $0.50 per share strike price, thereby enabling Kalani to continue to convert and sell its preferred stock and/or used it to cover naked short sales of Diana common stock it had conducted in violation of Regulation SHO. Diana's disclosures suggest that Kalani converted preferred stock worth 4.2 million shares of common stock between July 27, 2017, and August 23, 2017, increasing the total number of shares outstanding from approximately 1 million to 5.3 million – respectively, an increase of approximately 430%.[35] Importantly, Kalani appears to have received 1.86 million of those shares of Diana common stock on July 28, 2017, the first day after the July 27, 2017 stock split.[36] As Diana was not required to issue common stock until three days after receiving a conversion notice from Kalani, this strongly suggests Kalani requested the conversion in advance

---

[35] *Compare* Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Aug. 23, 2017) (Press Release), noting Diana's then-outstanding shares amounted to 5.3 million, against Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (July 26, 2017) (Press Release), noting that, as a result of the July 28, 2017 reverse stock split, Diana's outstanding shares would be reduced to approximately 1 million shares. Plaintiffs note that these reported changes in common stock were not recorded by Bloomberg's record of Diana common stock and float, which reported no change in Diana's outstanding shares between July 27, 2017 and August 23, 2017.

[36] Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (July 31, 2017), noting that Diana had "2,861,985 shares of common stock . . . issued and outstanding as of July 28, 2017," up from the approximately 1 million said to remain after the July 27, 2017 stock split.

of Diana's public announcement of the stock split on July 26, 2017, 15 minutes before the market closed. This conclusion is bolstered by the fact that July 25, 2017, was one of the few days during 2017 when trading volume in Diana common stock surpassed the 15 million volume restriction imposed upon Kalani's right to convert its preferred shares into common stock.[37] This suggests that once the volume requirement had been surpassed on July 25, 2017, Kalani and Diana agreed that Kalani would submit a further conversion request for common shares approximating 1.86 million and that Diana would immediately announce a further split.

58. Kalani's sales of Diana common stock following the July 27, 2017 stock split quickly drove Diana common stock price below the $0.50 price floor, where it largely stayed from August 2, 2017, until August 23, 2017, when it closed at $0.26. This price was 69% below the closing price of the Company's shares on July 27, 2017, after the Company's previously announced six-for-one reverse stock split took effect.

59. The next reverse stock split was announced on August 23, 2017, and took effect on August 24, 2017. Diana disclosed that the seven-for-one reverse stock split reduced the number of shares outstanding from 5.3 million to 0.8 million. The reverse stock split resulted in a temporary increase in the share price of Diana common stock from a close of $0.26 per share on August 23, 2017, to a close of $1.15 per share on August 24, 2017. While the stock split again pushed the price of Diana common stock above the B-1 and B-2 Convertible Shares' price floor, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined by 37% on a split adjusted basis.

---

[37] July 24, 2017, was also one of the only days since July 13, 2017, that Diana common stock closed above the $0.50 floor (it closed at $0.5095).

60. Diana's reporting suggests that Kalani continued to convert and sell its preferred stock and/or used it to cover its naked short sales in violation of Regulation SHO. Kalani's activities increased the total number of Diana common shares outstanding from 0.8 to 3.2 million between August 24, 2017, and September 22, 2017, a roughly 300% increase.[38] Kalani was able to convert its B-1 and B-2 Convertible Stock during this period, despite the fact that Diana common stock had not met the 15 million daily trading volume restriction imposed upon its conversion of preferred stock since July 25, 2017 (and would not do so again until November 3, 2017).

61. As a result of Kalani's sales following the August 24, 2017, stock split, Diana common share price declined from $1.15 per share to $0.42 per share by market close on September 22, 2017, a decline of 63%.

62. On September 22, 2017, the Company announced that the Diana Defendants approved a three-for-one reverse stock split, effective September 25, 2017, which reduced the number of shares outstanding from 3.2 million to 1.1 million. The reverse stock split resulted in a temporary increase in the share price of Diana common stock from a close of $0.42 per share on September 22, 2017, to a close of $0.74 per share on September 25, 2017, the next trading day. However, this increase did not offset the loss in value to shareholders from having their shares merged, and the price of the shares actually declined 41% on a split adjusted basis.

63. Following the September 25, 2017 stock split, Kalani's conversion and sale of its convertible securities and/or its use of the same to cover its naked short sales, again quickly pushed Diana common stock below the $0.50 floor price, first dipping below that mark on October 3,

---

[38] *Compare* Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Aug. 23, 2017) (Press Release), noting that Diana's outstanding shares would number 0.8 million on August 24, 2017, to Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Sept. 22, 2017) (Press Release), noting that Diana's outstanding shares stood at 3.2 million. Plaintiffs note that these reported changes in common stock were not recorded by Bloomberg's record of Diana common stock and float, which report no change in Diana's outstanding shares between August 24, 2017 and September 22, 2017.

2017, the end of the Class Period. Diana's disclosures suggest that from September 25, 2017, until October 31, 2017, Kalani received and sold 4.2 million shares of Diana common stock, accounting for an over 400% increase in the volume of Diana's outstanding shares.[39]

64. As noted above, and as the SEC factual findings reflect, in addition to selling the common shares it received from the conversion of its B-1 and B-2 Convertible Stock into the market to generate trading profits, Kalani also used them to cover naked short sales of Diana common stock it had already made and caused its brokers to erroneously label as "long" sales.[40] Each time Diana precured a bump in its stock price through a reverse stock-split, Kalani could engage in naked short selling of Diana common stock and then cover those sales with the discounted stock it would receive shortly thereafter. Kalani could, and apparently did, profitably engage in this practice with each stock split until the market value of Diana's common stock fell below the $0.50 floor price. As such, Kalani's undisclosed short sales in violation of Regulation SHO inevitably depressed the price of Diana common stock below the floor price.

65. By the end of the Class Period, as a result of Defendants' ongoing dilutive and manipulative conduct, the price of Diana common stock had declined to $0.47. At this share price, Diana had a market capitalization of between $520,000 and $3 million,[41] despite having raised tens of millions of dollars from Kalani since March 2017. On a split adjusted basis, taking into

---

[39] *Compare* Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Sept. 22, 2017) (Press Release), noting that Diana's outstanding shares would stand at 1.1 million shares on September 25, 2017, to Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Oct. 31, 2017), noting that Diana's outstanding shares then stood at 5.3 million.

[40] Kalani did so to grant itself two-more days to deliver the Diana common stock before a "buy-in" would be required. Doing so also allowed Kalani to avoid the onerous margin requirements for shorting stocks, which often is more than 100% the underlying stock price.

[41] The exact figure is dependent upon when Kalani received the common stock it converted after the September 25, 2017 stock split.

account the stock splits, the price of Diana stock had declined to approximately $0.0004688 since June 9, 2016, a decline of over 99.98%.

66. The decimation of shareholder value was entirely attributable to Diana's and Kalani's Undisclosed Agreement, through which Defendants manipulated the price of Diana common stock and induced the investing public to purchase Diana stock at prices significantly over their actual value.

67. Defendants continued their fraud after the close of the Class Period. Having practically exhausted the aggregate reverse stock split limit under the initial Reverse Stock Split Proposal,[42] Palios had Diana announce a Special Shareholders meeting to take place on October 26, 2017, to vote on a further proposal to allow the board to authorize additional reverse stock splits ("Second Reverse Stock Split Proposal"). In the announcement, Diana assured investors that should the Board receive permission to execute yet another reverse stock split, the Board would do so:

> ***only*** if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and ***only*** if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders. [Emphasis added].[43]

68. Notwithstanding that the value of Diana common stock had already declined by over 99% as a result of Defendants' Undisclosed Agreement, Diana's October 31, 2017 Form 6-K reported the unsurprising result that the Special Shareholders Meeting on October 26, 2017 had approved the Second Reverse Stock Split Proposal. The same Form 6-K also announced a seven-

---

[42] Diana's first four 2017 reverse stock splits summed to an aggregate split value of 882-for-1, near the 1000-for-1 ceiling imposed by Reverse Stock Split Proposal. To conduct any further whole share splits, Diana required further shareholder approval.

[43] Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Oct. 6, 2017) (Proposal).

for-one reverse stock split to take place on November 2, 2017, thereby reducing the number of Diana shares outstanding from 5.3 million to 757,194 shares.

69. It was only at this point that Defendants stopped their merry-go-round of reverse stock splits and share sales in order to enable Diana to regain compliance with the Nasdaq's $1.00 listing requirement ahead of the expiry of its 180-day grace period on November 18, 2017 (per the May 22, 2017, delisting noticed received from Nasdaq). Consequently, and unlike the prior stock splits, Diana's stock price remained above the requisite $1.00 minimum for the requisite 10-period, free from the depressive effect of Kalani's manipulative short selling. Defendants did not return to the scheme after Diana came back into compliance, evidently spooked by the announcements of the SEC's investigations into Kalani's activities with DryShips and Top Ships. *See* ¶145 below.

70. Indeed Defendants' behavior and approach to Kalani's conversion and sale of its remaining convertible securities changed noticeably after this time, with Kalani converting its securities into common stock at a much slower rate. Consequently, Diana's shares closed above the $0.50 floor price between November 2017 to early 2020 on an adjusted basis. This dramatic change in behavior after the SEC investigations were announced strongly suggests that Defendants were not simply acting as rational self-interested economic actors during the Class Period.

71. Had the purpose of the stock splits been to regain compliance with Nasdaq's $1.00 listing requirement, Diana would have spaced out the costly and destructive splits to take advantage of the 180-day grace period, rather than conduct five in a mere four-month period.

**<u>Diana's and Kalani's Undisclosed Agreement Can Be Inferred from Their Conduct</u>**

72. Diana's conduct in authorizing five reverse stock splits in the immediate aftermath of the SPA's execution is inexplicable but for the existence of the alleged Undisclosed Agreement.

No company board would conduct so many reverse stock splits without its insiders having some other motivation of personal profit.

73. There is a large body of research regarding when reverse stock splits are conducted, for what reasons, with what effect, and at what cost. That research shows that the number, frequency, and cumulative value of the splits deployed by Diana were a complete outlier and utterly inconsistent with Diana's claims that reverse stock splits were conducted in the "best interests" of the company, to raise its stock price, to meet Nasdaq's minimum listing price, and encourage institutional investors.

74. For example, a 2015 study of all reverse splits between 1980 and 2010 executed by public companies trading in the United States across all stock exchanges found that just five companies during this 30-year period had performed as many as five reverse stock splits, with the most extreme case (which led to a SEC investigation for fraud) having reverse split the stock five times within four years. *See* Claire E. Crutchley et al., *Multiple Reverse Stock Splits (Investors Beware!)*, 39 Journal of Economics and Finance 357, 359 (2015) ("Crutchley").[44] Indeed, only 2.2% of the 1,807 companies who conducted a reverse stock split during this entire 30-year period conducted three or more reverse splits. *Id.* In addition, approximately 85% of the reverse stock splits identified in the study utilized a split factor (the number of old shares exchanged for one new share) of 10 or less, and the median years between individual company's reverse stock splits fell between two and three years. *Id.* at 360-62.

[44] *See also* Ahmed Elnahas et al., *Stock Splits, Accounting Manipulation, and Unwarranted CEO Compensation*, SSRN (May 11, 2016), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2800765 (discussing literature of reasons why reverse splits take place, noting "Bacon, Salandro, and Shin (1993), and Peterson and Peterson (1992) document that corporate managers mention image improvement, marketability, increased ability to attract different segments of investors, and meeting stock market listing requirements as the main reasons for reverse splits. Many empirical studies . . . find that those stated objectives are not really achieved with reverse splits. Our analysis shows that, for many firms, ***a reverse split results from prior misdeeds in corporate gamesmanship***.") [Emphasis added].

75. Further, reverse stock splits are costly to implement – attorney's fees alone can run into the many hundreds of thousands of dollars – and have adverse consequences in terms of investor sentiment and stock price performance.[45] As such, they are usually engaged in by financially distressed companies as a last resort. And even then, a reverse stock split is typically a one-and-done proposition.

76. This research suggests that Diana's six reverse stock splits between June 2016 and November 2017, five of which were conducted between July 5, 2017, and November 2, 2017, were completely out of the ordinary, as were DryShips' and Top Ships' multiple stock splits during these years. This conclusion is buttressed by Plaintiffs' own analysis of the 3,212 private placement (or PIPEs) transactions reported as having been conducted by 1,864 issuers listed on U.S. exchanges across 2016 and 2017.[46] As shown in Table 1 below, of the 1,864 companies responsible for these PIPE transactions, only 21% have ever conducted a reverse stock split, and only 0.52% had performed four or more reverse stock splits in their lifetime. Diana, DryShips, and Top Ships were the only three issuers in this sample to have conducted six or more reverse splits in their lifetime.

---

[45] *See* Crutchley, *supra*, at 357, 361.

[46] Included in this analysis are private placement offerings of Common Stock; Convertible Preferred Stock; non-Convertible Preferred Stock (with Warrants); Convertible Debt; non-Convertible Debt (with Warrants); other Convertible Securities; Prepaid Warrants; Equity Lines; and At-the-Market Offerings.

**Table 2: Number of reverse stock splits conducted by 2016 and 2017 PIPEs issuers across their lifetime**

| Reverse Stock Splits Across History | Number of Issuers | Percentage of Total Issuers |
|---|---|---|
| 0 | 1472 | 78.97% |
| 1 | 269 | 14.43% |
| 2 | 81 | 4.35% |
| 3 | 32 | 1.72% |
| 4 | 6 | 0.32% |
| 5 | 1 | 0.05% |
| 6 | 1 | 0.05% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.05% |
| 9 | 1 | 0.05% |

77. More importantly, as shown in Table 2 below, only 8.58% of the issuers who conducted PIPEs transactions in 2016 and 2017 also conducted a reverse stock split during those same years. Indeed, only three of these issuers conducted more than two reverse stock splits across 2016 and 2017: Diana, DryShips, and Top Ships.[47] Aside from these three companies, only 10 of the companies who closed PIPEs transactions in 2016 and 2017 also conducted two reverse stock splits in those years.

[47] This is not the only issue in which Diana, DryShips, and Top Ships were outliers. Between November 7, 2016 and November 16, 2016, each entity experienced an inexplicable and short-lived spike in their share price. Diana's share price increased by 469%, DryShips' share price increased by 1486% (and trading was halted on November 16, 2016), and Top Ships' share price increased 175%. *See* annexed hereto as Exhibit G, a record of Diana's closing stock prices across the Class Period. Diana's shipping industry peers experienced nowhere near that level of volatility. For example, during that same time frame, Scorpio Tankers Inc.'s share price increased 15%, Nordic American Tankers Ltd. increased 17%, Teekay Tankers Ltd. increased 10%, and Maersk decreased 10%. The only fact connecting Diana's, DryShips', and Top Ships' price rise was that they were each working with Kalani. That this spike effected Diana, some four months before the SPA was disclosed to the public, is further evidence that Kalani and Diana had reached the Undisclosed Agreement in 2016.

**Table 3: Number of reverse stock splits conducted in 2016 and 2017 by 2016 and 2017 PIPEs issuers**

| Reverse Stock Splits Across 2016 and 2017 | Number of Issuers | Percentage of Total Issuers |
|---|---|---|
| 0 | 1704 | 91.42% |
| 1 | 147 | 7.89% |
| 2 | 10 | 0.54% |
| 3 | 0 | 0.00% |
| 4 | 0 | 0.00% |
| 5 | 1 | 0.05% |
| 6 | 1 | 0.05% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.05% |

78. Plaintiffs' research demonstrates that conducting multiple reverse stock splits over a short period of time is not a necessary corollary of conducting PIPEs transactions, even where the transaction is conducted by a financially distressed company such as Diana. Even when the analysis is limited to the 326 PIPE transactions across 2016 to 2017, where the issuance amount, excluding warrant coverage, exceeded 50% of the issuers' market capitalization, the results still suggest Diana's conduct is an outlier. Of the 267 companies responsible for these 326 PIPE transactions, only 21.7% also conducted at least one reverse stock split in 2016 or 2017, and no issuer dealing with an investor other than Kalani conducted more than two reverse stocks in those years:[48]

[48] The two issuers who conducted 5 and 8 splits across 2016 and 2017 as shown in Table 3 are Top Ships and DryShips, respectively. Diana does not appear in this table, as its issuance of 3,000 B-1 Preferred Stock to Kalani did not exceed 50% of its market capitalization and as Plaintiffs have excluded warrants from this analysis.

**Table 4: Number of reverse stock splits conducted in 2016 and 2017 by 2016 and 2016 PIPEs issuers whose issuance exceeded 50% of their market capitalization**

| Reverse Stock Splits Across 2016 and 2017 | Number of Issuers | Percentage of Total Issuers |
|---|---|---|
| 0 | 209 | 78.28% |
| 1 | 49 | 18.35% |
| 2 | 7 | 2.62% |
| 3 | 0 | 0.00% |
| 4 | 0 | 0.00% |
| 5 | 1 | 0.37% |
| 6 | 0 | 0.00% |
| 7 | 0 | 0.00% |
| 8 | 1 | 0.37% |

79. Furthermore, the fact that Diana conducted each of its 2017 reverse stock splits only after its stock price remained below the $0.50 price floor for a number of days,[49] strongly suggests that these splits were performed to facilitate Kalani's conversion and sale of further convertible securities. Had Diana intended the splits to help it maintain its listing on the Nasdaq Global Select Market by keeping its stock price above $1.00, as Diana suggested in its public announcements, one would have expected it to have conducted the stock splits as soon as its stock price dropped below $1.00, rather than wait for a prolonged period of trading below $0.50.

80. Moreover, the reverse stock splits conducted pursuant to the Undisclosed Agreement worked directly against another key listing requirement of the Nasdaq Global Select Market, namely that a company's float must be comprised of common shares worth at least $5 million.[50] Diana's repeated use of reverse stock splits to raise its share price above the SPA's floor

---

49 *See* Exhibit G.

50 Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Aug. 2, 2017) (Press Release), noting that it had received a Nasdaq delisting notice because the "Company is no longer in compliance with the continued listing requirement under Nasdaq Listing Rule 5450(b)(1)(C) because the market value of publicly held shares ('MVPHS') was below $5,000,000 for 30 consecutive business days."

price to facilitate Kalani's further trading took the value of its float well below this threshold, and is inconsistent with its claim that the reverse stock splits were conducted in part to maintain its Nasdaq listing.[51] While Diana and Palios were aware that Kalani's conversion of further preferred stock following each split would likely raise Diana's outstanding share numbers, they also knew that doing so would necessarily cause Diana's share price to fall.

81. Additionally, if only one company who dealt with Kalani had conducted multiple reverse stocks splits in the manner that Diana did, one might be able to attribute those splits to a misguided desire on the company's part to keep its stock price above $1.00 and maintain its Nasdaq listing. But the fact that Kalani reached strikingly similar PIPEs deals with two other companies in 2016 and 2017, DryShips and Top Ships, and both of these companies also performed multiple reverse stock splits after their share price fell below the exercise price of the convertible securities issued by them, suggests this pattern of behavior was by design.[52] In particular, it suggests that Diana's, DryShips', and Top Ships' repeated use of reverse stock splits to prop up their respective share prices above the price floors applicable to the securities granted to Kalani was part and parcel of their wider agreement with Kalani.

82. But for the existence of the alleged Undisclosed Agreement, Diana would not have authorized any further reverse stock splits after the July 5, 2017 split, as it would have recognized that any further splits would not be in the best interest of shareholders and would not achieve the

[51] Even in the absence of arrangements akin to Defendants' Undisclosed Agreement, reverse stock splits do not typically achieve the full extent of the promised mechanical rise implied by their split ratio. *See, e.g.*, Crutchley, *supra*, (which concluded that "[f]irms that declare multiple reverse splits tend to have lower returns following the reverse split and even less liquidity than one reverse split firm" and that "[s]ixty five percent of the firms with multiple reverse splits end up being liquidated or delisted" compared to 57% who conduct only one reverse split). Here, Diana ultimately chooses to move its listing to the NASDAQ Capital Market on March 6, 2020, after receiving further de-listing notices from Nasdaq. The change of listing has not materially changed its share performance.

[52] There is no record of Kalani having conducted any private placements with an issuer listed on a U.S. exchange outside of Diana, DryShips, and Top Ships. In both cases, the evidence suggests that, like here, Kalani immediately sold its common stock in DryShips and Top Ships upon converting its convertible securities, causing these issuers' respective stock prices to drop.

stated objectives of maintaining stable, higher prices. This conclusion is reinforced by the fact that Diana's board would have witnessed the impact of the reverse stock splits conducted previously by Top Ships and DryShips.[53] Had any reasonable board not known of Kalani's intentions in advance, it would have torn up the SPA after Kalani's trading activity pummeled Diana's share price below $0.50 in a matter of six days after the first post-SPA reverse stock split. The fact that Diana and Palios failed to walk away from the SPA and continued to conduct reverse stock splits to facilitate Kalani's continued conversion and sale of its convertible securities and its naked short selling activities, strongly suggests that they had made a prior commitment to do so.

83. The existence of the Undisclosed Agreement is also supported by DSI's decision to sell almost all of its Diana common stock as soon as it had secured passage of the Reverse Stock Split Proposal and Diana conducted the first reverse stock split pursuant to it. While DSI realized less money for its common stock than it would have had it sold at or around the time of the SPA's announcement, its failure to sell its shares earlier is explained by Palios' need to retain voting control of Diana until the Reverse Stock Split Proposal was passed.

84. Like DSI, who has consistently ranked in the lowest quartile of Wells Fargo Securities' scorecard of publicly owned shipping companies' corporate governance, Diana exhibited poor corporate governance throughout the Class Period. In particular, its board composition provided little check on Palios' activities. Not only was there not a majority of independent directors during the class period, each director had served from at least 2010 or 2011.[54] Indeed, when three directors finally departed Diana in 2020, two of them, Ioannis

---

[53] By July 2017, DryShips had already conducted reverse stock splits on March 11, 2016 (25:1); August 15, 2016 (4:1); November 1, 2016 (15:1); January 23, 2017 (8:1); April 11, 2017 (4:1); May 11, 2017 (7:1); June 22, 2017 (5:1); July 21, 2017 (7:1). By this time, Top Ships had conducted splits on February 22, 2016 (10:1); May 11, 2017 (20:1); and June 23, 2017 (15:1).

[54] A lack of board turnover over an extended period – here, seven years – dramatically increases the risk of capture.

Zafirakis and Anastasios Margaronis, remained directors of DSI. It was amongst this close-knit group of friends that Palios was able to procure Diana's adherence to the Undisclosed Agreement despite the obvious harm it would cause shareholders.

**Palios Siphoned Off the Funds Received from Kalani Before Using Diana's Depressed Share Price to Establish a Direct Controlling Stake**

85. While shareholders lost millions of dollars, Defendants reaped the benefits of their fraudulent scheme. Palios has earned millions of dollars through self-dealing, as monies have been funneled to companies he owns and controls. Diana reported that in 2017 it received $32.5 million in gross proceeds from Kalani's purchase of B-1 Convertible Shares and exercise of its B-1 and B-2 Warrants.[55]

86. During that same year, Palios and members of his family derive significant financial benefits from this injection of capital. For example, Palios owns and controls Diana Enterprises Inc. (together with its successor entity "DEI"[56]), which provides brokerage services to Diana in exchange for an annual fee, plus bonuses. Palios also owns and controls Altair Travel Agency S.A. ("Altair"), which serves as the Company's travel agent. In 2017, Diana paid DEI $2.1 million for providing broker services, and nearly $1 million to Altair Travel Agency.

---

[55] Diana Containerships, Annual Report (Form 20-F), at 37 (Mar. 16, 2018) ("2017 20-F"). $32.5 million in gross proceeds were reported to be split between the $3 million received upfront for the 3,000 Series B-1 Convertible Shares and the $29.5 million of gross proceeds received from Kalani's exercise of 29,500 B-1 and B-2 Warrants. Plaintiffs have not been able to verify these figures. Similarly, the 2017 20-F also states at page 37 that "in 2017, from the 32,500 Series B preferred shares issued [to Kalani], 32,211 preferred shares were converted to 4,049,733 common shares and 289 Series B preferred shares remained outstanding as of December 31, 2017." This appears to grossly understate the number of common shares received by Kalani across 2017 in light of the changes in common stock reported by Kalani in its Form 6-Ks announcing its stock splits, which suggest aggregate issuances of common stock to Kalani of approximately 14 million. This discrepancy does not appear to be explained by the effect of the stock split conducted throughout the year. Plaintiffs are aware of no disclosures from Diana recording any share issuance other than to Kalani in 2017 that might explain this discrepancy.

[56] DEI was recently renamed Steamship Shipbroking Enterprises, Inc. Diana Containerships, Annual Report (Form 20-F), at 72 (Mar. 18, 2019).

87. Palios also ensured that Diana subsidiaries run by his family members benefited. Unitized Ocean Transport Limited ("UOT"), is a wholly-owned subsidiary of Diana, led during the Class Period by Defendant Palios' daughter, Semiramis Paliou. In exchange for its services, Diana pays UOT commissions equal to 2% of gross revenues, a fixed management fee of $15,000 per month for each vessel in operation, a fixed monthly fee of $7,500 for laid-up vessels, and a $10,000 per month administrative fee. In 2017, Diana paid $2.4 million to UOT.

88. Similarly, Plaintiffs estimate that Kalani made millions of dollars in commissions, fees, and profits from its short sales and/or resale of the discounted Diana common stock to unsuspecting investors in the secondary market.

89. Palios received fees and payments from DSI similar to those he received from Diana through various businesses that he owns and controls, which provide services to DSI. For example, Diana Shipping Services S.A, another Palios owned and controlled entity, provides commercial, technical, administrative, and management services to DSI in exchange for various fees and commissions.

90. Importantly, Palios achieved this fraud without losing control of Diana. As explained above, he procured the grant of the Series C Preferred Shares to DSI. The special voting rights attached to these shares allowed Palios, through DSI, to maintain control over Diana regardless of how many B-1 and B-2 Warrants and B-1 and B-2 Convertible Shares Kalani held. DSI also concretely benefited from Diana's fraud, including through Diana's early repayment of the balance of its $50 million loan in July 2018.

91. These payments made by Diana to related entities in 2017 would not have been possible but for the capital injections received from Kalani as a result of Diana's participation in the Undisclosed Agreement. On March 16, 2018, Diana disclosed in its 2017 annual report that

its auditors expressed substantial doubt as to the Company's ability to continue as a going concern, which suggests that but for the $32.5 million reportedly received from Kalani across 2017, Diana would not have been able to make the payments outlined above.

92. Diana reported that it received $17.5 million of gross proceeds from Kalani's exercise of 17,490 Series B-2 Warrants in 2018.[57] In 2019, it reported that it received $6.5 million of gross proceeds from Kalani's exercise of 6,470 Series B-2 Warrants.[58] In 2018 and 2019, Kalani reportedly converted 17,529 and 5,220 Series B-2 convertible preferred shares, respectively. This reportedly generated 10,250,265 and 7,100,510 new common shares, respectively.

93. Kalani's sale of this common stock across 2018 and 2019 continued to depress Diana's share price. This, and Palios' knowledge that there were no further reverse stock splits to come (despite further delisting threats from Nasdaq), allowed Palios to buy back a direct controlling stake of Diana. Across the period he steadily rebuilt his ownership of Diana, having sold his prior stake in 2017 to avoid the impact of Defendants' fraud. By March 18, 2019, Palios had acquired a 6.76% stake in Diana, rising to 31.01% on June 20, 2019, and 47.81% by December 9, 2019.

94. Once Palios had re-established this controlling stake, Diana announced a share repurchase program on January 14, 2020, paving the way to siphon further funds to Palios and his affiliates. On March 27, 2020, the Company, now known as Performance Shipping, announced it had bought back DSI's Series C Preferred Shares for $1.5 million.[59] On April 8, 2020, Performance Shipping announced it had repurchased Kalani's remaining 400 B-2 Convertible

---

57 Diana Containerships, Annual Report (Form 20-F), at 32 (Mar. 18, 2019).

58 Diana Containerships, Annual Report (Form 20-F), at 50 (Apr. 10, 2020).

59 Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Mar. 27, 2020) (Press Release).

Shares for their exercise price of $1000 each.[60] With that purchase, Kalani no longer retained any B-1 or B-2 Convertible Preferred Shares.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

95. In furtherance of their scheme, Defendants made numerous materially false and misleading statements and omissions, including the following, without limitation: (i) that the SPA contained all of Diana's and Kalani's commitments to each other in relation to their PIPEs transaction, hiding the terms of their Undisclosed Agreement; (ii) that Diana intended to use the proceeds from its sales of securities to Kalani "for general corporate purposes and/or to repay indebtedness" when, in fact, Diana intended to siphon the vast majority of the proceeds from the Company for the benefit of the other Diana and Palios-related companies, family members, and other Diana insiders; (iii) that the reverse stock splits were in the "best interests" of Diana and its shareholders and intended to "increase the per share trading value of [Diana common stock]" and maintain its Nasdaq listing when, in fact, the stock splits formed part of Defendants' Undisclosed Agreement to manipulate the price of Diana common stock in a manner that would necessarily destroy shareholder value; and (iv) that Diana and Kalani intended to adhere to the SPA's restriction upon Kalani's right to convert its preferred stock into common stock on days on which trading volume in Diana exceeded 15 million when, in fact, they had no such intention.

### Failure to Disclose the Undisclosed Agreement in the Registration Statement or upon the Announcement of the SPA

96. As noted above, Diana and Kalani reached their Undisclosed Agreement in 2016. Under this Agreement: a) Diana would grant Kalani favorable warrants for virtually no consideration that could be converted into Diana common stock at a discount thereby obtaining

60 Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Apr. 8, 2020) (Press Release).

millions of dollars in capital that could be diverted to insiders and related companies; and b) in return, Diana would manipulate its stock price by conducting reverse stock splits every time the value of its common stock dropped below the warrants' floor price to enable Kalani to profitably convert and sell those warrants and/or use them to cover its naked short sales of Diana common stock it had conducted before it was deemed to own the shares in violation of Regulation SHO. The Undisclosed Agreement had no economic benefit to (and in no way could have benefited) Diana's shareholders and was completely out of keeping with ordinary corporate behavior, and, thus, was a material fact that was required to be disclosed to shareholders. Despite this, the Undisclosed Agreement was never disclosed to shareholders in the Shelf Registration Statement, Prospectus Supplements, the March 21, 2017 Form 6-K announcing the execution of the SPA, or the B-2 Registration Statement.

97. On January 26, 2017, the Company filed the Shelf Registration Statement, which was signed by Defendant Palios, amongst others. The Shelf Registration Statement failed to disclose the existence of the Undisclosed Agreement, instead noting only that "[w]e ***may*** issue additional common shares or other equity securities of equal or senior rank in the future." [Emphasis added]. The Shelf Registration Statement also included certain boilerplate disclosures about the potential impact of purportedly hypothetical future share issuances, including that, *inter alia*, "our existing shareholders' proportionate ownership interest in us will decrease; . . . the relative voting strength of each previously outstanding common share ***may*** be diminished; and the market price of our common shares ***may*** decline." [Emphasis added].

98. These misstatements were repeated in the Diana Form 20-F filed on February 16, 2017, which Defendants Michalopoulos and Palios signed (the "2016 Annual Report"). The report stated:

> We ***may*** offer and sell such securities from time to time and through one or more methods of distribution, subject to market conditions and our capital needs. The market price of our common stock ***could*** decline from its current levels due to sales of a large number of shares in the market, ***including sales of shares by our large shareholders, our issuance of additional shares, or securities convertible into our common stock*** or the perception that these sales could occur.[61]

99. The statements in ¶¶97 and 98 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because at the time of these statements, Defendants were adhering to the Undisclosed Agreement, which entailed both the issuance of securities to Kalani, and their subsequent sale in a manner that would necessarily depress Diana's share value.

100. In failing to disclose the existence of the Undisclosed Agreement and its likely impact, the Registration Statement and the 2016 Annual Report also omitted known trends or demands required to be disclosed under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(1) ("Item 303") and a significant risk factor required to be disclosed under Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105").

101. On March 21, 2017, Diana filed with the SEC a Form 6-K ("3/21/17 6-K"), announcing the SPA, which it annexed as Exhibit 10.1 to the 3/21/17 6-K. *See* Exhibit C. The SPA was executed by Defendant Palios on behalf of Diana and by John Gordon, a Kalani director, on behalf of Kalani.

102. Neither the 3/21/17 6-K, nor its annexures, disclosed the existence of the Undisclosed Agreement. In fact, the SPA positively misrepresented that no such agreement or understanding existed, stating: "The Company does not have any agreement or understanding with any Buyer with respect to the transactions contemplated by the Transaction Documents other than

---

[61] Diana Containerships, Annual Report (Form 20-F), at 33 (Feb. 16, 2017).

as specified in the Transaction Documents."[62] The SPA doubled down on this assertion, claiming that Diana was not aware of any attempt to manipulate its common stock and that it had not provided Kalani with any material non-public information, stating, in pertinent part:

> Neither the Company nor any of its Subsidiaries has, and, to the knowledge of the Company, no Person acting on their behalf has, directly or indirectly, (i) taken any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company or any of its Subsidiaries to facilitate the sale or resale of any of the Securities. . . .
>
> . . .
>
> The Company confirms that neither it nor any other Person acting on its behalf has provided any of the Buyers or their agents or counsel with any information that constitutes or could reasonably be expected to constitute material, nonpublic information concerning the Company or any of its Subsidiaries, other than the existence of the transactions contemplated by this Agreement and the other Transaction Documents.

103. The statements in ¶102 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because, *inter alia*: (i) Kalani and Diana had already concluded the Undisclosed Agreement and intended to implement it for the benefit of themselves at the expense of Diana's shareholders; and (ii) the existence of the Undisclosed Agreement was material, non-public information, concerning Diana.

104. In the SPA, Kalani represented and warranted that, *inter alia*:

> <u>No Public Sale or Distribution</u>. Such Buyer (i) is acquiring its [B–2] Warrants, (ii) upon exercise of its [B-2] Warrants will acquire the [B-2] Preferred Shares issuable upon exercise thereof, and (iii) upon exercise of its [B-2] Preferred Shares will acquire the [B-2] Conversion Shares issuable upon conversion thereof, in each case, for its own account and not with a view towards, or for resale in connection with, the public sale or distribution thereof in violation of applicable securities laws, except pursuant to sales registered or exempted under the 1933 Act[.]

---

62 *See also* the Entire Agreement clause at section 9(e) of the SPA, which makes similar misstatements as to the SPA containing the entirety of Diana's and Kalani's understanding in relation to the securities issuance documented in the SPA. Diana Containerships, Report of Foreign Private Issuer (Form 6-K) (Mar. 21, 2017) (Ex. 4.1).

105. The statement in ¶104 was materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because Defendants already knew and intended that Kalani would immediately convert and sell the securities granted to it under the SPA pursuant to the Undisclosed Agreement in breach of applicable securities laws governing manipulative trading and use of material non-public information.

106. On March 21, 2017, Diana filed with the SEC a Form 424B5 prospectus supplement to the Registration Statement (the "B-1 Prospectus Supplement") for the issuance and sale of 3,000 Series B-1 Convertible Shares, common stock underlying the B-1 Convertible Shares, and the B-1 Warrants. The B-1 Prospectus Supplement, which incorporated the Shelf Registration Statement, again failed to disclose the existence or terms of the Undisclosed Agreement. Moreover, it misrepresented Diana's intended use of the proceeds from the SPA, noting: "We intend to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay indebtedness under one or more of its existing credit facilities, although we have no present agreements to do so."

107. Diana made an identical claim as to the use of the proceeds from the B-2 Warrants in its March 22, 2017 Form 6-K, noting "[t]he Company intends to use the net proceeds from the sale of the offered securities for general corporate purposes and/or to repay indebtedness under one or more of our existing credit facilities, although the Company has no present agreements to do so." The press release also stated that, "[a]part from the transaction described in this press release, the Company is not aware of any other news that would result in the increased trading activity of its stock or a fluctuation of its stock price."

108. On March 24, 2017, Diana filed with the SEC the B-2 Registration Statement, which was signed by Defendant Palios, among others, to register the 140,500 Series B-2 Shares

issuable upon Kalani's exercise of the B-2 Warrants sold to it under the SPA. The B-2 Registration Statement, like the B-1 Prospectus Supplement and the Registration Statement, provided boilerplate risk disclosures that share dilution and share-price depreciation "may" occur if new securities were issued by Diana, but omitted to disclose the Undisclosed Agreement.

109. Again, the B-2 Registration Statement stated: "We intend to use the proceeds from the exercise of the Series B-2 Preferred Warrants for general corporate purposes and/or to repay indebtedness under one or more of its existing credit facilities, although we have no present agreements to do so."

110. The statements in ¶¶106 to 109 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because: (i) Kalani and Diana had already concluded the Undisclosed Agreement and intended to implement it for the benefit of themselves at the expense of Diana's shareholders; and (ii) the sums received from Kalani were to be used to benefit Defendant Palios and his related companies and family members and to otherwise funnel money to Company insiders. These facts also needed to be disclosed under Items 303 and 105 for the reasons stated in ¶100 above.

**<u>Failure to Disclose Purpose of Reverse Stock Splits</u>**

111. On March 29, 2017, Diana Containerships filed with the SEC a Form 6-K regarding the Notice of the Annual Meeting of Shareholders. The notice stated that the meeting would be held on May 10, 2017. Among other things, the Notice advised that shareholders would be asked to vote on a proposal to approve an amendment to Diana's Articles of Incorporation to allow up to 1,000-for-one share reverse splits in the aggregate. The Form 6-K stated that the "purpose of a reverse stock split is to increase the per share trading value of the Company's Common Shares" and "maintain compliance with [Nasdaq's] minimum bid price." It further assured investors that

Diana's "Board intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders."

112. These statements were materially false and misleading when made because, as Defendants knew but failed to disclose, or were reckless in not knowing, the true purpose of the proposal was to enable Diana to comply with its obligations under the Undisclosed Agreement to procure further reverse stocks whenever the price of its common stock fell below the exercise price of Kalani's B-1 and B-2 Convertible Shares.

113. On May 12, 2017, Diana filed with the SEC a Form 6-K, stating that its annual shareholder meeting originally scheduled for May 10, 2017, had been adjourned until May 19, 2017, "to allow additional time for the solicitation of proxies[.]" Diana disclosed the following concerning reverse stock splits, without limitation:

> 3. To approve one or more amendments to the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued common stock, each at a ratio of not less than one-for-two and not more than one-for-100 and in the aggregate at a ratio of not more than one-for-1,000, ***with the exact ratio to be set at a whole number within this range to be determined by the Company's board of directors in its discretion***, and to authorize the Company's board of directors to implement any such reverse stock split at any time prior to the date of the Company's 2019 Annual Meeting of Shareholders by filing an amendment to the Company's Amended and Restated Articles of Incorporation ("Proposal Three")[.] [Emphasis added].

(the "Reverse Stock Split Proposal Description").

114. On May 24, 2017, the Company filed a report on Form 6-K, stating that the Company's proxy proposal to allow for additional reverse splits was again adjourned until May 30, 2017, "to allow additional time for the solicitation of proxies." The Form 6-K repeated the

Reverse Stock Split Proposal Description that appeared in the May 12, 2017 6-K (and which is extracted at ¶107).

115. The failure to disclose that the Reverse Stock Split Proposal formed part of the Undisclosed Agreement rendered the statements in ¶¶113 and 114 materially false and misleading. Moreover, the Diana Defendants knew, but failed to disclose, that the shareholder meeting was being adjourned because the Diana Defendants planned to wrest voting control from shareholders by issuing DSI the Series C Preferred Stock.

116. On June 6, 2017, Diana filed with the SEC a Form 6-K, stating that the Company issued all 100 shares of newly designated Series C Preferred Stock (the "Series C Preferred Shares") to Diana's sister company DSI, which was effectively controlled by Defendant Palios and his affiliates. Each Series C Share entitled the holder thereof to up to 250,000 votes, which would be voted alongside the common shares. Although DSI's voting power was capped at 49%, because of Defendant Palios' independent ownership of Diana common stock,[63] this financial maneuver effectively gave him voting control of the Company with minimal exposure to the downside risks facing the Company's outside common shareholders. In sum, while Diana represented that it had adjourned the regularly scheduled shareholder meeting to provide time to solicit additional proxies for the reverse split proposal, in truth it had simply done so in order to allow Defendant Palios and his associates time to obtain voting control of the Company, so as to ensure the outcome of the vote to approve the Reverse Stock Split Proposal, thereby enabling Diana to meet its obligations to Kalani under the Undisclosed Agreement.

[63] On information and belief, Plaintiffs believe that, like DSI, Palios did not dispose of his 4.5% stake in Diana until after the passage of the Reverse Stock Split Proposal.

117. Indeed, on June 6, 2017, Diana filed with the SEC a Form 6-K ("6/6/17 6-K"). Attached to this was Exhibit ("Ex.") 99.1, the Notice of Annual Meeting of Shareholders and Proxy Statement of the Company, which was mailed to shareholders of the Company on or around June 5, 2017, which Defendant Palios signed. In the 6/6/17 6-K, Ex. 99.1, Diana disclosed that at the Annual Meeting of Shareholders to be held on June 29, 2017, holders of shares of the Company's common stock and Series C Preferred Shares would consider and vote on the Reverse Stock Split Proposal (which it described using the Reverse Stock Split Proposal Description extracted in ¶113 above).

118. In the 6/6/17 6-K, Ex. 99.1, Diana also disclosed the following about the proposal concerning the reverse stock splits, without limitation:

> The Board has approved and is hereby soliciting shareholder approval of one or more amendments to Section D of the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued Common Shares at a ratio of not less than one-for-two and not more than one-for-100 individually and of not more than one-for-1,000 in the aggregate (each, an "Amendment"). A vote FOR Proposal Three will constitute approval of one or more Amendments providing for the combination of any number of the Company's issued Common Shares between and including two and 100 into one Common Share and will grant the Board the authority to select which of the approved exchange ratios within that range will be implemented. ***If the shareholders approve this proposal, the Board will have the authority, but not the obligation, in its sole discretion, and without further action on the part of the shareholders, to select, for each reverse stock split, one of the approved reverse stock split ratios*** and to effect one or more approved reverse stock splits by filing an Amendment with the Registrar of Corporations of the Republic of the Marshall Islands for each reverse stock split at any time after the approval of such Amendment.
>
> * * *
>
> ***The Board believes that shareholder approval of an exchange ratio range (rather than an exact exchange ratio) provides the Board with maximum flexibility to achieve the purposes of one or more reverse stock splits. If shareholders approve Proposal Three, a reverse stock split will be effected, if at all, only upon a determination by the Board that the reverse stock split is in the Company's and the shareholders' best interests at that time.*** In connection with any

determination to effect a reverse stock split, the Board will set the time for such a split and select a specific exchange ratio within the range. ***These determinations will be made by the Board with the intention to create the greatest marketability of the Company's Common Shares based upon prevailing market conditions at that time.***

***The Board reserves its right to elect not to proceed, and abandon, a reverse stock split if it determines, in its sole discretion, that implementing this proposal is not in the best interests of the Company and its shareholders.***

* * *

**Purpose and Background of One or More Reverse Stock Splits**

The purpose of a reverse stock split is to increase the per share trading value of the Company's Common Shares. ***The Board intends to effect one or more reverse stock splits only if it believes that a decrease in the number of Common Shares outstanding is likely to improve the trading price for the Company's Common Shares, and only if the implementation of a reverse stock split is determined by the Board to be in the best interests of the Company and its shareholders.***

The NASDAQ Global Select Market has several listing criteria that companies must satisfy in order to maintain their listing, including that the Company's Common Shares maintain a minimum bid price that is greater than or equal to $1.00 per share. The Company believes that effecting one or more reverse stock splits will help it maintain (or, as applicable, regain) compliance with the minimum bid price per share listing requirement for listing its Common Shares on the NASDAQ Global Select Market.

In addition, the Company believes that a number of institutional investors and investment funds are reluctant to invest, and in some cases may be prohibited from investing, in lower-priced stocks and that brokerage firms are reluctant to recommend lower-priced stocks to their clients. ***By effecting one or more reverse stock splits, the Company believes it may be able to raise its Common Share price to a level where its Common Shares could be viewed more favorably by potential investors.***

Other investors may also be dissuaded from purchasing lower-priced stocks because the brokerage commissions, as a percentage of the total transaction, tend to be higher for lower-priced stocks. A higher stock price after a reverse stock split could alleviate this concern.

The combination of continuing to be listed on the NASDAQ Global Select Market and the lower transaction costs and increased interest from institutional investors and investment funds could have the effect of improving the trading liquidity of the Company's Common Shares. [Emphasis added].

119. The statements in ¶118 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, as Defendants knew but failed to disclose, or were reckless in not knowing, *inter alia*: (i) that the purpose of the proposal was to enable Diana to comply with its obligations under the Undisclosed Agreement to procure further reverse stocks whenever the price of its common stock fell below the exercise price of Kalani's B-1 and B-2 Convertible Shares; (ii) that in adhering to the Undisclosed Agreement, Diana and its board were not acting in the "best interests" of the shareholders; and (iii) that the impact of Diana's adherence would render Diana's delisting from the Nasdaq Global Select Market more, rather than less, likely.

120. On June 29, 2017, Defendant Palios and his affiliates used their newly-obtained voting control of the Company to approve the "reverse stock split" shareholder proposal. On June 30, 2017, Diana filed with the SEC a Form 6-K, disclosing the results of the continued annual shareholders meeting on June 29, 2017. Diana disclosed the following about the approved and adopted proposal about the reverse stock splits, without limitation:

> The approval of one or more amendments to the Company's Amended and Restated Articles of Incorporation to effect one or more reverse stock splits of the Company's issued common stock, each at a ratio of not less than one-for-two and not more than one-for-100 and in the aggregate at a ratio of not more than one-for-1,000, ***with the exact ratio to be set at a whole number within this range to be determined by the Company's board of directors in its discretion***, and to authorize the Company's board of directors to implement any such reverse stock split at any time prior to the date of the Company's 2019 Annual Meeting of Shareholders by filing an amendment to the Company's Amended and Restated Articles of Incorporation. [Emphasis added].

121. The statements in ¶120 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, because at the time of these statements, Diana and Palios intended to execute reverse stock splits whenever the price of Diana common stock fell below the exercise price of Kalani's B-1 and B-2 Convertible Shares.

**Misstatement as to Intent to Adhere to the Volume Restriction**

122. By its 3/21/17 6-K, which annexed the SPA and associated exhibits, Diana and Kalani represented that Kalani could only request the conversion of its B-1 and B-2 Convertible Shares into Diana common stock on days on which "the trading volume (as reported on Bloomberg) in the Company's Common Stock on the Principal Market is not less than 15,000,000 shares of Common Stock" (the "Volume Restriction").[64] The existence of, and Diana's intent to adhere to, the Volume Restriction, was positively affirmed in the Form-424B5 B-1 Prospectus Supplement (Kalani could convert "provided that on the date of conversion the trading volume of our common shares on The Nasdaq Global Select Market is not less than 15,000,000 shares") and the B-2 Registration Statement (same).

123. The statements in ¶122 were materially false and misleading and/or failed to disclose material adverse information, which was required to be disclosed, as Defendants knew but failed to disclose, or were reckless in not knowing, *inter alia*, that: (a) the Volume Restriction was unlikely to be satisfied with any regularity; and (b) neither party intended to adhere to the Volume Restriction, and intended instead to allow Kalani to request the conversion of its B-1 and B-2 Convertible Shares into Diana common stock on any day, regardless of the trading volume of Diana's shares.

124. This intent can be inferred from the fact that, as detailed above, Kalani was able to convert its preferred stock across the remainder of 2017 after the execution of the SPA, notwithstanding that Bloomberg only reported three trading days on which the Volume Restriction was met, only one of which was within the Class Period: July 25, 2017. *See* Exhibit G. Moreover, the Defendants' stated intent to honor the Volume Restriction was rendered false by the

64 *See* Exhibits E and F.

Undisclosed Agreement. Defendants' intent to ignore the Volume Restriction can also be inferred from the fact that the average trading volume of Diana common stock across the first three months of 2017 up to the execution of the SPA, as reported to Bloomberg, was approximately 750,000 per day, well below the 15 million threshold established by the Volume Restriction.

## LOSS CAUSATION/MATERIALIZATION OF THE RISK

125. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

126. Throughout the Class Period, the price of Diana common stock was artificially inflated and/or maintained at an artificially high level as a result of Defendants' fraudulent scheme to manipulate Diana's stock price for the purpose of diverting Company assets and/or profits from sales of Diana securities to Defendants at the expense of investors and as a result of Defendants' materially false and misleading statements and omissions identified herein.

127. As the true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Diana common stock declined as the artificial inflation was removed from the market price of the stock, causing damage to Plaintiffs and members of the Class.

128. The risks of Defendants' fraudulent Undisclosed Agreement began to materialize following Diana's March 21, 2017, announcement that the Company entered into the SPA. Subsequently, as Defendants planned, the Kalani Defendants began converting these securities into common shares and dumping them on the secondary market, driving the price of Diana common stock down and extracting value from shareholders.

129. As detailed above, each time Diana's share price declined below the $0.50 floor price, and Kalani could no longer profitably convert its preferred stock into Diana common stock,

Diana announced and procured further reverse stock splits. These stock splits facilitated Kalani's further conversion of the securities granted to it under the SPA for onward sale or to cover its naked short sales, further depressing the price of Diana's stock, thereby allowing the risks of Defendants' fraudulent Undisclosed Agreement and false statements to continue to materialize. Further, as also noted above, while the reverse stock splits temporarily increased the share price of Diana common stock, these increases never offset, even temporarily, the loss in value to shareholders from having their shares merged. Consequently, on the day of each reverse stock split, the price of Diana's shares actually declined on a split adjusted basis.

130. By October 3, 2017, as a result of Defendants' ongoing fraudulent and manipulative conduct, the price of Diana common stock had declined to close at $0.47 per share. On a split adjusted basis, taking into account the stock splits, the price of Diana stock had declined to approximately $0.0004688 since June 9, 2016, a decline of over 99.98%.

131. This shocking erosion in shareholder value was the direct result of Defendants' adherence to their fraudulent Undisclosed Agreement, which manipulated the price of Diana common stock and induced purchases through the series of dilutive and manipulative stock offerings and reverse stock splits detailed herein.

132. While reverse stock splits are not inherently manipulative, Defendants rendered those conducted by Diana in this case as manipulative through their failure to disclose that the splits were being conducted pursuant to the Undisclosed Agreement, which required Diana to execute reverse stock splits each time the price of its common stock fell below the SPA's $0.50 price floor. This omission, as well as the positive misrepresentations detailed above, sent a false price signal to the market, namely that: (a) the price floor within the SPA placed a restriction on Kalani's ability to convert its preferred stock should its prior conversions result in a decline in

Diana's stock price; and (b) the value of Diana's stock should rise in relative proportion to the ratios of the reverse stock splits deployed.

133. Had Defendants, prior to the reverse stock splits, disclosed the Undisclosed Agreement and their shared intent to embark upon a course of conduct that would render Diana common stock completely worthless, the market would have valued the shares as such and no amount of reverse stock splits would have changed that (as any multiple of zero is zero).

134. As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of the Diana securities, which are now virtually worthless, Plaintiffs and other Class members have suffered significant losses and damages.

**NO SAFE HARBOR**

135. Diana's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the "Safe Harbor" has no applicability.

136. The defendants are also liable for any false or misleading FLSs pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Diana who knew that the FLS was false. In addition, the FLSs were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

137. At all relevant times throughout the Class Period, Defendants knew and/or recklessly disregarded, *inter alia*, the existence of the Undisclosed Agreement and Diana and Kalani's implementation of the same. In addition to the allegations set forth herein, each of the following demonstrates Defendants' scienter.

**Coordination of Transactions by Defendants**

138. At all relevant times, Defendants had direct access to information concerning Diana's business, operations, and finances. Through his ownership and/or control of Diana and numerous related parties, Defendant Palios also exerted his influence over the Company's Board to perpetuate the fraudulent Undisclosed Agreement described herein.

139. As noted in ¶¶72 to 84 above, the timing and sequence of the common stock conversions and sales, and reverse stock splits, are highly suspicious and indicative of a coordinated and pre-planned effort among Defendants to manipulate Diana's stock price and deceive investors.

140. The five reverse stock splits conducted after the SPA's execution were all perfectly timed to coincide with: (i) the drop in Diana common stock price below the $0.50 price floor; and (ii) Kalani's continued conversion of its preferred stock into common shares, thereby enabling Kalani to continually sell its common shares into an artificially-inflated market. While Diana's disclosures do not permit the identification of the exact dates on which Kalani requested the conversion of its preferred stock to common shares, as noted in ¶57 above, Diana's disclosures do confirm that Kalani was given advance notice of at least the July 27, 2017, reverse stock split.

**Defendants Personally Benefited from Their Fraud**

141. As noted in ¶¶85 to 91 above, Defendant Palios, entities he owns and/or controls, and other related parties derived substantial profits from Diana's adherence to its Undisclosed Agreement with Kalani, while preserving Palios' position of power and control over Diana both during and after the Class Period. In particular, Palios profited as a result of his control over DSI, which was Diana's largest shareholder, as well as a substantial creditor. Utilizing his power and influence, Palios caused Diana to issue DSI preferred stock with "super-voting" rights, which enabled him to secure voting control over Diana and approve the Reverse Stock Split Proposal authorizing the reverse stock splits that were critical to the Defendants' scheme. At the same time, Palios engineered a profitable exit of DSI's holdings of Diana common stock, waiting to liquidate over 90% of DSI's interest in open-market transactions between July 7 and July 14, 2017 – immediately after Diana's reverse stock split took effect on July 5, 2017, and while the Company's stock price remained inflated. With direct knowledge of the impending volatility and dilution of Diana common stock, Palios insulated DSI (and himself) from common stock price declines, while retaining voting control of Diana through ownership of the "super-voting" rights preferred shares.

142. Kalani has also profited as a direct result of its knowledge and participation in Defendants' fraud, earning millions of dollars through its sales of discounted common stock.

**Kalani Profited from Similar Schemes Executed at the Same Time with Other Companies**

143. As noted above, this is not the first time that Kalani has been involved in a manipulative and deceptive financing scheme. Kalani executed nearly identical schemes with two other Greek shipping companies – DryShips Inc. and Top Ships – alongside its Undisclosed Agreement with Diana.

144. As noted above in ¶¶72 to 84, this pattern of behavior suggests that the repeated use of reverse stock splits in the manner described herein formed part of the Undisclosed Agreements between Kalani and Diana, DryShips, and Top Ships, respectively.

145. On August 31, 2017, DryShips disclosed that the company received a subpoena from the SEC seeking information related to its offerings to Kalani. Top Ships disclosed that it had received a similar subpoena from the SEC on August 1, 2017. Top Ships received additional subpoenas on September 26, 2018 and on October 5, 2018. To date, the SEC investigation resulted in the August 17, 2021 Cease-and-Desist Order against Murchinson and Bistricer.

146. Based on information and belief, both investigations remain ongoing and further charges are possible

## CLASS ACTION ALLEGATIONS

147. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Diana common stock during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

148. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Diana securities were actively traded on the Nasdaq. While the exact number of Class members is unknown to Plaintiffs at this time, and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Stock owners and other members of the Class may be identified from records maintained by Diana or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

149. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

150. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

151. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Diana;
- whether Palios caused Diana to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Diana securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages; and
- whether Defendants' manipulative conduct negatively impacted the price of Diana stock.

152. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

153. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Diana securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the Nasdaq and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased or acquired Diana common stock without knowledge of the omitted or misrepresented facts.

154. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

155. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

156. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

157. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5(a), (b), and (c), promulgated thereunder by the SEC.

158. During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period did: (a) deceive the investing public, including Plaintiffs and the Class, as alleged herein; and (b) cause Plaintiffs and other members of the Class to purchase Diana common stock at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants made the false statements alleged herein.

159. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made, or participated in the making of, untrue statements of material facts and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct which operated as a fraud and deceit upon the purchasers of Diana common stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct alleged herein.

160. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal the adverse material information as specified herein.

161. Defendants' liability arises from the fact that they developed and engaged in a scheme to manipulate the price of Diana common stock, and were privy to, participated in, and were otherwise aware of the dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

162. Defendants had actual knowledge of the misrepresentations, omissions, and deceptive conduct alleged herein, or acted with reckless disregard for the truth. Defendants' acts were done for the purpose and effect of concealing the scheme alleged herein from the investing public, and manipulating the price of Diana common stock.

163. By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

164. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases of Diana common stock during the Class Period.

## COUNT II

### VIOLATION OF SECTION 9 OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS

165. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

166. Defendants violated §9 of the Exchange Act in that they conspired to engage, and did engage, in a deceptive financing scheme to manipulate the price of Diana common stock and induce the purchase of Diana common stock by others, in violation of Section 9(a)(2) of the Exchange Act.

167. Further, to induce the purchase of Diana common stock, through their dissemination of false statements during the Class Period, Defendants misled investors concerning

the nature of their actions and its effect on Diana common stock in violation of Section 9(a)(4) of the Exchange Act.

168. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and members of the Class suffered damages in connection with their respective purchases and sales of Diana common stock during the Class Period.

## COUNT III

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST PALIOS

169. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

170. During the Class Period, Defendant Palios participated in the operation and management of Diana, and conducted and participated, directly and indirectly, in the conduct of Diana's business affairs. Because of his senior positions, he knew the adverse non-public information about Diana alleged herein.

171. As an officer and director of a publicly-owned company, Palios had a duty to disseminate accurate and truthful information with respect to Diana, and to correct promptly any public statements issued by Diana which had become materially false or misleading.

172. Because of his position of control and authority as a senior officer, Palios was able to, and did, control the contents of the various reports, press releases, and public filings, which Diana disseminated in the marketplace during the Class Period. Throughout the Class Period, Palios exercised his power and authority to cause Diana to engage in the wrongful acts complained of herein. Palios, therefore, was a "controlling persons" of Diana within the meaning of Section 20(a) of the Exchange Act. In this capacity, he participated in the unlawful conduct alleged, which artificially inflated the market price of Diana common stock.

173. By reason of his senior management positions and being a director of Diana, Palios had the power to direct the actions of, and exercised the same to cause, Diana to engage in the unlawful acts and conduct complained of herein. Palios exercised control over the general operations of Diana and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

174. By reason of the above conduct, Palios is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Diana.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: October 1, 2021

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*/s/* Deborah Clark Weintraub
Deborah Clark-Weintraub
Thomas L. Laughlin, IV
Patrick McGahan
Jeffrey P. Jacobson
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169

Telephone: (212) 223-6444
Facsimile: (212) 223-6334
dweintraub@scott-scott.com
tlaughlin@scott-scott.com
jjacobson@scott-scott.com

**POMERANTZ LLP**
Jeremy A. Lieberman
Cara David
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
cdavid@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Lead Plaintiffs*